UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL BOARDLEY,
11532 Quay St. NW, Coon Rapids,
MN 55433

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF THE
INTERIOR; NATIONAL PARK SERVICE;
DIRK KEMPTHORNE, Secretary of the U.S.
Department of Interior, in his official and
individual capacities; MARY BOMAR,
Director of the National Park Service, in her
official and individual capacities, ERNIE
QUINTANA, Midwestern Regional Director
of the National Park Service, in his official and
individual capacities; GERARD BAKER,
Superintendent of Mt. Rushmore National
Monument, in his official and individual
capacities; MIKE PFLAUM, Chief Ranger of
Mt. Rushmore National Monument, in his
official and individual capacities,

      Defendants.

Cl

Case: 1:07-cv-01986
Assigned To : Robertson, James
Assign. Date : 11/2/2007
Description: TRO/PI

## APPLICATION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.   STATEMENT OF FACTS ................................................................................... 1

II.  ARGUMENT ........................................................................................................ 7

  A.   THERE IS A SUBSTANTIAL LIKELIHOOD THAT PLAINTIFF WILL
       SUCCEED ON THE MERITS OF HIS CLAIMS. ................................................ 8

     1.   Defendants' Regulations Violate Plaintiff's First Amendment Rights ........ 8

        a.   Plaintiff's speech is constitutionally protected. ............................... 8

        b.   National Park lands, such as the Mt. Rushmore viewing area,
             are public fora. ............................................................................... 8

        c.   36  C.F.R.  §§3.51-3.52  and  Defendants'  denial  of  Mr.
             Boardley's permit are unconstitutional prior restraints. ............... 10

           i.    Defendants' regulations grant unfettered discretion to
                 park officials to grant or deny permission for expressive
                 activities. ........................................................................... 11

           ii.   Defendants' regulations are facially content-neutral, but
                 allow park officials to apply them based on the content
                 of the speech at issue. ........................................................ 15

           iii.  Defendants' regulations and denial of Mr. Boardley's
                 permit are not narrowly tailored. ....................................... 15

           iv.   Defendants' regulations and denial of Mr. Boardley's
                 permit  leave  open  no  alternative  channel  of
                 communication. ................................................................... 19

     2.   Defendants' Regulations Violate Plaintiff's Fifth Amendment Rights. .... 20

  B.   PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF AN INJUNCTION
       IS NOT GRANTED. ............................................................................................. 21

  C.   AN  INJUNCTION  WILL  NOT  SUBSTANTIALLY  INJURE  THE
       DEFENDANTS. .................................................................................................... 22

  D.   AN INJUNCTION WILL FURTHER THE PUBLIC INTEREST. ...................... 22

III. CONCLUSION ................................................................................................... 23

## TABLE OF AUTHORITIES

### Cases

*American-Arab Anti-Discrimination Comm. v. City of Dearborn,*
    418 F.3d 600 (6th Cir. 2005) ............................................................................... 16, 19

*Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221 (1987) ................................................ 15

*Bantam Books v. Sullivan,* 372 U.S. 58 (1963) ............................................................................ 10

*\*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569 (1987) .................................. 18, 19

*Boos v. Barry,* 485 U.S. 312 (1988) ................................................................................................ 9

*City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750 (1988) ..................................... 11

*CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738 (D.C. Cir. 1995) ......................... 7

*Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288 (1984) ............................................. 9, 15

*\*Cmty. For Creative Non-Violence v. Turner,* 893 F.2d 1387 (D.C. Cir. 1990) .............. 16, 17, 19

*Connally v. Gen. Constr. Co.,* 269 U.S. 385 (1926) ..................................................................... 20

*Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788 (1985) ................................. 8

*Cox v. Charleston,* 250 F. Supp. 2d 582 (D.S.C. 2003) ......................................................... 16, 17

*Douglas v. Brownell,* 88 F.3d 1511 (8th Cir. 1996) ................................................................ 16, 17

*Elrod v. Burns,* 427 U.S. 347 (1976) ........................................................................................... 21

*Fernandes v. Limmer,* 663 F.2d 619 (5th Cir. 1981) ................................................................... 14

*\*Forsyth County v. Nationalist Movement,* 505 U.S. 123 (1992) ..................................... 10, 11, 15

*Frisby v. Schultz,* 487 U.S. 474 (1988) ........................................................................................ 16

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ...................................................................... 20

*\*Grossman v. City of Portland,* 33 F.3d 1200 (9th Cir. 1994) ................................................ 10, 16

*Hague v. CIO,* 307 U.S. 496 (1939) ............................................................................................... 9

*\*Henderson v. Lujan,* 964 F.2d 1179 (D.C. Cir. 1992) ...................................................... 9, 10, 18

*Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610 (1976) .................................. 20

*Knowles v. City of Waco*, 462 F.3d 430 (5th Cir. 2006) .................................. 16

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .......................................... 18

*NAACP v. Button*, 371 U.S. 415 (1963) .......................................................................... 20

*\*Naturist Soc'y Inc. v. Fillyaw*, 858 F.Supp. 1559 (S.D. Fla. 1994) ............................ 13

*Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515 (11th Cir. 1992) ..................................... 9

*Nebraska Press Ass'n v. Stuart,* 427 U.S. 539 (1975) ..................................................... 10

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ........................ 8

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) .......................................................................... 15

*Schneider v. State of New Jersey*, 308 U.S. 147 (1939) ...................................................... 8

*Serono Labs, Inc. v. Shalala*, 158 F.3d 1313 (D.C.Cir.1998) ............................................ 7

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) .................................... 11, 14

*United States v. Baugh,* 187 F.3d 1037 (9th Cir. 1999) ...................................................... 9

*\*United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000) ...................................... 9, 12

*United States v. Grace*, 461 U.S. 171 (1983) ............................................................ 8, 9, 22

*United States v. Kokinda*, 497 U.S. 720 (1990) ................................................................ 18

*\*United States v. Rainbow Family*, 695 F.Supp. 294 (E.D. Tex. 1988) ......................... 14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ....................................................... 15

*Wash. Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977) ......... 7

### Regulations

*\*36 C.F.R. §§2.51-2.52 (2007) ................................................................................. passim*

*Pursuant to LCvR7(a) counsel has placed asterisks to the left of those cases or authorities on which counsel chiefly relies.

Plaintiff Michael Boardley, by and through counsel, hereby applies to this Court for a preliminary injunction enjoining enforcement of the challenged regulations for the pendency of this litigation. 36 C.F.R. §§2.51-2.52 (2007) are unconstitutional prior restraints on expression in our National Parks, which are traditional public fora. They are so facially overbroad that a permit is required before one can publically wear a T-shirt, button, verbally say something, distribute literature, or engage in any other "public expression of views" in a National Park. The circumstances at issue in this case make the restrictive nature of these regulations all the more ironic, given that they were used by park administrators to restrain Mr. Boardley's protected expression at Mt. Rushmore National Monument, proclaimed by Defendants as "America's Shrine to Democracy."[1] As long as these regulations remain in effect, and as long as Defendants continue to merely ignore Mr. Boardley's requests for a permit, Mr. Boardley continuously suffers irreparable injury, and therefore requires a preliminary injunction to protect his rights. In support of his application, Plaintiff relies on the following points and authorities and his Verified Complaint ("Compl.").

## I.    STATEMENT OF FACTS

Plaintiff Michael Boardley is a resident of Coon Rapids, Minnesota. (Compl. ¶6). He is a professing Christian, and he believes it is his Christian duty and privilege to inform others about the Gospel of Jesus Christ. (Compl. ¶7). Mr. Boardley hands out gospel tracts in public areas because of his sincerely held religious beliefs concerning Christianity. (Compl. ¶8). On August 9, 2007, Mr. Boardley and a few other individuals traveled to Mt. Rushmore to hand out free gospel tracts. (Compl. ¶17). They distributed the tracts beside the "Alley of Flags," an open section with walkways for visitors after visitors gain entrance to the Mt. Rushmore National

---

[1] *See* Mount Rushmore National Memorial (U.S. National Park Service), http://www.nps.gov/moru (last accessed Nov. 1, 2007).

Memorial facility. (Compl. ¶18). Their activities occurred without incident or comment from park officials. (Compl. ¶19).

On August 10, 2007, Mr. Boardley and the other individuals returned to Mt. Rushmore and began to hand out the same gospel tracts near the same spot. (Compl. ¶20). Mr. Boardley was not engaging in any loud, consistent speech or using any amplification. (Compl. ¶¶21-22). Mr. Boardley was distributing the tracts by offering them to passersby, and at no time did he attempt to force his tracts on anyone who did not wish to take one. (Compl. ¶¶23-24). While he was engaged in this activity, Mr. Boardley was approached by Park Ranger L. Hanson. (Compl. ¶25). Ranger Hanson told Mr. Boardley that unless he had a free speech permit for the free speech zone, he would not be allowed to distribute the free gospel tracts. (Compl. ¶26). Ranger Hanson told Mr. Boardley in order to obtain a free speech permit he needed to call a certain phone number—which was available on the Mt. Rushmore website—to request one. But there is a two-day waiting period for free speech permits. (Compl. ¶¶29-30). The free speech zone is a 50 by 30 foot area reserved for expression of free speech and is contained within a section of the Mount Rushmore National Memorial visitor complex, between and near to the visitor parking lots and the main entrance area. (Compl. ¶¶27-28).

After Mr. Boardley returned to Minnesota, he called the ranger's office in order to request a permit, and he left two messages. (Compl. ¶31). A park official returned his call and asked for some information from Mr. Boardley, such as his name and address. (Compl. ¶32). There was no application form given to Mr. Boardley to fill out personally. (Compl. ¶33). The park official said that she would mail a free speech permit to him; however, Mr. Boardley never received a permit or denial of permit. (Compl. ¶¶34-35).

On October 2, 2007, Mr. Boardley called Nancy Marteens at the ranger's office and left a voicemail requesting an additional new permit for a different date. (Compl. ¶36). Ms. Marteens returned his call and told Mr. Boardley to contact Chief Ranger Mike Pflaum regarding a permit. (Compl. ¶37). Ms. Marteens also said she would forward Mr. Boardley's request to Defendant Pflaum. (Compl. ¶38). Mr. Boardley called Defendant Pflaum and requested a permit. (Compl. ¶39). However, to date, he has not received a permit or a denial of permit from Pflaum or any other official regarding his October 2nd request, or his previous requests. (Compl. ¶40).

One of Mr. Boardley's associates, Mark Oehrlein, experienced similar problems obtaining a free speech permit in July of 2006. (Compl. ¶¶44-54). Mr. Oehrlein brought tracts to distribute at no charge at Mt. Rushmore. (Compl. ¶45). He asked a park ranger about doing so, and the park ranger said he needed a permit to distribute tracts. (Compl. ¶46). Mr. Oehrlein went to the office to request a permit and was told by park staff to return later in the day. (Compl. ¶47). He returned at the requested time and was told that they "ran out of permits." (Compl. ¶48).

Mr. Oehrlein called the next morning about his request for a permit and was told by park staff to come back to the office. (Compl. ¶49). He returned to the office the next morning and a park official asked him why he wanted a permit. (Compl. ¶50). Mr. Oehrlein responded that he wanted to distribute tracts about the Gospel and Christianity. (Compl. ¶51). The park official told Mr. Oehrlein that he "didn't like that" and that he would have to speak with Defendant Pflaum. (Compl. ¶52). However, Mr. Oehrlein was told that Defendant Pflaum was at the dentist that day. (Compl. ¶53). Mr. Oehrlein then called the South Dakota Governor's office to complain about the issue, but when he received no meaningful response to his complaint, he gave up trying to obtain a free speech permit. (Compl. ¶54).

Mr. Boardley would like to return to Mt. Rushmore to engage in expressive activities, including distributing gospel tracts, but is prevented from doing so by Defendants' regulations, policies and practices. (Compl. ¶¶41-42).

## Challenged Regulations & Policies

36 C.F.R. §§2.51-2.52 (2007) apply to public expression at all national park lands, including Mt. Rushmore. These regulations often use the same language. (Compl. ¶¶58-59).

### 2.51 Public assemblies, meetings.

(a) Public assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views are allowed within park areas, provided a permit therefore has been issued by the superintendent.

(b) An application for such a permit shall set forth the name of the applicant; the date, time, duration, nature and place of the proposed event; an estimate of the number of persons expected to attend; a statement of equipment and facilities to be used and any other information required by the permit application form.

(c) The superintendent shall, without unreasonable delay, issue a permit on proper application unless:

   (1) A prior application for a permit for the same time and place has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of that particular area; or

   (2) It reasonably appears that the event will present a clear and present danger to the public health or safety; or

   (3) The event is of such nature or duration that it cannot reasonably be accommodated in the particular location applied for, considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities.

(d) If a permit is denied, the applicant shall be so informed in writing, with the reason(s) for the denial set forth.

(e) The superintendent shall designate on a map, that shall be available in the office of the superintendent, the locations available for public assemblies. Locations may be designated as not available only if such activities would:

4

(1) Cause injury or damage to park resources; or

(2) Unreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or commemorative zones; or

(3) Unreasonably interfere with interpretive, visitor service, or other program activities, or with the administrative activities of the National Park Service; or

(4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors; or

(5) Present a clear and present danger to the public health and safety.

(f) The permit may contain such conditions as are reasonably consistent with protection and use of the park area for the purposes for which it is established. It may also contain reasonable limitations on the equipment used and the time and area within which the event is allowed.

(g) No permit shall be issued for a period in excess of 7 days, provided that permits may be extended for like periods, upon a new application, unless another applicant has requested use of the same location and multiple occupancy of that location is not reasonably possible.

(h) It is prohibited for persons engaged in activities covered under this section to obstruct or impede pedestrians or vehicles, or harass park visitors with physical contact.

(i) A permit may be revoked under any of those conditions, as listed in paragraph (c) of this section, that constitute grounds for denial of a permit, or for violation of the terms and conditions of the permit. Such a revocation shall be made in writing, with the reason(s) for revocation clearly set forth, except under emergency circumstances, when an immediate verbal revocation or suspension may be made to be followed by written confirmation within 72 hours.

(j) Violation of the terms and conditions of a permit issued in accordance with this section may result in the suspension or revocation of the permit.

### 36 C.F.R. § 2.52 Sale or distribution of printed matter.

(a) The sale or distribution of printed matter is allowed within park areas, provided that a permit to do so has been issued by the superintendent, and provided further that the printed matter is not solely commercial advertising.

(b) An application for such a permit shall set forth the name of the applicant, the name of the organization (if any), the date, time, duration, and location of the proposed sale or distribution, the number of participants, and any other information required by the permit application form.

(c) The superintendent shall, without unreasonable delay, issue a permit on proper application unless:

> (1) A prior application for a permit for the same time and location has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of the particular area; or

> (2) It reasonably appears that the sale or distribution will present a clear and present danger to the public health and safety; or

> (3) The number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated in the particular location applied for, considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities; or

> (4) The location applied for has not been designated as available for the sale or distribution of printed matter; or

> (5) The activity would constitute a violation of an applicable law or regulation.

(d) If a permit is denied, the applicant shall be so informed in writing, with the reason(s) for the denial set forth.

(e) The superintendent shall designate on a map, which shall be available for inspection in the office of the superintendent, the locations within the park area that are available for the sale or distribution of printed matter. Locations may be designated as not available only if the sale or distribution of printed matter would:

> (1) Cause injury or damage to park resources; or

> (2) Unreasonably impair the atmosphere of the peace and tranquility maintained in wilderness, natural, historic, or commemorative zones; or

> (3) Unreasonably interfere with interpretive, visitor service, or other program activities, or with the administrative activities of the National Park Service; or

> (4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors.

> (5) Present a clear and present damage to the public health and safety.

(f) The permit may contain such conditions as are reasonably consistent with protection and use of the park area for the purposes for which it is established.

(g) No permit shall be issued for a period in excess of 14 consecutive days, provided that permits may be extended for like periods, upon a new application, unless another applicant has requested use of the same location and multiple occupancy of that location is not reasonably possible.

(h) It is prohibited for persons engaged in the sale or distribution of printed matter under this section to obstruct or impede pedestrians or vehicles, harass park visitors with physical contact or persistent demands, misrepresent the purposes or affiliations of those engaged in the sale or distribution, or misrepresent whether the printed matter is available without cost or donation.

(i) A permit may be revoked under any of those conditions, as listed in paragraph (c) of this section, that constitute grounds for denial of a permit, or for violation of the terms and conditions of the permit. Such a revocation shall be made in writing, with the reason(s) for revocation clearly set forth, except under emergency circumstances, when an immediate verbal revocation or suspension may be made, to be followed by written confirmation within 72 hours.

(j) Violation of the terms and conditions of a permit issued in accordance with this section may result in the suspension or revocation of the permit.

## II.    ARGUMENT

When deciding whether to grant a preliminary injunction, the court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998) (citing *Wash. Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). A court must balance these factors, and "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* at 1318 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

Here, there is a substantial likelihood Plaintiff will succeed on the merits, Plaintiff will suffer irreparable injury if the injunction is not granted, and the injunction will further the public

interest. Enjoining the challenged policies will not substantially injure the Defendants. Thus, all of the factors in considering an application for preliminary injunction weigh in the favor of Plaintiff, and an injunction should be issued in this case.

A.    **THERE IS A SUBSTANTIAL LIKELIHOOD THAT PLAINTIFF WILL SUCCEED ON THE MERITS OF HIS CLAIMS.**

1.    **Defendants' Regulations Violate Plaintiff's First Amendment Rights.**

A three-part framework is used to evaluate the constitutionality of a restriction on free speech; first, it must be determined whether or not the speech is protected; second, the nature of the forum where the speech would take place must be identified; third, the government's restriction on the speech must be justified by the requisite standard. *Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 797 (1985).

a.    **Plaintiff's speech is constitutionally protected.**

It is beyond dispute that Plaintiff's desired expression, peacefully handing out gospel tracts to those who wish to take them, is protected by the Constitution. Oral communication and literature distribution are also protected activities and classic forms of speech, and their exercise lies at the very "foundation of free government by free men." *Schneider v. State of New Jersey*, 308 U.S. 147, 160 (1939). Plaintiff's peaceful leafletting activities are clearly protected by the First Amendment. *See United States v. Grace*, 461 U.S. 171, 176 (1983); *Schneider*, 308 U.S. at 160-64 (1939).

b.    **National Park lands, such as the Mt. Rushmore viewing area, are public fora.**

Streets and parks are the quintessential traditional public fora because those areas "'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)

(quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).  Public places historically associated with the free exercise of expressive activities, such as parks, are "considered without more, to be public forums." *Grace*, 461 U.S. at 177.  As such, the government's capacity to limit expressive activities in these areas is severely limited. *Boos v. Barry*, 485 U.S. 312, 318 (1988).

National parks are no exception to this rule, for they too are public fora.  *See United States v. Frandsen*, 212 F.3d 1231, 1237-38, 1238 n.4 (11th Cir. 2000) (noting that the government conceded that national parks are traditional public fora, and that their decision in *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515 (11th Cir. 1992), confirms that national parks are traditional public fora); *see also United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999) (stating that the Presidio, a part of Golden Gate National Recreation Area, was a "quintessential public forum," and analyzing 36 C.F.R. §2.51 in that context).  This circuit has previously analyzed national park property as a traditional public forum. *See Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992) (determining sidewalk part of Vietnam Veterans Memorial was a traditional public forum).  And in *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984), the Supreme Court analyzed restrictions on speech in Lafayette Park, part of a National Historic Landmark District and governed by Defendant National Park Service, under the public forum framework.

Looking more precisely at the area of Mt. Rushmore where Mr. Boardley wishes to engage in expressive activity confirms that it must be analyzed as a traditional public forum.  Mr. Boardley was standing near the "Alley of Flags," an open outdoor area with walkways for visitors after visitors gain entrance to the Mt. Rushmore National Memorial facility.  (Compl. ¶18).  There is nothing that makes this area different than what may be found in any other public park, except for perhaps a view of Mt. Rushmore.  But that alone is not enough to strip the Alley

of Flags and preceding areas of its natural character as what appears to be a traditional public forum. For example, in *Henderson*, this court described the sidewalks abutting the Vietnam Veterans Memorial as "physically indistinguishable from ordinary sidewalks used for the full gamut of urban walking," and found that the sidewalks' "apparent similarity to ones of the classic variety at a minimum put the burden on the government to show that the use was *overwhelmingly specialized*" if it wanted to argue that the sidewalks were not a traditional public forum. *Henderson*, 964 F.2d at 1182 (emphasis added). In other words, if a piece of National Park property looks and feels like a traditional public forum, the burden is on the government to show that there is some specialized use for that particular property that takes it out of that category. There is no such specialized use here, and the public areas of the National Parks, such as the Alley of Flags at Mt. Rushmore, should be considered a traditional public forum for purposes of the First Amendment.

     **c.**    **36 C.F.R. §§3.51-3.52 and Defendants' denial of Mr. Boardley's permit are unconstitutional prior restraints.**

Regulations requiring authorization from a public official before expressive activity may occur in an archetypical public forum are a prior restraint on speech. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Since prior restraints censor speech before it occurs, there is a heavy presumption against their constitutionality. *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963). This heavy presumption is "justified by the fact that 'prior restraints on speech . . .are the most serious and least tolerable infringement on First Amendment rights.'" *Grossman v. City of Portland*, 33 F.3d 1200, 1204 (9th Cir. 1994) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1975)). In fact, in order to survive constitutional scrutiny, a regulation or scheme amounting to a prior restraint must meet several requirements. First, it may not delegate overly broad discretion to a government official. *Forsyth County*, 505 U.S. at 130.

Second, any prior restraint that controls the time, place or manner of speech must not be based on the content of the message. *Id.* (citation omitted). Finally, the regulation must also be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication. *Id.* It is enough that Defendants' regulations and actions fail just one of these requirements to render them unconstitutional; but as discussed below, they fail multiple requirements.

**i.    Defendants' regulations grant unfettered discretion to park officials to grant or deny permission for expressive activities.**

The Supreme Court has consistently condemned regulations on speech which vest discretion in an administrative official to grant or withhold a permit based upon broad criteria unrelated to the proper regulation of public places. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969) (citations omitted). If the permit scheme involves the appraisal of facts, exercise of judgment, and formation of an opinion, the danger of censorship is too great to be permitted. *Forsyth County*, 505 U.S. at 130. Left with only vague or non-existent criteria on which to base their decision, government officials "may decide who may speak and who may not based on the content of the speech or the viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757, 763-64 (1988). Even if there is no evidence to point to a content-based motive for the Defendants' application of their regulations, the very fact that the regulations are so open-ended as to allow administrators to enforce them based on content is enough for them to fail constitutional scrutiny. "The success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." *Forsyth County*, 505 U.S. at 133 n.10.

11

§§2.51 and 2.52 run afoul of this requirement in two different ways; first, there is no specified time limit on the park official's decision to grant or deny the permit; second, the criteria for granting a license and whether or not the regulations apply are vague and bestow too much discretion on the park official in deciding whether or not to grant the permit, and whether or not a permit is needed in the first place.

In *Frandsen*, the Eleventh Circuit held that §2.51 was facially unconstitutional because it failed to confine the time within which park officials must grant or deny a permit application. *Frandsen*, 212 F.3d at 1239-40. Although §2.51(c) requires the park superintendent to issue a permit "without unreasonable delay," the Eleventh Circuit found that this does not "provide the superintendent, the public, or any reviewing court, with any guidance as to what is considered 'unreasonable.'" *Id.* at 1240. §2.52(c) contains the same language.

The *Frandsen* court was concerned that because this language puts no real time limits on the park superintendent, he or she could receive a permit application for planned speech well in advance, but fail to act on the request until after the date of the event, deciding on his or her own that they were acting without "unreasonable delay." *Id.* at 1240. The court was also concerned that a superintendent that does not agree with the political message to be espoused could allow the permit request to sit on his or her desk for an indefinite period of time—resulting in speech being silenced by inaction. *Id.*

This concern about the language in §§2.51 and 2.52 was borne out by what happened to Mr. Boardley at the hands of the Defendants. Here, Mr. Boardley applied twice for a permit and received no response. (Compl. ¶¶31-40). Mr. Boardley's associate Mark Oehrlein also tried to apply for a permit but was told by a park official that they "didn't like" what he wanted to do, was told they "ran out" of permits, and was told Defendant Pflaum was at the dentist and

unavailable, never receiving a permit. (Compl. ¶¶44-54).  Whether Defendants do not like gospel tracts or just do not approve when individuals exercise their free speech rights at Mt. Rushmore, they have effectively silenced Mr. Boardley and Mr. Oehrlein's speech through their concerted inaction—precisely the danger of the vague language and lack of constraints in §§2.51-2.52 that was pointed out by the Eleventh Circuit.  As the Eleventh Circuit found, §§2.51-2.52 are facially unconstitutional because they fail to adequately confine the time in which the park official must act in granting or denying a permit.  Moreover, Defendants' actions in ignoring Mr. Boardley's repeated requests for a permit under the unconstitutional regulations has resulted in a total ban on his expressive activity at Mt. Rushmore.  Both the regulations and Defendants' refusal to issue a permit are unconstitutional prior restraints.

§§2.51 and 2.52 are also facially unconstitutional because the criteria park officials must follow in considering whether to grant or deny a permit are vague and permit those officials to exercise unbridled discretion. Both regulations permit the park superintendent to deny a permit if "it reasonably appears" that the expressive conduct "will present a clear and present danger to the public health or safety."  36 C.F.R. §2.51(c)(2), §2.52(c)(2).  Other courts have found similar language to vest excessive discretion in administrators, since the term is not defined and is unduly vague.  For example, in *Naturist Soc'y Inc. v. Fillyaw*, 858 F.Supp. 1559 (S.D. Fla. 1994), the court found a state park regulation containing the same language to be unconstitutional on its face.  The court found that "clear and present danger" was somewhat vague, and "required park managers to make individualized judgments about the nature of an event."  *Id.* at 1570.  In the court's opinion, this "bestow[s] too much discretion upon park managers, and therefore pose[s] a danger that permits may be denied based upon the content of a demonstrator's message."  *Id.*

In *United States v. Rainbow Family*, 695 F.Supp. 294 (E.D. Tex. 1988), the court found that a different Forest Service regulation with the same language at issue here was facially unconstitutional for granting unbridled discretion to administrators. The court stated:

> Indeed, under *Shuttlesworth*[2] and *Fernandes*,[3] it is apparent that the "clear and present danger to public health and safety" ground for denial of a special use permit is standardless, and allows Forest Service officials to deny permits for expressive activity based on their subjective, unbridled discretion. Under this criterion, an official is free to speculate as to the likely effect of some act of speech, association or other expressive activity, before it happens, drawing his or her own conclusions as to what the "public health or safety" may be.

*Id.* at 311.

§§2.51 and 2.52 contain the same language as the regulations in *Fillyaw* and *Rainbow Family*, and similar language to the regulations at issue in *Fernandes*. For similar reasons, the court should find these regulations to be unconstitutional prior restraints on their face because they bestow too much discretion on the park superintendent in whether to grant or deny a permit.

Additionally, §2.51 requires a permit for any "public expression of views." As discussed in Part II(a)(2) *infra*, if the Defendants do not mean to require a permit for every instance of someone publicly expressing their views at a National Park, these words are unduly vague and do not restrain administrators in deciding whether or not a permit should be required. The words of the regulation give park administrators the authority to decide what, in their sole discretion,

---

[2] *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969).

[3] *Fernandes v. Limmer*, 663 F.2d 619, 628, 631 (5th Cir. 1981), *cert. dismissed*, 458 U.S. 1124 (1982). The provision at issue in that case gave administrators the authority to deny a permit for expressive activities if they had "good reason to believe that the granting of the permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare." *Id.* at 631. In the Fifth Circuit's view, this standard of "good reason" for denial of a permit "is indefinite and does not comport with the constitutional requirement that discretion in public officials be specifically and narrowly circumscribed. A before-the-fact determination as to the harmful consequences of an applicant's speech is by this ordinance made a subjective judgment call in the total discretion of the Director. *This type of unbridled discretion has been condemned time and time again by the Supreme Court.*" *Id.* (emphasis added).

constitutes a "public expression of views" necessitating a permit. This type of unbridled discretion is repugnant to the First Amendment, and renders §2.51 unconstitutional on this additional ground.

> **ii.** **Defendants' regulations are facially content-neutral, but allow park officials to apply them based on the content of the speech at issue.**

"Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984). Restrictions on speech are content-based when the message determines whether the speech is subject to the restriction. *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987). In other words, the requirement is content-neutral if it is "justified without reference to the content of the regulated speech." *Clark*, 468 U.S. at 293. In this situation, it appears to Plaintiff that the regulations at issue are content-neutral on their face. However, the vague and overbroad nature of the regulations allows park officials to *apply* them based on the content of the speech at issue, since their discretion is virtually unrestrained. This alone, even without any evidence of actual content-based discrimination, is enough to find these regulations facially unconstitutional. *Forsyth County*, 505 U.S. at 133 n.10.

> **iii.** **Defendants' regulations and denial of Mr. Boardley's permit are not narrowly tailored.**

In order to satisfy a requirement of narrow tailoring, a regulation must promote a "substantial government interest that would be achieved less effectively absent the regulation," but must not "burden more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). In other words, a regulation is narrowly tailored if it "targets and eliminates no more than the exact source of the evil it seeks

to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal quotation and citation omitted).

Mr. Boardley does not dispute that the government has a substantial interest in protecting and maintaining the National Parks for future generations. But under clear precedent, Defendants' regulations are not narrowly tailored to serve that interest and are facially unconstitutional prior restraints on this basis as well. First, Defendants' regulations can apply to even individual speakers like Mr. Boardley, and courts have repeatedly recognized that permit requirements on individual speakers or small groups violate the First Amendment. *See, e.g., Cmty. For Creative Non-Violence v. Turner*, 893 F.2d 1387 (D.C. Cir. 1990); *Douglas v. Brownell*, 88 F.3d 1511 (8th Cir. 1996); *Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994); *Cox v. Charleston*, 250 F. Supp. 2d 582 (D.S.C. 2003); *see also American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring"); *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("Other circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest").

In *Turner*, the court struck down a permit scheme that applied to all "free speech activities" on Transit authority property. *Turner*, 893 F.2d at 1392. The court pointed out that while the defendant transit authority's state interests were achieved more effectively with the regulation than without it, the permit requirement also "restricts many incidents of free expression that pose little or no threat to WMATA's ability to provide safe and efficient transportation and an equitably available forum for public expression." *Id.* The court found this requirement so overbroad that it was "unclear what free speech activities would *not* be covered

by the permit requirement," thereby restricting a "substantial quantity of speech that does not impede WMATA's permissible goals." *Id.* Even if the defendants' interests were admirable, requiring a permit for all free speech activities accomplished that interest at "too high a cost." *Id.*

The Eighth Circuit came to a similar conclusion in *Douglas* and struck down a permit requirement for parades of ten or more people. 88 F.3d at 1524. The *Douglas* court noted, "We entertain doubt whether applying the permit requirement to such a small group is sufficiently tied to the City's interest in protecting the safety and convenience of citizens who use the public sidewalks and streets." *Id.* While the court recognized that "some type of permit requirement *may* be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial," this same concern is not present when there is a small group or individual speaker. *Id.* at 1206.

In *Cox,* the court found that "ordinances are facially unconstitutional to the extent that they require small gatherings, *including sole protestors*, to obtain a permit before protesting in a public forum." 250 F.Supp. 2d at 591. Such ordinances "sweep[] too broadly and [are] not narrowly tailored to achieve the cities' safety interest." *Id.* at 590.

The regulations at issue here do not restrict the applicability of the permit requirement by the size of the group. Rather, they require a permit for *any* "public assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views. . .within park areas," §2.51, and for *any* "sale or distribution of printed matter," §2.52. Thus, on their face, the ordinances apply to individual speakers or pamphleteers. Prohibiting such expressive conduct by one or few individuals is not justified by the Defendants' interest in maintaining park lands.

This holds true even for individuals or small groups distributing literature, as Mr. Boardley wishes to do. As the Supreme Court has noted, free distribution of literature is far less disruptive than solicitation: "One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide and act in order to respond to a solicitation." *United States v. Kokinda*, 497 U.S. 720, 734 (1990) (plurality opinion). And it is difficult to see how a few people distributing tracts in a public area of a National Park like Mt. Rushmore harms the government's interest in protecting those park lands, especially when this circuit has invalidated a Park Service regulation restricting literature distribution on sidewalks in close proximity to the Vietnam Veterans Memorial, a much more solemn venue, for precisely that reason. *Henderson*, 964 F.2d at 1184-85. Mr. Boardley's repeated requests for a permit have been ignored, despite that his desired activities do not impede the government from acting to further its interest in maintaining park lands. This total ban on his expression is not narrowly tailored, and cannot be allowed consistent with the First Amendment.[4]

Further, §§2.51 prohibits "public expression of views" without a permit. Requiring a permit for any "public expression of views" does not even come close to being narrowly tailored to satisfy a substantial government interest. In *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), the Court struck down a policy at Los Angeles International Airport that banned all "First Amendment activities." The Court stated:

> The resolution therefore does not merely reach the activity of respondents at LAX; it prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing. Under such a sweeping ban, virtually every individual who enters LAX may be found to violate the resolution by engaging in some "First Amendment activity." We think it obvious that such a ban cannot be justified

---

[4] It should also be noted that a permit requirement for all distribution of literature effectively prevents anonymous leafleting, which is protected speech. Limitations on anonymous speech have been struck down by the Supreme Court as a violation of the First Amendment. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).

> even if LAX were a nonpublic forum because no conceivable governmental
> interest would justify such an absolute prohibition of speech.

*Id.* at 575.

There are certainly a great many instances where a person might publicly express their views on National Park land; yet under the regulation, the plain language requires a permit for any expression, which would even include expression of "views" on a T-shirt, button or tattoo. It suffices to say that this regulation is "hopelessly overbroad." *American-Arab Anti-Discrimination Comm.*, 418 F.3d at 608. Thus, the regulations and Defendants' refusal to grant Mr. Boardley a permit also fails this prong of prior restraint analysis.

### iv. Defendants' regulations and denial of Mr. Boardley's permit leave open no alternative channel of communication.

In considering whether a regulation leaves open ample alternative channels of communication, the Supreme Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area or to a limited time frame. *Turner*, 893 F.2d at 1393. But in contrast, Defendants' permit requirements at issue here completely exclude all individuals wishing to engage in "public expression of views" or "distribution of printed matter," from all areas of all National Park land unless they obtain a permit. There are no National Park lands *not* covered by the permit requirement. Thus, "there is no intra-forum alternative." *Id.* Moreover, Defendants have refused to grant Mr. Boardley a permit for his expressive activities at Mt. Rushmore, resulting in a total ban on his desired activities at the Memorial. This leaves no alternatives for Mr. Boardley. Defendants' regulations and actions file this final prong of prior restraint analysis, and are unconstitutional under the First Amendment as unlawful prior restraints.

2.    **Defendants' Regulations Violate Plaintiff's Fifth Amendment Rights.**

Vague laws offend several important values:

> Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts on sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

For a statute to pass muster with respect to vagueness, it must define the offense involved with sufficient specificity so that a person of ordinary intelligence is not required to guess at what conduct is prohibited. *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). This standard is applied even more strictly to statutes that inhibit free speech because of the high value our society places on it. *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Just like the provisions at issue in *Turner*, it is unclear what expressive activity would *not* be included within the ambit of these regulations. §2.51 requires a permit for any "public expression of views." Under these regulations, a visitor to Mt. Rushmore may shout to a companion, "hurry up!" without requiring a permit; however, if the same visitor shouts, "I think you should hurry up," that could be a "public expression of views." If Defendants really mean to require a permit for *all* "public expression of views" in all National Park lands, the regulations are too overbroad to pass constitutional muster, as discussed above. But if Defendants do not

20

mean to proscribe such a broad spectrum of expression, the language of §2.51 is unconstitutionally vague, since on its face it is so broad that it will cause potential speakers to self-censor speech in order to not run afoul of the regulation. This is because if it is not meant to proscribe such a broad gamut of speech, the language does not put a person of reasonable intelligence on notice of what conduct is and is not allowed. In turn, this allows park officials to apply the regulation at their sole discretion, which cannot be countenanced under the First Amendment.

### B.    PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF AN INJUNCTION IS NOT GRANTED.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Here, Mr. Boardley was not permitted to engage in his desired expression, and therefore suffered a deprivation of his First Amendment freedoms in that instance. But further, Mr. Boardley has also shown that his "First Amendment interests are either threatened [and] in fact [are] being impaired at the time relief is sought." *Id.* at 373. As discussed in Part II(a)(1) *supra*, Defendants maintain facially unconstitutional regulations which currently restrict Mr. Boardley's First Amendment freedoms. Moreover, Defendants have refused to allow Mr. Boardley's expression to occur even under their unconstitutional regulations by ignoring his repeated requests for a permit. Mr. Boardley is therefore currently unable to exercise any of his First Amendment freedoms at Mt. Rushmore, and his First Amendment rights are unconstitutionally restrained on any National Park Service land. Mr. Boardley requires a preliminary injunction in order to halt the ongoing violation of his First Amendment rights.

C.    **AN INJUNCTION WILL NOT SUBSTANTIALLY INJURE THE DEFENDANTS.**

Plaintiff only intends to peacefully exercise his right to speak and distribute literature in a public forum. And, there is no doubt that peaceful picketing, leafleting, and the like, involves "speech" protected by the First Amendment. *See, e.g., Grace*, 461 U.S. at 176. If the Defendants are enjoined from enforcing the ordinances in question, they will suffer little harm because the lawful exercise of constitutionally protected expression can hardly be considered harmful to any legitimate interest. Defendants have other means at their disposal to protect their interest in maintaining the character of the National Parks, such as anti-littering regulations, criminal and civil legal penalties, and content-neutral time, place and manner restrictions which comply with the Constitution. Finally, Defendants cannot claim that their interests are substantially harmed by allowing Mr. Boardley to peacefully distribute his tracts at Mt. Rushmore. Thus, a preliminary injunction would impose only a minimal burden on the Defendants, and it is undoubtedly worth this cost to protect the bedrock constitutional freedoms at stake.

D.    **AN INJUNCTION WILL FURTHER THE PUBLIC INTEREST.**

Given the irreparable injury to Plaintiff, the lack of any harm to Defendants, and critical nature of the First Amendment rights at issue, the public interest will best be served by issuance of the preliminary injunction. The public undoubtedly has an interest in preserving the foundation of American democracy via informed public discourse and political debate.

22

III.    **CONCLUSION**

Through the actions of the Defendants, "America's Shrine to Democracy" has instead become a mockery of it. The free exchange of ideas and distribution of literature have been treasured values in this country since the days of George Washington and Thomas Jefferson, and Abraham Lincoln is the ultimate icon symbolizing the American values of freedom and equality of all persons. Sadly, these sacred rights were denied to Mr. Boardley literally right under their sculpted noses. Mr. Boardley respectfully requests that the Court grant his application for a preliminary injunction, and enjoin Defendants from enforcing 36 C.F.R. §§3.51-3.52 during the pendency of this litigation.

Respectfully submitted this *2nd* day of November, 2007.

By: *Jordan Lorence*

Jordan W. Lorence
ALLIANCE DEFENSE FUND

Jordan W. Lorence
D.C. Bar No. 385022
801 G. Street NW, Suite 509
Washington, D.C. 20001
Tel: (202) 637-4610
Fax: (202) 347-3622
jlorence@telladf.org

Kevin H. Theriot*
Kansas Bar No. 21565
W. Jesse Weins*
Kansas Bar No. 23127
15192 Rosewood
Leawood, Kansas  66224
Tel: (913) 685-8000
Fax: (913) 685-8001
ktheriot@telladf.org
jweins@telladf.org

Heather Gebelin Hacker*
California Bar No. 249273
101 Parkshore Drive, Suite 100
Folsom, California 95630
Tel: (916) 932-2850
Fax: (916) 932-2851
hghacker@telladf.org

Benjamin W. Bull+
Arizona Bar No. 009940
15100 N. 90th Street
Scottsdale, Arizona 85260
Tel: (480) 444-0020
Fax: (480) 444-0028
bbull@telladf.org

*Motions to permit appearances *pro hac vice* filed concurrently
+Of counsel, not admitted in this jurisdiction

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL BOARDLEY, ) | |
| Plaintiff, ) | Civil Case No. _____ |
| vs. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| INTERIOR; NATIONAL PARK ) | |
| SERVICE; DIRK KEMPTHORNE; ) | |
| MARY BOMAR; ERNIE QUINTANA; ) | |
| GERARD BAKER; and MIKE ) | |
| PFLAUM, ) | |
| Defendants. ) | |
| ) | |

## [PROPOSED] ORDER GRANTING PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

THIS MATTER coming to be heard on the Plaintiff's Application for Preliminary Injunction, the Court being advised, it is HEREBY ORDERED:

1. Plaintiff's Application for Preliminary Injunction is **GRANTED**;

2. Defendants are hereby enjoined from enforcing 36 C.F.R. §§2.51-2.52 during the pendency of this litigation.

IT IS SO ORDERED.

DATED this _____ day of _____, 2007.


_____
United States District Judge

1

Copy to:

United States Department of Interior
National Park Service
1849 C Street NW
Washington, DC 20240

Dirk Kempthorne, Secretary
UNITED STATES DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240

Mary Bomar, Director
NATIONAL PARK SERVICE
UNITED STATES DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240

Ernie Quintana, Midwest Regional Director
NATIONAL PARK SERVICE
601 Riverfront Drive
Omaha, Nebraska 68102

Gerard Baker, Superintendant
Mike Pflaum, Chief Ranger
MOUNT RUSHMORE NATIONAL MEMORIAL
13000 Highway 244, Building 31
Suite 1
Keystone, South Dakota 57751

Alberto Gonzalez, Attorney General
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Street NW
Washington, DC 20530

Jeffrey A. Taylor, U.S. Attorney
UNITED STATES ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA
555 4th Street NW
Washington, DC 20530

Jordan W. Lorence, Attorney for Plaintiff
ALLIANCE DEFENSE FUND
801 G Street, NW
Suite 509
Washington, DC 20001

Heather Gebelin Hacker, Attorney for Plaintiff
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, California 95630

Kevin H. Theriot, Attorney for Plaintiff
W. Jesse Weins, Attorney for Plaintiff
ALLIANCE DEFENSE FUND
15192 Rosewood
Leawood, Kansas 66224