**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                          )
MICHAEL BOARDLEY,                         )
                                          )
              Plaintiff,                   )
                                          )   Civil Action No. 07-1986 (JR)
                                          )
         v.                               )
                                          )
                                          )
UNITED STATES DEPARTMENT OF THE           )
INTERIOR et al.,                          )
                                          )
              Defendants.                 )
———————————————————————)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION**
**FOR PRELIMINARY INJUNCTION**

Plaintiff, Michael Boardley, alleges that his First Amendment rights are being violated by the enforcement of the National Park Service ("NPS") regulations requiring him to obtain a permit to distribute printed matter at Mount Rushmore National Memorial ("Mount Rushmore"), and asks this Court to enjoin enforcement of the regulations. As demonstrated below, plaintiff's motion for injunctive relief should be denied. The applicable content-neutral, NPS regulations and Management Policies are reasonable time, manner, and place restrictions on his protected First Amendment activity, and plaintiff cannot establish concrete irreparable harm because the NPS has not denied a properly-submitted permit application to distribute material at Mount Rushmore by plaintiff or any one else.

BACKGROUND

I.    Regulatory Framework

The National Park Service general regulations require a permit for public assemblies, demonstrations, and the sale or distribution of printed matter within national park areas, 36 CFR §§ 2.51, 2.52. Both regulations provide that the superintendent of a particular park "shall, without unreasonable delay, issue a permit on proper application," or specify the reasons why a permit is denied.    36 CFR §§ 2.51(c), 2.52(c).  For example, a superintendent may deny a permit for the sale or distribution of printed matter if:

> (1) A prior application for a permit for the same time and location has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of the particular area; or
>
> (2)  It  reasonably  appears  that  the  sale  or distribution will present a clear and present danger to the public health and safety; or
>
> (3) The number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated  in  the  particular  location  applied  for considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of  peace  and  tranquility,  interference  with  program activities, or impairment of public use facilities; or
>
> (4) The location applied for has not been designated as  available  for  the  sale  or  distribution  of  printed matter; or
>
> (5) The activity would constitute a violation of an applicable law or regulation.  36 CFR § 2.52(c).

If the superintendent denies a permit, "the applicant shall be so informed in writing with the reason(s) for the denial set forth.

2

36 CFR § 2.52(d).  The superintendent shall also designate on a map "the locations within the park area that are available for the sale or distribution of printed matter."  36 CFR § 2.52(e).

The NPS has also promulgated Management Policies relating to these regulations (See Exhibit A, Memorandum dated October 24, 2007, from Mary A. Bomar, Director, NPS).  Specifically, NPS Management Policy ¶ 8.6.3 (2006)[1] explains that there are two different sets of NPS regulations governing demonstrations on national parkland, 36 CFR § 7.96(g) for parks in the National Capital Region, and 36 CFR 2.51 for all other national parks (see Exhibits A, B).  The Memorandum makes clear that "NPS Management Policies ¶ 8.6.3 (2006) also provides that a permit request under 36 CFR § 2.51 will be issued or denied within two business days after receipt of a proper application."

II.  Factual Statement

Plaintiff and a few other unspecified individuals visited Mount Rushmore on August 9, 2007, and distributed free gospel tracts without incident (Verified Complaint ("Compl.", ¶¶ 17-19).  Plaintiff did not request a permit prior to traveling to Mount Rushmore and was stopped by a Park Ranger at the Memorial the following day and told that he could not distribute printed matter without a permit (Compl. 20-26).  The Park Service employee

---

[1] This statement is also accessible on the NPS website, www.nps.gov.

advised plaintiff that he should allow two days for processing of a permit (Compl., 30). Plaintiff returned home to Minnesota and began making inquiries about getting a permit for a planned return to Mount Rushmore on August 7 and 8, 2008 (see Compl., 31-41; Exhibit C, Declaration of Chief Park Ranger Mike Pflaum, Mount Rushmore, ¶¶ 3-5). Specifically, plaintiff made a telephonic request for information relating to distributing gospel tracts and "preaching" at Mount Rushmore in the summer of 2008 (Exhibit C, ¶ 3). The request was forwarded to Chief Park Ranger Pflaum, who "remain[s] committed to processing Mr. Boardley's permit in an expedited manner, and would be able to issue him a permit for demonstration activity within 2 business days after receipt of an application" (Exhibit C, ¶ 8).

Chief Park Ranger Pflaum explained that permits for First Amendment activity at Mount Rushmore can be expedited, "if we are able to obtain appropriate information and come to [a] verbal agreement, we [can] simply issue the member of the public a permit based on telephone conversations or person to person meetings, rather than requiring the member of the public to fill out the application (Exhibit C, ¶ 6). Chief Park Ranger Pflaum further stated, "In my 18 years [as Chief Park Ranger, Mount Rushmore], I do not believe that the Memorial has ever formally denied a demonstration application" (Exhibit C, ¶ 2).

<u>ARGUMENT</u>

PLAINTIFF HAS FAILED TO SATISFY THE STANDARDS FOR
<u>THE ISSUANCE OF INJUNCTIVE RELIEF</u>

Plaintiff bears a heavy burden to justify the grant of preliminary injunctive relief. It is well settled that injunctive relief is an extraordinary remedy, and the party seeking it has a substantial burden of proof. <u>See</u>, <u>e.g.</u>, <u>Sea Containers Ltd. v. Stena AB</u>, 890 F.2d 1205, 1208 (D.C. Cir. 1989); <u>Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958). To be entitled to the extraordinary remedy of injunctive relief, a plaintiff must meet this strict burden by showing that: (1) it has a substantial likelihood of succeeding on the merits, (2) it will suffer irreparable harm if the injunction is not granted, (3) other interested parties will not suffer substantial harm if the injunction is granted, and (4) the public interest will be furthered by the injunction. <u>Sea Containers</u>, 890 F.2d at 1208; <u>Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C. Cir. 1977); <u>Virginia Petroleum Jobbers</u>, 259 F.2d at 924-925. "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (citation omitted). To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical." <u>Id</u>.

Plaintiff is plainly not entitled to preliminary injunctive

5

relief. He has failed to show the existence of irreparable harm, which alone is a sufficient basis to deny the motion. In addition, plaintiff has failed to demonstrate a substantial likelihood of success on the merits, or that he has no adequate remedy at law. Consequently, as demonstrated below, his application must be denied.

   A.   <u>Plaintiff Has Failed To Establish Irreparable Injury</u>

   The Court of Appeals for this Circuit has repeatedly held that the issuance of preliminary injunctive relief is dependent upon a showing of concrete irreparable injury. <u>See</u>, <u>e.g.</u>, <u>Wisconsin Gas Co.</u>, 758 F.2d at 674. Indeed, the Court has noted that, while such relief may be available when there is a particularly strong likelihood of success on the merits and only a relatively slight showing of irreparable injury, the moving party still is required to demonstrate at least "some injury," since the basis of injunctive relief in federal courts has always been irreparable injury. <u>CityFed Financial Corp v. Office of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C. Cir. 1995) (Court requires demonstration of "at least 'some injury'") (citation omitted); <u>Sea Containers</u>, 890 F.2d at 1210-11 (upholding denial of preliminary injunction where movant demonstrated likelihood of success on the merits but failed to show any irreparable injury). When the movant has made no showing of irreparable injury, that alone is sufficient for rejecting the request for preliminary

injunctive relief.  <u>CityFed Financial</u>, 58 F.3d at 747.

Plaintiff has failed to make the requisite showing of irreparable injury.  Plaintiff did not apply for a permit prior to going to Mount Rushmore and did not ask for a permit until he was stopped by a Park Service employee and told he had to have a permit to distribute printed material.  Chief Park Ranger Mike Pflaum stated in his declaration that he cannot think of an instance in his 18 years at Mount Rushmore where the NPS has formally denied a demonstration application (Exhibit C, ¶ 3).  Plaintiff is now seeking a permit for August 2008, and Chief Park Ranger Pflaum's declaration provides an application, map and photographs of the designated First Amendment sites (<u>id.</u>, ¶¶ 3-7).  Consistent with NPS regulations, Chief Park Ranger Pflaum is willing to provide plaintiff with a permit upon submission of a proper application (<u>id.</u>, ¶ 8).  Therefore, plaintiff will suffer no injury, irreparable or otherwise, from any action taken by the Park Service.

> B.   Plaintiff Has Failed to Establish a Substantial Likelihood of Prevailing on the Merits

>> 1.   NPS's Regulations Are Constitutionally Valid Time, Place, and Manner Restrictions on First Amendment Activity

It is well-established the First Amendment does not grant a wholly unfettered right to express ideas.  "[T]he First Amendment does not guarantee the right to communicate one's views at all

times and places or in any manner that may be desired." <u>Heffron v.</u>
<u>International Society for Krishna Consciousness, Inc.</u>, 452 U.S.
640, 647 (1981) (citations omitted).    Similarly, it is beyond
dispute that "[n]othing in the Constitution requires the
Government freely to grant access to all who wish to exercise
their right to free speech on every type of Government property
without regard to the nature of the property or to the disruption
that might be caused by the speaker's activities." <u>Cornelius v.</u>
<u>NAACP Legal Defense and Educational Fund Inc.</u>, 473 U.S. 788, 799-
800 (1985) (citation omitted).

In <u>Clark v. Community for Creative Non-Violence</u>, 468 U.S. 288
(1984), a case which involved an unsuccessful challenge to the
Park Service's regulation banning camping in the National Parks
except in campgrounds specifically designated for such purpose,
the Supreme Court set out the test of a regulation that impacts
speech in a traditional public forum:

> Expression, whether oral or written or symbolized by
> conduct, is subject to reasonable time, place, or manner
> restrictions.  We have often noted that restrictions of
> this kind are valid provided that they are justified
> without reference to the content of the regulated
> speech, that they are narrowly tailored to serve a
> significant governmental interest, and that they leave
> open ample alternative channels for communication of the
> information.

468 U.S. at 293-294 (citations omitted).[2]  The three-part test set

---

[2]  In <u>Clark</u>, the plaintiff had sought to conduct a wintertime
demonstration in Lafayette Park and the Mall to demonstrate the
plight of the homeless; as part of the demonstration, plaintiff

out in <u>Clark</u> has been widely used and reaffirmed by later decisions of the Supreme Court. <u>See</u>, <u>e.g.</u>, <u>Ward</u>, <u>v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989).

Thus, the government may in appropriate circumstances place reasonable restrictions on the time, place, or manner of protected speech, so long as ample alternative means of communication are left open. <u>See also</u>, <u>e.g.</u>, <u>Ward</u>, 491 U.S. at 791; <u>City Council of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. 789 (1984); <u>Heffron</u>, 452 U.S. at 647-48; <u>ISKCON v. Kennedy</u>, 61 F.3d 949, 955 (D.C. Cir. 1995).

The Supreme Court recently upheld a "content-neutral" permit scheme by the Chicago Park District regulating uses (including First Amendment speech uses) of public parkland. <u>Thomas v. Chicago Park District</u>, 534 U.S. 316 (2002). The Supreme Court held that the permit scheme's time, place, and manner restrictions were constitutional because the reasons for denying a permit did not relate to the content of the speech, and were "narrowly drawn, reasonable and definite standards." 534 U.S. at 324 (citation omitted). The object of the permit regulations in <u>Thomas</u>, like the NPS regulations at issue here, was "not to exclude particular communications, but to coordinate multiple uses of limited space; assure preservation of park facilities; prevent

_____

sought permission for the demonstrators to sleep in tents erected in these areas as a symbol of homelessness. 468 U.S. at 291-92.

dangerous, unlawful, or impermissible uses; and assure financial accountability for damage caused by an event." Id. At 322. Moreover, "[r]egulations of the use of a public forum that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." Id. at 323 (citation omitted).

The NPS regulations challenged by plaintiff here have been found to be reasonable time, place, or manner restrictions on speech. United States v. Kistner, 68 F.3d 218 (8th Cir. 1995) (affirming conviction for distribution of pamphlets without a permit at Jefferson National Expansion Memorial in St. Louis, a violation of 36 CFR § 2.52 (a)). Indeed, the Eight Circuit rejected Kistner's claim that the requirement that permits be issued "without reasonable delay" under § 2.52 (a) was not narrowly tailored to serve a significant government interest because the policy statement of the national park at issue in that case required that permits "should be received at least ten (10) working days prior to date needed." 68 F.3d at 221-22. In any event, the NPS Management Policies § 8.6.3 (2006), provides that a First Amendment permit request will be issued or denied "within two business days after receipt of a proper application" (Exhibits A, B). See United States v. Sued, 143 F.Supp.2d 346, 349-50 (S.D.N.Y. 2001) (Magistrate Judge opinion denying motion to

dismiss citations issued for violations of 36 CFR §§ 2.51 and 2.52 at Statute of Liberty and Liberty Island, and noting that "published procedures" afforded NPS officials "at least 72 hours to review each written permit application, [although] in practice the review is considerably less involved"). See also Liberman v. Schesventer, 447 F. Supp. 1355 (M.D. Fla. 1978) (finding an earlier version of the printed matter regulation, 36 CFR § 2.52, to be constitutional, even as applied in nondiscriminatory fashion to religious literature).

Thus, the regulations at issue here, as read in conjunction with the NPS Management Policies, easily satisfy Clark's three-part test for determining the constitutionality of time, place, or manner restrictions on First Amendment activity at Mount Rushmore, and other national parks. Specifically, the NPS's decision on a proper application must be made within two business days, although review may take considerably less time (See Exhibit C, ¶ 6). Hence, the likelihood of plaintiff prevailing on the merits is slight, and, in any event, even if the Court were to consider the issue a close one, it is insufficient to justify granting the injunction.

            2.    NPS's Regulations Are Not An Unconstitutional
                  Prior Restraint on First Amendment Activities

In A Quaker Action Group v. Morton, 516 F.2d 717 (D.C. Cir. 1975), the Court of Appeals expressly considered whether the Park Service's permit system for the National Capital Region

constituted a prior restraint on First Amendment activity.[3]  The Court of Appeals held that it did, but noted that "it is well settled that expressive conduct is subject to both contemporaneous and to prior restraint under certain circumstances." Id. at 725. The Court went on to state that:

> Obviously, conduct that creates a danger to life and property, or that is destructive of public order, may be checked by authorities.  In such situations, when the First Amendment rights of demonstrators compete with other legitimate interests, government may develop a system of restraints, on the otherwise protected conduct, that attempts to accommodate these various competing interests.

Id.  The Court of Appeals further stated that:

> In so holding [that the permit regulation is a prior restraint], we are approving the overall permit system as being justified by the asserted governmental interests, and as being no more restrictive than necessary to preserve those interests. [footnote omitted].

A Quaker Action, 516 F.2d at 727.  See also Kroll v. U.S. Capitol Police, 847 F.2d 899, 903 (D.C. Cir. 1988).

Plaintiff argues that the Park Service's permit regulations relating to parks outside the National Capital Region constitute a prior restraint because they inhibit expression before it takes place and grant the Park Service "unbridled discretion" to deny expression altogether (See Plaintiff's Application at 12). Plaintiff relies on United States v. Frandsen, 212 F.3d 1231 (11th Cir. 2000) for the proposition that 36 CFR § 2.51(c) (and the

---

[3] The Court of Appeals noted that "First Amendment activity might be inappropriate for a wilderness area such as Yellowstone Park."  516 F.2d at 724-25.

analogous language in 36 CFR § 2.52(c)) is facially unconstitutional because it failed to set a time limit for issuing a permit "without unreasonable delay" (id.)[4] However, the Eleventh Circuit in Frandsen, unlike the Eighth Ciruit in Kistner, was not asked to consider a NPS policy statement specifying the time for reviewing a permit application.  As stated, NPS Management Policies § 8.6.3 (2006), which applies to Mount Rushmore, sets a two business day period for reviewing permit applications.

Plaintiff also complains that the NPS regulations are not narrowly tailored because they apply to individual speakers like himself (Plaintiff's Application at 16).  However, the challenges to the constitutionality of these same regulations in Kistner, Sued, and Fransden involved enforcement against individuals who demonstrated or distributed printed matter in national parks. Moreover, Chief Park Ranger Pflaum stated in his declaration that plaintiff's application would be processed expeditiously, and that permit requests can often be done based on a phone conversation or a short meeting (Exhibit C, ¶¶ 6, 8).

C.    The Injunction Is Not in the Public Interest

Under Virginia Petroleum Jobbers, preliminary injunctive relief may not be granted unless the alleged irreparable harm

---

[4] Frandsen is the only case cited by plaintiff that found the challenged NPS regulations to be facially unconstitutional.  The other cases cited by plaintiff refer to state park regulations or different federal regulations.

outweighs the harm to be encountered by other parties and the public interest.  259 F.2d at 925.  Plaintiff wants to enjoin the nationwide enforcement of the NPS regulations relating to issuance of permits for demonstrations and distribution of printed matter that is applicable in all but eight of the 391 units of the National Park System (see 36 CFR §§ 1.2(a), (c); 36 CFR § 7.96(a); see also Exhibit D, accessible at www.nps.gov/faq.htm).  Each National Park unit -- which range from Aztec Ruins National Monument in New Mexico, Grand Teton National Park in Wyoming, Everglades National Park in Florida, to Zion National Park in Utah -- has its own unique circumstances that may affect enforcement of the demonstration and permit regulations, subject to the NPS Management Policies.  The issuance of the broadly-requested injunction will disrupt the orderly administration of the National Park System.  Given the slight likelihood that plaintiff will prevail on the merits, the application for a preliminary injunction should be denied as contrary to the public interest, and plaintiff should redress his grievance through submission of an application for a permit, and, if necessary, through the regular litigation process.

Accordingly, the balance of the equities clearly lies with the defendants.

<u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully submit that plaintiff's application for a preliminary injunction should be denied.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
JOHN G. INTERRANTE
PA Bar # 61373
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7220
John.Interrante@usdoj.gov

**EXHIBIT A**



# United States Department of the Interior
## NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:                     *** ELECTRONIC COPY ONLY – NO HARD COPY TO FOLLOW ***
L30 (2465)                                            October 24, 2007

Memorandum

To:         Regional Directors
            Attention: Superintendents

From:       Director   /s/  Mary A. Bomar

Subject:    Political Activities Involving NPS Land or NPS Employees

This memorandum, developed with the help of the Solicitor's Office, serves as a timely reminder for Regional Directors and Superintendents of the legal and policy guidance governing political activities in the National Park System and political activities by National Park Service (NPS) employees.

I.        Demonstrations

NPS Management Policies ¶ 8.6.3 (2006) provides that NPS will authorize the use of parkland for public assemblies, meetings, demonstrations, religious activities, and other public expressions of views protected under the First Amendment of the U.S. Constitution, in accordance with 36 CFR § 2.51 or 36 CFR § 7.96. The terms "public expressions of views" under 36 CFR § 2.51 and "demonstrations" under 36 CFR § 7.97(g) have traditionally been used interchangeably to include "demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers. This term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers." 36 CFR § 7.97(g)(1). Since such demonstrations involve personal expressive activity, and parks are not mere billboard venues, unattended signage is not allowed.

Two different sets of NPS regulations govern demonstrations on parkland. One is applicable in National Capital Region parks under 36 CFR § 7.96(g) and the other applies to all other parks under 36 CFR § 2.51. These regulations are quite detailed and must be closely followed. Within most park units of the National Capital Region, the NPS issues or denies permits based on 36 CFR § 7.96(g)(5)(iii). In all other park areas, the regulation at 36 CFR § 2.51 provides procedures specifying when park areas may be designated as not available or available, and when a permit may be granted or denied. See 36 CFR § 2.51(c). NPS Management Policies

¶ 8.6.3 (2006) also provides that a permit request under 36 CFR § 2.51 will be issued or denied within two business days after receipt of a proper application.

## II. Political Activities by Federal Employees

Political activities of Federal employees are governed by the Hatch Act, which establishes general provisions applicable for all Federal employees as well as specific rules which are dependent on certain employment classes. Attached is a summary of the Hatch Act as well as information on permissible political activity in the National Park System, issued by the Department's Ethics Office and the Solicitor's Office, September 8, 2004. Also attached is NPS HR Advisory 06-022 dated May 22, 2006, on the display of political signage in and from park housing.

If you have any questions, please contact Lee Dickinson, Special Park Uses Program Manager at 202/513-7092. Legal questions may be directed to Assistant Solicitor Molly N. Ross or Senior Attorney Randolph J. Myers, Office of the Solicitor, Branch of National Parks, at 202/208-4338.

Attachments

**EXHIBIT B**

2006 NPS Management Policies

#### 8.6.2.2    Helium-filled Balloons

Helium-filled balloons pose a danger to the health and safety of marine wildlife (such as sea turtles and sperm whales) and create a litter problem. Therefore, no releases of helium-filled balloons into the atmosphere within a park will be authorized, except for research or planning purposes. Releasing balloons indoors where they can be retrieved may be authorized under permit.

#### 8.6.2.3    Fireworks Displays

Fireworks displays will be considered unless they pose an unacceptable risk of wildland or structural fire or will cause unacceptable impacts on park resources or values or jeopardize public safety. In all instances, the decision to approve or deny a request will be made by the superintendent following consultation with the regional safety officer. Fireworks displays will be conducted in compliance with the National Fire Protection Association Code for the Display of Fireworks (NFPA 1123).

#### 8.6.2.4    Sale of Food or Merchandise

The sale of food and merchandise in the parks may be allowed when managed under a commercial use authorization that does not conflict with a concession contract and that complies with applicable public health codes and Director's Order #83: Public Health. The sale of printed matter as defined in 36 CFR 2.52, 36 CFR 7.96(k) and Reference Manual 53 is allowed under a special use permit. The sale of products produced as part of living exhibits, interpretive demonstrations, or park programs is addressed in section 7.5.7.

*(See Commercial Use Authorizations 10.3)*

#### 8.6.3    First Amendment Activities

The National Park Service will authorize the use of park land for public assemblies, meetings, demonstrations, religious activities, and other public expressions of views protected under the First Amendment of the U. S. Constitution, in accordance with 36 CFR 2.51 or 36 CFR 7.96. To ensure public safety and the protection of park resources and values, and to avoid assigning the same location and time to two or more activities, the Service may manage these activities by issuing a permit to regulate the time, location, number of participants, use of the facilities, and number and type of equipment used, but not the content of the message presented.

For all parks except those within designated portions of the National Capital Region, locations that are available for public assemblies and other First Amendment activities, including the sale and distribution of printed matter, will be so designated by the superintendent on a map in accordance with procedures and criteria found in NPS regulations (36 CFR 1.5, 1.7, 2.51, and 2.52), unless the sites are otherwise protected from public disclosure, such as sites sacred to American Indians or sites with vulnerable natural and cultural resources. Selected National Capital Region parks are subject to special demonstration regulations found at 36 CFR 7.96(g)(4)(iii) and do not have such areas designated by the superintendent.

When the Service allows one group to use an area or facility for expressing views, it must provide other groups with a similar opportunity, if requested. No group wishing to assemble lawfully may be discriminated against or denied the right of assembly provided that all permit conditions are met. Whenever religious activities are conducted in parks, any NPS actions pertaining to them must reflect a clearly secular purpose, must have a primary effect that neither advances nor inhibits religion, and must avoid "excessive governmental entanglement with religion."

NPS staff on duty in an area in which a First Amendment activity is being conducted will be neutral toward the activity, but will remain responsible for the protection of participants, spectators, private property, public property, and park resources. On-duty staff may not participate in a First Amendment activity. NPS employees exercising their First Amendment rights when off-duty must not in any way imply any official NPS endorsement of the activity.

When a permit is requested for the exercise of First Amendment rights, including freedom of assembly, speech, religion, and the press, the superintendent will issue the permit without any requirement for fees, cost recovery, bonding, or insurance. The superintendent will issue or deny a First Amendment permit request under 36 CFR 2.51 within two (2) business days after receiving a proper application. In National Capital Parks subject to special demonstration regulations found at 36 CFR 7.96(g)(3), permits are deemed granted subject to all applicable limitations and restrictions, unless denied within 24 hours of receipt.

*(See Confidentiality 5.2.3. Also see Reference Manual 53)*

#### 8.6.4    Rights-of-Way for Utilities and Roads
#### 8.6.4.1    General

A right-of-way is a special park use allowing a utility to pass over, under, or through NPS property. It may be issued only pursuant to specific statutory authority, and generally only if there is no practicable alternative to such use of NPS lands. The criteria listed in section 8.2 must also be met. New roads may not be permitted with a right-of-way permit, but require specific statutory authority. Procedures for roads are addressed in section 8.6.4.4.

Before a written application is submitted to the park, potential applicants for a right-of-way permit should meet with the staff to discuss the proposed project. Once an application for a right-of-way is submitted, a compliance analysis must be conducted according to NEPA, NHPA, and other statutory compliance requirements as appropriate. Due to the potentially high costs and values associated with rights-of-way, special attention will be paid to charges and a fair market value for use of the land. Permits will be drafted by park staff and should include terms and conditions necessary to protect park resources and values. New right-of-way permits will be executed by the regional director; conversions from other authorizing documents, amendments, and renewals of existing permits may be signed by the superintendent. A right-of-way permit issued

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael Boardley<br>11532 Quay St. N.W., Coon Rapids,<br>MN 55433<br>        Plaintiff,<br><br>      v.<br><br>United States Department of<br>Interior et al.,<br><br>        Defendants. | Civil Action No. 01986 (JR) |

## DECLARATION OF MIKE PFLAUM

1. I am the Chief Park Ranger for Mount Rushmore National Memorial

(hereinafter Memorial), a unit of the National Park Service, which is an

agency of the Department of Interior. The Memorial is located in South

Dakota. I have served as Chief Park Ranger of the Memorial for 18 years. I

make this declaration in support of defendant's opposition to plaintiff's

motion for a preliminary injunction in the above captioned case.

2. In my capacity as Chief Park Ranger, one of my duties is to oversee the

granting of permits for 1st Amendment demonstration activity within the

Memorial, with the Memorial's Superintendent as the final authority. I would not deny such a permit request without the Superintendent's concurrence or final decision. In my 18 years here I do not believe that the Memorial has ever formally denied a demonstration application. Moreover, because of my responsibilities in this area, I recall Mr. Boardley's questions regarding 1st Amendment activity within the Memorial.

3. On August 13, 2007, while I was on leave and out of state on a family trip, Supervisory Ranger Nancy Martinz left a voice mail message on my telephone. The message stated that she was passing along information that Mike Boardley of Redeemer Bible Church in Minnesota at phone number 612-987-8808 was wanting information to distribute gospel tracts and do some preaching as a 1st Amendment Activity at the Monument "next summer", which I interpreted as the Summer of 2008.

4. I listened to this voice mail on approximately August 20 when I returned to work following leave. I recall thinking at that time that this event was a long while away, and that we would have plenty of time to handle Mr. Boardley's request and intended to do so.

5. On October 5, 2007, I received a telephone voice mail message from Mr. Boardley. In the message, Mr. Boardley stated that he was interested in

getting a permit for August 7 and 8, 2008 to hand out gospel tracts and to conduct open air preaching at the Memorial. With over ten months to deal with Mr. Boardley's request for a permit, I knew that I would be able to get his request processed and a permit issued many months in advance of the proposed dates in August of 2008.

6. In some instances where members of the public contact us for 1st Amendment permits, if we are able to obtain appropriate information and come to verbal agreement, we simply issue the member of the public a permit based on telephone conversations or person to person meetings, rather than requiring that the member of the public fill out the application. The Memorial does have an application for demonstration activity, which is enclosed here as Attachment A. The Memorial also has 3 designated 1st Amendment areas, shown on the map enclosed as Attachment B. These areas provide ample opportunity for demonstrators to interact with members of the public as they journey from the parking lot of the Memorial to the Grand View Terrace, Visitor Center, and Amphitheatre, which are the focal points for most visitors' trip to the Memorial. I have also enclosed photographs of these 1st Amendment areas, as Attachment C.

7. On November 5, 2007, a media representative contacted a staff member at the Memorial wanting comments on a lawsuit that had been filed against the Memorial regarding 1st Amendment rights. This phone call was when and how I first learned of the above captioned lawsuit. I immediately searched my notes in an attempt to determine who might be taking such an action. I remembered and located my note of a telephone message from Mr. Boardley on October 5, 2007, and I called and spoke to him on the morning of November 5, 2007. I told him that I was prepared to further discuss and prepare a permit for his proposed activity at the Memorial on August 7 and 8, 2008, and that we could prepare such a permit in a very short time frame. I also told him that we had no intent to deny his request for a permit. Mr. Boardley confirmed that he was involved with the lawsuit and he told me that he would have to talk to his lawyer before he could provide any further response. As of today November 15, 2007, I have not heard back from Mr. Boardley.

8. I remain committed to processing Mr. Boardley's permit in an expedited manner, and would be able to issue him a permit for demonstration activity within 2 business days after receipt of an application.

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing are true and correct to the best of my current knowledge.

Executed in Mount Rushmore National Memorial, Keystone, South Dakota on this 15 day of November 2007.

Mike Pflaum
Chief Ranger
Mount Rushmore National Memorial
National Park Service
Civil Action No. 01986 (JR)

**EXHIBIT C, ATTACHMENT A**

(NPS Form 10-930)
(NEW 10/00)                                                        (OMB No. 1024-0026)

## National Park Service
## Mount Rushmore National Memorial
### Application for Special Use Permit

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name: _____ Social Security #

Organization Name (if applicable): _____ Tax ID #

Street/Address:

City/State/Zip Code:

Telephone number:

Description of Proposed Activities:


Requested Location:

Date (s): _____ Set-up will begin at:

Event will begin at: _____ Removal will be completed by:

Maximum Number of Participants _____

Maximum Number of Vehicles _____ (Please provide best estimate)

Support Equipment (generators, amplification, etc.) _____ (attach parking plan)


Support Personnel (contractors, etc.)

Individual (if other than applicant) in charge of event on site:

Is this an exercise of First Amendment Rights?
Are you familiar with/ have you visited the requested area?          Y     N
Do you plan to advertise or issue a press release?                   Y     N
Will you distribute printed material?                                Y     N
Is there any reason to believe there will be attempts to disrupt,    Y     N
    protest or prevent your event?(if yes explain on separate sheet) Y     N

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.


Signature _____ Date

**Note** that this is an application only, and does not serve as permission to conduct a special event or any other use of a National Park. If your request is approved, a permit containing applicable conditions and regulations will be sent to the person designated on the application. The permit must be signed and returned to the park prior to the event.

Return this application to:    Permit Coordinator
National Park Service
Mount Rushmore National Memorial
13000 Highway 244
Building 31, Suite 1
Keystone, SD 57751
Phone (605) 574-2523    Fax (605) 574-2307

**Paperwork Reduction Act Statement:** This information is being collected to allow the park manager to make a valued judgement on whether or not to allow the requested use. All the applicable parts of the form must be completed.

**Estimated Burden Statement:** Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, review instructions and complete the form. Direct comments regarding this burden estimate or any aspects of this form to the National Park Service Program Manager, Special Park Uses, Ranger Activities Division, 1849 C Street, NW., Washington, D.C. 20240 and to the Information Collection Clearance Officer, Washington Administrative Program Center, 1849 C Street, NW., Washington, D.C. 20240. An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

**EXHIBIT C, ATTACHMENT B**



Mount Rushmore National Memorial
Keystone, South Dakota

Designated First Amendment Areas
marked in red

**EXHIBIT C, ATTACHMENT C**

@005/020

Case 1:07-cv-01986-JR    Document 16-4    Filed 11/20/2007    Page 13 of 16    @003/010



Mount Rushmore National Memorial
Designated First Amendment Area #1
"Greenway" area



Mount Rushmore National Memorial
Designated First Amendment Area #2
"Walkway" area

Mount Rushmore National Memorial
Designated First Amendment Area #2
"Walkway" area



Mount Rushmore National Memorial
Designated First Amendment Area #3
"Amphitheater" area

**EXHIBIT D**



search

# Frequently Asked Questions



### Who is the Director of The National Park Service?
Mary Bomar

Learn More about **Past Directors** of the National Park Service

### What government agency oversees the National Park Service?
The National Park Service is a bureau of the **Department of the Interior**. Directly overseeing its operation is the Department's Assistant Secretary for Fish and Wildlife and Parks.

### How Old is the System?
The National Park Service was created by an Act signed by President Woodrow Wilson on August 25, 1916. Yellowstone National Park was established by an Act signed by President Ulysses S. Grant on March 1, 1872, as the Nation's first national park.

View the National Park System **Timeline**.

### How many areas are there in the National Park system?
The National Park System comprises 391 areas covering more than 84 million acres in every state (except Delaware), the District of Columbia, American Samoa, Guam, Puerto Rico, and the Virgin Islands. These areas include national parks, monuments, battlefields, military parks, historical parks, historic sites, lakeshores, seashores, recreation areas, scenic rivers and trails, and the White House. **Learn More** about National Park Designations.

### How many employees are in the National Park Service?
Permanent, Temporary, and Seasonal - Approximately 20,000 diverse professionals

Volunteers in Parks - 145,000

### How many people visit the National Parks?
Total recreation visitors to the National Parks in 2006: 272,623,980

Visit the **Public Use Statistics** for more detailed information.

### What is the National Park Service Budget?
FY 2006 Enacted - $2.256 billion
FY 2007 Request - $2.156 billion

### How do I make reservations for camping/lodging in the National Parks?
For campground reservations go here. Not all parks participate in this service, many

campgrounds are first come, first served. For more information on specific camping and lodging services offered at the park(s) of your interest, please check their homepage by using our **"Visit Your Parks"** feature.

**What are concessions?**
There are more than 630 NPS concessionaires (in 128 different park units) which vary in size from small, family-owned businesses to national/international corporations. Concessionaires provide park visitors with lodging, transportation, food services, shops, and other services.

**What is the largest/smallest National Park?**
Largest - **Wrangell-St. Elias National Park and Preserve**, AK - 13.2 million
Smallest - **Thaddeus Kosciuszko National Memorial, PA** - 0.02

Current information on acreage is also **available.**

**What is the origin of the National Park Service Arrowhead?**
The **arrowhead** was authorized as the official National Park Service emblem by the Secretary of the Interior on July 20, 1951. The Sequoia tree and bison represent vegetation and wildlife, the mountains and water represent scenic and recreational values, and the arrowhead represents historical and archeological values. It was registered Feb. 9, 1965, by the U.S. Patent Office as the official emblem of the NPS. Further information on the Arrowhead, including definitions, uses, powers to revoke uses, and penalties for wrongful use can be found in Title 36 Code of Federal Regulations 11.1-4.

Disclaimer | Accessibility | Privacy | FOIA | Notices | USA.gov