## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL BOARDLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | )  **Civil Action No. 07-01986 (JR)** |
| **v.** | ) |
| | ) |
| **UNITED STATES DEPARTMENT OF THE** | ) |
| **INTERIOR et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' ALTERNATIVE MOTION FOR PARTIAL
## SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR
## PARTIAL SUMMARY JUDGMENT

### INTRODUCTION AND SUMMARY

Plaintiff, Michael Boardley, filed this lawsuit to challenge the National Park Service

("NPS") regulations governing general demonstration activity and distribution of printed matter

at Mount Rushmore National Memorial ("Mount Rushmore"), and his alleged inability to obtain

a permit to distribute material in the Avenue of Flags area of Mount Rushmore.  The complaint

includes claims seeking multiple forms of relief, many of which have become moot, and the

remainder of which should be dismissed for other reasons.  See Defendants' Motion to Dismiss,

Dkt. Entry 36; DOI/NPS Officials' Motion to Dismiss, Dkt. Entry 44.  This opposition and cross-

motion for partial summary judgment concerns Plaintiff's facial attack on the constitutionality of

36 C.F.R. Sections 2.51 and 2.52.

Plaintiff's facial challenge fails because the regulations are a reasonable time, manner or

place restriction upon individuals' exercise of their First Amendment rights at Mount Rushmore

or other national parks.  They serve important public safety concerns, and are an essential means

of preserving the parks' facilities and resources and maintaining the parks' atmosphere of peace and tranquility.  The permit requirements are narrowly tailored to serve those interests, and the regulations provide clear objective criteria to guide NPS personnel's review of a permit application.  Indeed, the Eighth Circuit, where Mount Rushmore is located, rejected a constitutional challenge similar to plaintiff's in United States v. Kistner, 68 F.3d 218 (8th Cir. 1995), and the Southern District of New York reached the same conclusion in a more recent challenge to the regulations.

Plaintiff's overbreadth and vagueness theories fare no better.  The speech that the regulations reach implicates the public safety and preservation concerns on which the regulations are founded, and therefore the regulations' reach is not unduly broad.  There is nothing unconstitutionally vague about the permit regulations and accompanying management policies, which specify the reasons upon which a permit may be denied and require that a permit be processed in two business days.  In sum, Plaintiff's claims are legally deficient, and his motion for summary judgment should be denied.  In the event that the Court does not grant Defendants' motion to dismiss, Defendants are entitled to judgment as a matter of law.

## BACKGROUND

### A.    Statutory and Regulatory Framework

The National Park Service Organic Act, codified at 16 U.S.C. § 1, directs the National Park Service to

> promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified … by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the

enjoyment of future generations.

16 U.S.C. § 1. So that the NPS might fulfill that mandate, Congress empowered the Secretary of the Interior, at 16 U.S.C. § 3, to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks."

Consistent with that statutory directive, the National Park Service has issued general regulations regarding public assemblies, demonstrations, and the sale or distribution of printed matter within national park areas. Those regulations, which are codified at 36 C.F.R. Sections 2.51 and 2.52, require a permit for such activities. Both regulations provide that the superintendent of a particular park "shall, without unreasonable delay, issue a permit on proper application," or specify the reasons why a permit is denied. 36 C.F.R. §§ 2.51(c), 2.52(c). For example, a superintendent may deny a permit for the sale or distribution of printed matter if:

    (1)    A prior application for a permit for the same time and location has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of the particular area; or

    (2)    It reasonably appears that the sale or distribution will present a clear and present danger to the public health and safety; or

    (3)    The number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated in the particular location applied for considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities; or

    (4)    The location applied for has not been designated as available for the sale or distribution of printed matter; or

    (5)    The activity would constitute a violation of an applicable law or regulation.

36 C.F.R. § 2.52(c).

If the superintendent denies a permit, "the applicant shall be so informed in writing with the reason(s) for the denial set forth."  36 C.F.R. § 2.52(d).  The superintendent shall also designate on a map "the locations within the park area that are available for the sale or distribution of printed matter."  36 C.F.R. § 2.52(e).

The NPS also has promulgated Management Policies relating to the processing of permits for First Amendment activities.  See Dkt. Entry 16-2 and 16-3, Exhs. A and B to Defendants' Opposition to Motion for Preliminary Injunction.[1]  Specifically, NPS Management Policy ¶ 8.6.3 (2006) explains that there are two different sets of NPS regulations governing demonstrations on national parkland, 36 C.F.R. § 7.96(g) for parks in the National Capital Region, and 36 C.F.R. § 2.51 for all other national parks.  See Dkt. Entry 16-2 and 16-3, Exhs. A, B.[2]  The Memorandum makes clear that "NPS Management Policies ¶ 8.6.3 (2006) also provides that a permit request under 36 C.F.R. § 2.51 will be issued or denied within two business days after receipt of a proper application."  Id.

The NPS website for Mount Rushmore now includes a link to obtain an Application for First Amendment Permit and a Map of Designated First Amendment Areas (www.nps.gov/moru/planyourvisit/permit.htm).  The application advises that the applicant should allow two business days for processing and that there is no fee for a First Amendment permit.

Permits are routinely granted at Mount Rushmore and other national parks.  Chief Park

---

[1]  Exhibit A is a Memorandum dated October 24, 2007, from Mary A. Bomar, Director, NPS, to Regional Directors, NPS, referencing NPS Management Policies 8.6.3 (2006).  Exhibit B is the text of NPS Management Policies 8.6.3 (2006) (First Amendment Activities).

[2]  This statement is also accessible on the NPS website, www.nps.gov.

Ranger Pflaum has stated, "In my 18 years [as Chief Park Ranger, Mount Rushmore], I do not believe that the Memorial has ever formally denied a demonstration application."  Decl. of Chief Park Ranger Mike Pflaum, ¶ 2 ("Pflaum Decl.") (Dkt. Entry No. 16-4, Ex. C to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, at ¶¶ 3-5).  Neither Chief Ranger Pflaum nor other Mount Rushmore personnel has denied a request for First Amendment use within the most recent eight years, and anecdotally no denials have occurred in the many years preceding that.  See Third Declaration of Mike Pflaum, ¶¶ 47, 53 ("Third Pflaum Decl."). (attached hereto as Exh. 1).  Permits have been granted to a wide variety of speakers, ranging from neo-Nazi groups to religious groups wishing to conduct a mass.  See Third Pflaum Decl., ¶¶ 45-46 & Attachment F (describing and providing examples of recent permitted activities at Mount Rushmore); Decl. of Dan Wenk, ¶¶ 72-78 (attached hereto as Exh. 2) (providing examples of past rallies).

### B. Plaintiff's Distribution of Literature at Mount Rushmore

Plaintiff and a few other unspecified individuals visited Mount Rushmore on August 9, 2007, and distributed free gospel tracts without incident.  Compl., ¶¶ 17-19.  Plaintiff did not request a permit prior to traveling to Mount Rushmore and was stopped by a Park Ranger at the Memorial the following day and was told that he could not distribute printed matter without a permit.  See Compl. ¶¶ 17-26.  A Park Service employee advised Plaintiff that he should allow two days for processing of a permit (Compl., ¶ 30).  Plaintiff voluntarily left the park grounds and returned home to Minnesota, where he began making inquiries about getting a permit for a planned return to Mount Rushmore on August 7, 2008, and August 8, 2008.  See Compl., ¶¶ 31-41; Pflaum Decl., ¶¶ 3-5.

Specifically, Plaintiff made a telephonic request for information relating to distributing gospel tracts and "preaching" at Mount Rushmore in the summer of 2008.  Pflaum Decl., ¶ 3. The request was forwarded to Chief Park Ranger Pflaum.  Although Plaintiff still has not submitted a written permit application, Chief Park Ranger Pflaum approved a permit for plaintiff to return to the park to engage in the requested First Amendment activities on August 7, 2008 and August 8, 2008, based upon Plaintiff's litigation declaration.  Suppl. Pflaum Decl., ¶ 4 (Dkt. Entry 20-2) .

## STANDARD OF REVIEW

Under Rule 56, summary judgment is required when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).   A genuine issue of material fact is one that would change the outcome of the litigation.  See Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 243 (1986).  While all evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), summary judgment should be granted if the moving party submits "affirmative evidence that negates an essential element of the nonmoving party's claim" or demonstrates "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  Celotex, 477 U.S. at 331.  The nonmoving party has the burden of establishing more than the "mere existence of a scintilla of evidence" demonstrating a genuine issue in dispute for purposes of defeating the moving party's motion.  See Lester v. Natsios, 290 F. Supp.2d 11, 19-20 (D. D.C. 2003), citing Anderson v.

Liberty Lobby, Inc., 477 U.S. at 255.  "[M]atters of law rather than of fact" are properly

presented in a summary judgment motion.  Douglas v. First Nat'l Realty Corp., 437 F.2d 666,

669 (D.C. Cir. 1970).

## ARGUMENT

I. **SECTIONS 2.51 AND 2.52 ARE FACIALLY CONSISTENT WITH THE FIRST AMENDMENT.**

Defendants do not dispute that distributing non-commercial leaflets and participating in

demonstrations are forms of expressive conduct that are subject to First Amendment protections.

See Hill v. Colorado, 530 U.S. 703 (2000).  However, that does not mean that Plaintiff has an

unfettered right to engage in those activities whenever, wherever, and however he desires.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times

and places or in any manner that may be desired." Heffron v. International Society for Krishna

Consciousness, Inc., 452 U.S. 640, 647 (1981) (citations omitted).  Similarly, it is beyond

dispute that "[n]othing in the Constitution requires the Government freely to grant access to all

who wish to exercise their right to free speech on every type of Government property without

regard to the nature of the property or to the disruption that might be caused by the speaker's

activities." Cornelius v. NAACP Legal Defense and Educational Fund Inc., 473 U.S. 788, 799-

800 (1985) (citation omitted).

In order to determine what limits, if any, may be placed on the exercise of First

Amendment rights on property owned or controlled by the government, courts first look to the

nature of the forum the speaker desires to use.  Frisby v. Schultz, 487 U.S. 474, 479 (1988).  The

nature of the forum will determine the standard which governs the constitutional analysis.  The

7

government's ability to restrict First Amendment activity in a public forum is very limited.  See
United States v. Grace, 461 U.S. 171, 177-78 (1983).

      **A.      National Parks And Memorials Are Not Inherently Public Forums.**

The Supreme Court has held that "[t]he State, no less than a private owner of property,
has power to preserve property under its control for the use to which it is lawfully dedicated."
Adderly v. Florida, 385 U.S. 39, 47 (1966).  Accordingly, "'the First Amendment does not
guarantee access to government property simply because it is owned or controlled by the
government.'" Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 814 (1984)
(quoting Postal Service v. Greenburgh Civic Ass'ns, 453 U.S. 114, 129 (1981)); United States v.
Kokinda, 497 U.S. 720, 725 (1990).  Indeed, the Supreme Court has emphasized that "[n]othing
in the Constitution requires the Government freely grant access to all who wish to exercise their
right to free speech on every type of government property without regard to the nature of the
property or to the disruption that might be caused by the speaker's activities."  Cornelius, 473
U.S. at 799-800.

Moreover, the fact that government property may be open to the public at large to enter
does not, by itself, render that property a public forum for First Amendment activities.  See, e.g.,
Greer v. Spock, 424 U.S. 828, 836 (1976).  Rather, the question is whether the property is a
place that has "been traditionally held open for use of the public for expressive activities."
Grace, 461 U.S. at 178.  Areas that historically have been open to the public for "assembly and
debate," such as municipal streets and sidewalks, are public forums.  Perry Educational Ass'n v.
Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983); see, e.g., Cox v. Louisiana, 379 U.S. 536

(1964) (public sidewalks leading to and across the street from the courthouse); Frisby v. Schultz, 487 U.S. at 480-81 (public residential streets and sidewalks).

The second type of public forum is one that has been designated by the government as a place for use by members of the public wishing to engage in First Amendment activity. This category -- the "designated public forum" -- covers property that has not been traditionally open to the public for expressive activity but which the government has opened "for indiscriminate use by the general public" or "permission [to demonstrate] has been granted as a matter of course." Perry, 460 U.S. at 47; Forbes, 523 U.S. at 677. If the government has intentionally opened up certain property for only certain types of speakers, or for speakers engaged in only certain types of expressive activity, then the property is a "designated public forum" only for entities of similar character. Perry, 460 U.S. at 48.

Finally, other government properties, such as many government buildings, are either nonpublic fora or not fora at all, because they consist of property that has never, by tradition or designation, been open to the general public for First Amendment activity. Rather, the nonpublic forum property has been used by the government only "for its intended purposes." Perry, 460 U.S. at 46.

Although some national park areas have been deemed public forums for purposes of a constitutional analysis, there is no categorical rule that all parks must be classified as such. Public forums are properties "that have as 'a principal purpose . . . the free exchange of ideas.'" ISKCON v. Lee, 505 U.S. 672, 679 (1992) (quoting Cornelius, 473 U.S. at 800). These types of property are open for expressive activity regardless of the government's intent, and "[t]he

9

objective characteristics of these properties require the government to accommodate private speakers." Forbes, 523 U.S. at 678.

Of course, not "every public sidewalk is a public forum." Kokinda, 497 U.S. at 728-29. Rather, "[a]s [the Supreme Court] recognized in Grace, the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." Id. The same is true concerning national parks. "First Amendment activity might be inappropriate for a wilderness area such as Yellowstone Park." A Quaker Action Group v. Morton, 516 F.2d 717, 724-25 (D.C. Cir. 1975). Many other national parks, including Mount Rushmore, contain wilderness areas, as well as sacred sites at which First Amendment activity would also be inappropriate. See Wenk Decl., ¶¶ 15, 21, 25-26, 32; Third Pflaum Decl., ¶¶ 10-11.

Accordingly, Defendants dispute Plaintiff's assertion that all national parks are traditional public forums. However the Court need not resolve that question in order to determine which legal standards govern Plaintiff's constitutional challenge. Some areas within national parks, such as Mount Rushmore, have been designated as "free speech areas." Third Pflaum Decl., ¶¶ 35-38. Those areas appear to meet the definition of designated public forums, which are governed by the same stringent standards as traditional public forums. Defendants are therefore willing to assume for the purposes of this motion that the regulations for such "free speech areas" should be subject to the close constitutional scrutiny that governs speech in traditional and designated public forums.

**B.      36 C.F.R. Sections 2.51 and 2.52 Are Constitutionally Valid  Time, Place, and Manner Restrictions On First Amendment Activity Even When Analyzed Under the Stringent Standards Governing Public Forums.**

Plaintiff's facial challenge to the constitutionality of the regulations under the First Amendment (Count I and II) must fail because he cannot "'establish[] that no set of circumstances exists under which [the regulations] would be valid,' i.e., that the law is unconstitutional in all of its applications." Washington State Grange v. Washington State Republican Party, – U.S. –, 128 S.Ct. 1184, 1190 (2008) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). The Supreme Court noted in Washington State Grange that "[f]acial challenges are disfavored," because they "often rest on speculation," they "run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is applied,'" and they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." 128 S.Ct. at 1191.

Restrictions upon the time, place, and manner of speech in traditional and limited public forums are analyzed under a three-part test. They must be (1) "justified without reference to the content of the regulated speech," (2) "narrowly tailored to serve a significant governmental interest," and (3) they must "leave open ample alternative channels for communication of the information." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293-94 (1984); see also Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (applying same test). To withstand First Amendment scrutiny, a permitting scheme must also contain "narrowly drawn, reasonable, and definite" standards that prevent the exercise of "limitless discretion" by state officials in determining what expression is allowed. Niemotko v. Maryland, 340 U.S. 268, 271-

72 (1951); see also Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 132-33, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

The Supreme Court applied that three-part test and upheld a "content-neutral" permit scheme by the Chicago Park District regulating uses (including First Amendment speech uses) of public parkland. Thomas v. Chicago Park District, 534 U.S. 316 (2002). The object of the permit regulations in Thomas, like the NPS regulations at issue here, was "not to exclude particular communications, but to coordinate multiple uses of limited space; assure preservation of park facilities; prevent dangerous, unlawful, or impermissible uses; and assure financial accountability for damage caused by an event." Id. at 322. The permit scheme's time, place, and manner restrictions were constitutional because the reasons for denying a permit did not relate to the content of the speech, and were "narrowly drawn, reasonable and definite standards." 534 U.S. at 324 (citation omitted).

The Supreme Court considered the permit scheme in Thomas to be a ministerial necessity to preserve the opportunity of effective freedom of speech for all citizens. Id. at 323. The Court also recognized that limiting use of park space by requiring permits could actually increase the speech that is heard: "[T]o allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech." Id. at 322 (citation omitted). The Court rejected the argument that absolute specificity was required in the ordinance, and stated that a case arguing an abuse of a permit process, e.g., discrimination based on content, should only be "dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal agreements." Id. at 325.

Sections 2.51 and 2.52 are facially constitutional, for many of the same reasons articulated in Thomas. They apply irrespective of the message the demonstrator(s) or leafleter(s) wish to advocate, and further public safety and preservation goals. They are narrowly tailored to "avoid overcrowding and overlapping activities, to preserve peace and tranquility, to prevent dangers to health and safety, and to minimize damage to park resources and facilities." United States v. Kistner, 68 F.3d 218, 223 (8th Cir. 1995). They create clear and readily discernible standards, and therefore do not give officials unfettered discretion to discriminate based upon the content of speech. In sum, they satisfy all of the Clark criteria, and are a lawful prior restraint upon speech.

### 1.    The Regulations are Content-Neutral.

A regulation or policy is content-neutral if it is "justified without reference to the content of the regulated speech." Clark, 468 U.S. at 293. There is no dispute that Sections 2.51 and 2.52 apply irrespective of the content of the speech or expression at issue. See Plaintiff's Motion for Summary Judgment, Dkt. Entry 35, at 13 (admitting that the regulations are "facially content-neutral"). Therefore, this factor of the First Amendment analysis favors Defendants.

### 2.    The NPS Permit Regulations Serve Important Government Interests.

As Plaintiff admits, the government has a substantial interest in maintaining and protecting the national parks. See Clark, 468 U.S. at 296 (recognizing that the NPS camping regulations "narrowly focused on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence"); United States v. Kistner, 68 F.3d 218, 221 (8th Cir. 1995)

13

(acknowledging the government's "substantial interest in preserving national parks in an attractive and intact condition).  Indeed, Congress has defined the "fundamental purpose" of the NPS as "conserving] the scenery and the natural and historic objects and the wild life therein and . . . provid[ing] for the enjoyment of the same in such manner and by such means as will leave them unimpaired for future generations."  Wenk Decl., ¶ 13; 16 U.S.C. § 1.  Visitors to the natural and historic sites that have been designated as national parks traditionally have enjoyed a variety of experiences, which are "not only visual, educational and recreational experiences but also inspirational, contemplative and spiritual experiences."  Wenk Decl., ¶ 25.

The permit requirements allow NPS to protect the integrity of the park experience.  The regulations identify several factors that should be considered when reviewing an application for a permit to distribute written materials, such as the potential for damage to park resources and facilities, the preservation of peace and tranquility, and whether the number of people who intend to distribute materials exceed the location's capacity.  See 36 C.F.R. §§ 2.51(c)(3), 2.52(c)(3); Kistner, 68 F.3d at 221-22 (discussing interests served by regulation).

NPS's interest in maintaining and protecting the parks also contains a significant law enforcement component.  NPS "makes every reasonable effort to provide for the protection, safety, and security of park visitors, employees, concessioners, and public and private property, and to protect the natural and cultural resources entrusted to [its] care."  Wenk Decl., ¶ 36.  To do so, NPS law enforcement personnel must respond to the law enforcement incidents that arise in parks.  See id. ¶ 43.

National icons, like Mount Rushmore, are uniquely at risk for terrorist attack, and therefore require special protections.  Wenk Decl., ¶ 47.  "Mount Rushmore National Memorial

has a history of threats to security, and attempted security breaches, going back to at least 1970 and continuing to the present time."  Third Pflaum Decl. ¶ 13.  NPS has to develop and coordinate comprehensive policies, practices, and protective measures regarding such attacks. See Wenk Decl. ¶ 47.  Mount Rushmore has increased and improved its security and law enforcement measures in the aftermath of September 11, 2001.  Third Pflaum Decl. ¶ 17.  The permit regulations codify those safety concerns, and provide that a permit may be denied if the proposed distribution or demonstration poses "a clear and present danger to the public health and safety."  36 C.F.R. §§ 2.51(c)(2), 2.52(c)(2).

The permit requirement serves those interests in several respects.  Permit applications give NPS officers notice of upcoming events, so that law enforcement personnel can arrange to be on site to address any anticipated conflicts.  Wenk Decl. ¶¶ 67-68.  That law enforcement presence often facilitates the leafleters' and demonstrators' exercise of their rights, as it may defuse or limit conflict between the leafleters and demonstrators and counter-demonstrators or people who oppose the expressive conduct.  Id. ¶¶ 71-73.  Permits also apprise NPS of the number of individuals expected to participate in the activity, which enables NPS to provide adequate facilities given the size of the activity, and address public health concerns.  See id. ¶ 70. Finally, the permitting rules, and the designation of specific areas for leafleting and demonstrations, allow NPS to ensure that such activities do not impair the parks' atmosphere of peace and tranquility, interfere with program activities, or impair the public use of the park.  See id. ¶ 65.  In sum, the NPS regulations clearly advance "the government's significant interest in maintaining the safety and attractiveness of park grounds."  Kistner, 68 F.3d at 222; see

generally Clark, 468 U.S. at 294 (concluding regulation forbidding sleeping in the park advanced similar interests).

### 3.    The Regulations are Narrowly Tailored to Further Those Government Interests.

A regulation is "narrowly tailored" to serve substantial government interests if it "target[s] and [eliminates] no more than the exact source of the 'evil' [it seeks] to remedy."

Members of City Council v. Taxpayers for Vincent, 466 U.S. at 808-10. As the D.C. Circuit has stated:

> We conclude that a regulation will meet the Supreme Court's 'narrowly tailored' requirement if a substantial portion of the burden it imposes furthers the Government's interest, even though a less intrusive alternative might also exist.

American Library Ass'n v. Reno, 33 F.3d 78, 88 (D.C. Cir. 1994), cert. denied, 515 U.S. 1158 (1995). Thus, the test for "narrowly tailored" cannot be equated with "the least restrictive means." Indeed, the Supreme Court has specifically held that "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, [] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800 (emphasis added).

Moreover, courts "have been loath to second-guess the Government's judgment to that effect." Board of Trustees of the State Univ. of New York v. Fox, 492 U.S. 469, 478 (1989). Indeed, the Supreme Court in Clark made very plain that a challenged regulation is not rendered invalid merely "because there are less speech-restrictive alternatives that could have satisfied the Government interest in preserving park lands." The Clark Court counseled the judiciary to accord those in charge of managing public lands appropriate deference in the carrying out of

those responsibilities.  <u>Clark</u>, 468 U.S. at 288, 299;  <u>White House Vigil for the ERA Committee</u> <u>v. Clark</u>, 746 F.2d 1518,  1531-32 (D.C. Cir. 1984).

The regulations challenged here are narrowly tailored because the burdens they impose directly correlate to significant preservation and safety concerns.  As explained <u>supra</u>, the permit process allows NPS to assess the extent to which the proposed leafleting or demonstration activity will affect the safety, peacefulness and tranquility, and functionality of the park and/or memorial at issue.  The application contains questions designed to further that assessment, such as "Do you plan to advertise or issue a press release before the event?" and "Is there any reason to believe there will be attempts to disrupt, protest or prevent your event" Third Pflaum Decl. at Attachment E.  The form also asks for the applicant's "best estimate" of the maximum number of participants, the number of vehicles, and the time and location of the activity.  <u>See</u> <u>id.</u> Without that information, it would be exceedingly difficult for NPS to determine how and where to deploy its law enforcement and other personnel, where additional trash disposal or other facilities may be needed, and where crowds may temporarily overcrowd the park.  Thus, the information is critical to NPS's ability to protect and preserve the national parks.

Courts have upheld the NPS permit regulations at issue in this case as "narrowly tailored."  <u>United States v. Kistner</u> involved a single leafleter who, unlike Plaintiff, was issued a criminal citation for violating the regulations.  The Eighth Circuit rejected Kistner's facial challenge to the regulations which codified the permit requirement for distributing written material, and affirmed the lower court's conclusion that the regulations were narrowly tailored "to preserve the national parks in an attractive and intact condition."  68 F.3d at 222.  <u>United</u>

States v. Sued, 143 F. Supp.2d 346 (S.D.N.Y. 2001), also involved a single leafleter who received a criminal citation for distributing written material without a permit.  There, the Southern District of New York concluded that the permit regulations are narrowly tailored, and rejected a facial challenge to Sections 2.51 and 2.52.  Specifically, the permit requirement was "a reasonable accommodation to the needs of the many different users of Liberty Island."  Id. at 352.

Plaintiff argues that the regulations are not narrowly tailored because they limit spontaneous and anonymous speech, and do not distinguish between large groups, small groups, and individuals.  Plaintiff also contends that Section 2.51 is not narrowly tailored because its reference to "public expression of views" is unduly broad.  Each of those arguments lacks merit. Permits must be sought two business days in advance of the demonstration so that the NPS officials may consider and address safety and capacity concerns, as well as any logistics and public health issues the speech would implicate.  The permit requirement applies globally, rather than being limited to large groups, because individual speakers and small groups' distribution of literature and other expressive activity may also pose safety and security concerns.  Finally, NPS Management Policies, and the text of Section 2.51 itself, clearly define the phrase "expression of public views."

> **a.    The Permit Requirement Addresses the NPS's Need for Advance Notice of Activities That May Cause Security, Safety, Public Health and Logistics Concerns.**

Allowing unfettered "spontaneous" distributions of leaflets would undermine the security, safety, logistics, and public health concerns that underlay the permit requirement.  The permit requirement affords NPS time to "plan and prepare for events in advance, as well as

manage competing activities, so that [the parks] have appropriate levels of staffing and resources at hand." Third Pflaum Decl. ¶ 55.   That advance notice is essential for events that require the presence of a Special Events and Tactical Team ("SETT") unit, because it gives NPS sufficient lead time to activate and deploy a SETT unit.  See id. ¶ 27.  It also enables NPS to arrange to bring law enforcement personnel in from other parks.  See Wenk Decl. ¶ 68.  Moreover, the permit puts NPS on notice of a potential need to arrange for additional parking, traffic control, sanitary facilities, water fountains, and/or first aid stations.  See id. ¶ 70.

The advance notice requirement also facilitates Plaintiff's and other individuals' exercise of their First Amendment rights.  "Regulations of the use of a public forum that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." Thomas, 534 U.S. at 323 (citation omitted).  An advance permit avoids potential conflicts between groups who wish to demonstrate or distribute material in the same place at the same time, and makes it possible for NPS to establish a law enforcement presence to address any incidents that may arise between demonstrators and counter-demonstrators, and to address any other activities that may disrupt the applicant's expressive activities.

In sum, the two-day time frame for processing requests balances NPS's need for advance notice against the applicant's desire to commence expressive activities.  See A Quaker Action Group v. Morton, 516 F.2d 717, 735 (D.C. Cir. 1975) (approving a provision requiring applicants to apply for a permit 48 hours in advance of a planned public gathering). It is a quick turn-around time, and therefore does not require applicants to wait very long.  Yet it allows NPS to develop a plan to respond to any potential problems or issues the activity may present.

       **c.**     **The Permit Application's Request for the Applicant's Name Serves  a Practical Purpose And Only Minimally Burdens a leafleter or Demonstrator's Interest In Anonymity.**

The requirement that a permit applicant provide his or her name on the application also is narrowly tailored to serve the interests of NPS.  The Supreme Court has held that a rule requiring an individual to reveal his/her identity prior to engaging in protected expression may, in some instances, chill speech in violation of the Constitution.  See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 166-67 (2002).  However, that does not mean that every permit scheme with a self-identification requirement is unconstitutional.

In this case, and in many others, it is logical, reasonable, and lawful for the regulating body to request identifying information.  Without the applicant's full name, the officials do not know to whom they should return the approved permit, or who to contact should any questions arise.  See generally Third Pflaum Decl. ¶¶ 49-51 (describing difficulty responding to message regarding request for a permit from a person identified only as "Mark").  When the applicant represents a group, having the name of the organization may help NPS assess the likelihood that counter-demonstrators will attempt to disrupt the speech.

Moreover, the identification requirements here are materially different from those invalidated in Watchtower.  The regulations "require neither face-to-face identification at the moment of public speech nor the identification of each individual engaged in speech."  Green v. City of Raleigh, 523 F.3d 293, 301-02 (4th Cir. 2008).  As such, they intrude very little upon prospective demonstrators or leafleters' asserted right to anonymity.  See id.

       **d.**     **Individual and Small Group Speakers Are Included in the Permit Requirements Because Their Distribution and**

### Demonstrations Also Implicate Security, Safety, Public Health and Logistics Concerns.

As Deputy Director Wenk has explained, "sometimes just a few people demonstrating or distributing printed matter can pose a law enforcement safety and security problem as much as a large number of people."  Wenk Decl. ¶ 71.  For example, the Westboro Baptist Church is a small group whose speech activities frequently require a law enforcement presence.  That group's past demonstrations at funerals and other venues have often inspired emotional counter-demonstrations, raising a risk that the demonstrators might be attacked.  See id. ¶ 72.  A small group of Ku Klux Klan members might provoke a similar response.  See id. ¶ 71.

Therefore, Plaintiff's assertion that the permit requirements should be limited to large groups is misguided.  The expressive activity of a singe person may generate opposition, and lead to conflict and/or attempts to disrupt theat person's actions.  For example, individuals attending a large military funeral might respond forcefully to a vocal anti-war protester distributing leaflets.  Indeed, at least two individuals have come forward to oppose Plaintiff's proposed distribution of gospel tracts at Mount Rushmore, arguing that it is a "national shrine" in which it is inappropriate to hand out material.[3]  See Third Pflaum Decl. ¶ 41 & Attachment D.

In addition, requiring small groups and individuals to obtain permits is an important means of ensuring that expressive activity does not strain the parks' resources, exceed the capacity of the area, or cause other preservation and/or public health concerns.  If ten groups composed of fifteen people each seek a permit for the same date and place, that would have the

---

[3] NPS has issued a permit to Plaintiff notwithstanding those individuals' objection to Plaintiff's proposed activities.

same effect as a single group of 150 people.  Absent applications from the smaller groups, NPS

would not know to expect 150 additional people in a given area, would likely not be prepared to

obtain extra personnel or coordinate additional services that the groups' presence requires, and

would not be able to designate appropriate areas for each group's demonstration.  See generally

Wenk Decl. ¶ 63.  Further, given the "tremendous" variance in the size and diversity of NPS

park units, even a very small group might burden the resources of some NPS locations.  See

generally Wenk Decl. ¶ 7; id. Attachment A.

> e.    **Section 2.51's Reference to the "Public Expression of Views"
> Does Not Make the Regulation Overly Expansive.**

Plaintiff also argues that Section 2.51 is not narrowly tailored because it allegedly

prohibits *any* public expression of views without a permit. Plaintiff speculates that the regulation

could reach activity such as wearing a t-shirt with a message or a tattoo.  This argument overlaps

with Plaintiff's void for vagueness argument, which is discussed infra, and is based upon a

flawed interpretation of the scope of Section 2.51.

Plaintiff's selective quotation of Section 2.51 ignores the context in which the regulations

use the term "public expression of views."  Section 2.51 does not simply state that the "public

expression of views" requires a permit, but instead uses the term at the end of a list of activities.

Specifically, it provides that "Public assemblies, meetings, gatherings, demonstrations, parades

and other public expressions of views are allowed within park areas, provided a permit therefor

has been issued by the superintendent."  36 C.F.R. § 2.51(a).

NPS Management Policies provide a binding and precise interpretation of the term

"public expressions of views."  Wenk Decl. ¶ 51 & Attachment H.  Paragraph 8.6.3 of those

policies explains that the term traditionally has been used to include

demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers.

Id.  Notably, and as detailed in NPS Director Brown's memorandum dated October 24, 2007, "[t]his term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers."  Id. (emphasis added).  That interpretation rules out the expansive definitions that Plaintiff has hypothesized, and plainly excludes conduct like wearing a t-shirt, button, or tattoo.

> **4.    The Regulations Leave Open Ample Alterative Means and Manners of Expression.**

Although Plaintiff must obtain a permit prior to distributing literature or participating in a demonstration at Mount Rushmore, he remains free to express his views in other ways.  Plaintiff has not alleged that individuals are unable to distribute pamphlets or engage in permitless demonstrations on other property near Mount Rushmore.  Furthermore, the restrictions here are limited only to the distribution of printed matter and demonstrations, and do not prevent a single individual like Plaintiff from approaching other individuals and requesting permission to talk to them.  Therefore, "ample alternative means to communicate exist under both the regulation[s] and policy statement."  Kistner, 68 F.3d at 222; accord Sued, 143 F. Supp. 2d at 353.

> **5.    The Regulations Do Not Give Officials Unfettered Discretion.**

The doctrine prohibiting unbridled discretion "requires that the limits [the defendant] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice."  City of Lakewood v. Plain Dealer Pub.

<u>Co.</u>, 486 U.S. 750, 770 (1988).  Here, such limits can be found in the text of the regulations, binding agency policy, and agency practice.  Plaintiff's assertion that Sections 2.51 and 2.52 give officials unbridled discretion ignores those restrictions, and is clearly wrong.

### a.    The Regulations Establish Clear and Definite Criteria For Denying a Permit.

The regulations state that the superintendent "shall" issue a permit for the sale or distribution of printed matter unless certain criteria are met.  A superintendent may deny a permit only for the following limited reasons stated in the regulation:

(1)    A prior application for a permit for the same time and location has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of the particular area; or

(2)    It reasonably appears that the sale or distribution will present a clear and present danger to the public health and safety; or

(3)    The number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated in the particular location applied for considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities; or

(4)    The location applied for has not been designated as available for the sale or distribution of printed matter; or

(5)    The activity would constitute a violation of an applicable law or regulation.

36 C.F.R. § 2.52( c).  The same criteria govern applications for permits to hold demonstrations.

<u>See</u> <u>id.</u> § 2.51(c).

Those criteria are both clear and objective.  The use of the term "shall" imposes a duty upon the superintendent, as opposed to the term "may" which typically conveys discretion.  <u>See</u>

24

generally <u>Kistner</u>, 68 F.3d at 222 (noting use of "shall"); <u>Sued</u>, 143 F. Supp. 2d at 352 (same).

Moreover, by identifying the sole permissible grounds for denying a permit, they prevent

officials from denying permits in a content-based manner.  <u>See</u> <u>Forsyth</u>, 505 U.S. at 133.  In light

of those detailed regulatory provisions, Plaintiff's assertion that the regulations are vague and

overbroad, and give officials unfettered discretion, is unwarranted.

Allowing officials to determine whether the proposed activity "will present a clear and

present danger to the public health and safety" is not an excessive grant of discretion.  In fact, the

Chicago park permit scheme that the Supreme Court upheld in <u>Thomas</u> contained a very similar

provision, which allowed a permit to be denied if "the use or activity intended by the applicant

would present an unreasonable danger to the health or safety of the applicant, or other uses of the

park, of Park District Employees or of the public."  <u>Thomas</u>, 534 U.S. at 319 n.1. The District of

Colorado also has held that nearly identical language, in a Forest Service regulation, is an

objective factor that limits officials' discretion.  <u>See</u> <u>United States v. Fee</u>, 787 F. Supp. 963, 966-

67 (D. Colo. 1992).

Although Defendants recognize that some courts in other jurisdictions have deemed

"clear and present danger" provisions to be unduly broad, in this context the phrase has an

objective and readily discernable meaning to the officials who enforce the permit regulations.

Law enforcement personnel routinely assess the risks and dangers of situations that they

encounter or expect to encounter.  NPS law enforcement officers' expertise and experience

surely qualifies to make that assessment in connection with a permit application.

Moreover, the precedent on which Plaintiff relies cannot be reconciled with the Supreme

Court's holding in <u>Thomas</u>.  "A licensing standard which gives an official authority to censor the

content of a speech differs <u>toto</u> <u>coelo</u> from one limited by its terms, or by nondiscriminatory

practice, to considerations of public safety and the like." <u>Thomas</u>, 534 U.S. at 323. The "clear

and present danger" factor plainly is directed towards the public safety and security concerns

discussed <u>supra</u>. The <u>Thomas</u> Court concluded that a permit requirement which asked whether

"the intended use would present an unreasonable danger to . . . health and safety" was a

"reasonably specific and objective" grounds for denying a permit. <u>Id.</u> at 324. That

criterion"do[es] not leave the decision 'to the whim of the administrator.'" <u>Id.</u> The same is true

of the "clear and present danger" factor at issue here.

> **b.    The Regulations Also Establish Clear Objective Criteria For Designating Areas In Which Permits Cannot Be Granted.**

The NPS regulations also establish objective standards for making a park location off-

limits for public assemblies or the distribution of printed material:

Locations may be designated as not available only if such activities would:

(1) Cause injury or damage to park resources; or

(2) Unreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or commemorative zones; or

(3) Unreasonably interfere with interpretive, visitor service, or other program activities, or with the administrative activities of the National Park Service; or

(4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors; or

(5) Present a clear and present danger to the public health and safety.

36 C.F.R. §§ 2.51(e)(1)-(5), 2.52(e)(1)-(5). The Avenue of Flags is an area at Mount Rushmore

that is "not available" for demonstrations or distribution of printed material, due to the size and

unique characteristics of that busy pedestrian area. <u>See</u> Third Pflaum Decl. ¶ 33. Opening that

area to demonstrations or leafleting "would unreasonably impair the atmosphere of peace and tranquility of this important commemorative zone, impede pedestrian access, and impair visitors'' use and potentially represent a danger to public health and safety in the event of a serious emergency, including an emergency evacuation.  Id. ¶ 35.

> ### c.    The Time Limits For Processing Applications Ensure that Permit Applications Will Be Granted or Denied In a Short Time Period.

There are time limits upon park officials' review of First Amendment permit applications, and Plaintiff's contrary assertion is baseless.  As explained supra, permits involving First Amendment expression must be processed within two days, pursuant to NPS Management Policies ¶ 8.6.3 . The current permit application form for Mount Rushmore expressly states that First Amendment applications will be processed within two business days.  See Third Pflaum Decl. ¶ 44 & Attachment E.  Plaintiff's allegation that the ranger who stopped him advised him that it would take two days to process his application clearly demonstrates that the two-business day rule was in place at Mount Rushmore.  Indeed, that time is a ceiling, given Park Ranger Pflaum's testimony that a permit could be processed in less time, and he is aware of no instance when a permit has been denied at Mount Rushmore.  See Pflaum Decl., ¶¶ 2,6.

To be sure, the text of the regulations simply states that the applications should be processed "without unreasonable delay," and does not explain that the maximum processing time cannot exceed two business days.  However, the regulations cannot be examined in isolation. Instead, any analysis of their constitutionality must also consider agency policies and practices which interpret and further define that "unreasonable delay" standard.  See Ward, 491 U.S. at 795-96; City of Lakewood, 486 U.S. at 770; Sued, 143 F. Supp. 2d at 352 (when reviewing constitutionality of 2.51 and 2.52 court must consider the manner in which officials have

27

interpreted it).  Here, those agency policies and practices establish a firm and reasonable time

limit for processing permit applications, and give officials <u>no</u> discretion to adopt a longer

processing period.

Plaintiff's reliance upon <u>United States v. Frandsen</u>, 212 F.3d 1231 (11th Cir. 2000), is

therefore misplaced.  <u>Frandsen</u> predated the Supreme Court's holding in <u>Thomas</u>, and the

Eleventh Circuit has since held that "time limits are not per se required when the licensing

scheme at issue is content-neutral."  <u>Solantic, LLC v. City of Neptune Beach</u>, 410 F.3d 1250

(11th Cir. 2005).  In any event, in <u>Frandsen</u>, the Eleventh Circuit, unlike the Eighth Circuit in

<u>Kistner</u>, was not asked to consider a NPS policy statement specifying the time for reviewing a

permit application.  <u>See</u> <u>Sued</u>, 143 F. Supp. 2d at 352 (distinguishing <u>Frandsen</u> for failure to

consider not only regulation, "but also how it has been interpreted by the persons charged with

its implementation, and what their actual practices are.") (citing, <u>e.g.</u>, <u>Ward</u>, 491 U.S. at 795).

The constitutionality of the NPS regulations has been affirmed by every court that has

considered the regulations in connection with a specific time frame that was placed on the

processing of permits by a policy and practice.

## II.    PLAINTIFF'S OVERBREADTH CHALLENGE LACKS MERIT.

A regulation may be overturned if the plaintiff brings a facial challenge pursuant to the

First Amendment and demonstrates that the law "seeks to prohibit such a broad range of

protected conduct that it is unconstitutionally overbroad."  <u>Initiative and Referendum Inst. v.</u>

<u>United States Postal Service</u>, 417 F.3d 1299, 1312 (D.C. Cir. 2005).  Plaintiff characterizes

Sections 2.51 and 2.52 as overbroad, on the grounds that they cover a wide range of expressive

conduct and foreclose "spontaneous" and "anonymous" speech. Pl. MSJ at 21-22. That argument fails as a matter of law.

Plaintiff's overbreadth arguments rests upon two of the same faulty premises as Plaintiff's contention that the regulations are not "narrowly tailored" and give NPS officials "unfettered discretion" theories. First, Plaintiff suggests that individuals' and small groups' activities need not be regulated, and that subjecting them to the permit requirement is overly expansive. However, small groups and individuals' activities may raise significant preservation and public safety concerns, for the reasons discussed supra. Second, Plaintiff mistakenly posits that individuals have an unfettered right to anonymous and spontaneous speech. If that were true, no permit requirement could withstand constitutional scrutiny as permits, by definition, require one to submit a request, which presumably would include the requester's name, at some point prior to engaging in the expressive conduct. Yet the Supreme Court and other courts repeatedly have upheld permit requirements provided that they impose reasonable limitations on the time, place, and manner of speech. See, e.g., Thomas, 534 U.S. at 322-25 (upholding permit requirement at Chicago park); Kistner, 68 F.3d at 223 (upholding NPS permit requirement).

## III.    SECTION 2.51 IS NOT UNCONSTITUTIONALLY VAGUE.

Plaintiff's Fifth Amendment challenge to Section 2.51 also duplicates arguments raised in the First Amendment facial challenge. Specifically, he contends that the phase "public expression of views" is so vague that a person of reasonable intelligence would not know what speech it covers. That void-for-vagueness claim fails for substantially the same reasons as Plaintiff's assertion that the phrase "public expression of views" gives NPS officials unfettered discretion and is not "narrowly tailored."

29

A statute is vague where it fails to "provide adequate notice to a person of ordinary intelligence that his conduct is illegal," <u>Buckley v. Valeo</u>, 424 U.S. 1, 77 (1976), or where it "authorizes or even encourages arbitrary and discriminatory enforcement." <u>Hill</u>, 530 U.S. at 732. However, even in the First Amendment context, "perfect clarity and precise guidance have never been required." <u>Ward</u>, 491 U.S. at 794. Further, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." <u>Hill</u>, 530 U.S. at 733.

Here, the text of Section 2.51 illuminates the meaning of the phrase "public expression of views." Specifically, it provides that "Public assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views are allowed within park areas, provided a permit therefor has been issued by the superintendent." 36 C.F.R. § 2.51(a). The regulations' reference to assemblies, gatherings, parades, and demonstrations makes it clear that this regulation reaches activities that involve or attract a crowd, as has been clarified in the Management Policies.

Plaintiff's speculation that one could interpret the phrase to include wearing a t-shirt with a message on it is the type of "hypertechnical theor[y] as to what the statute covers" that the Supreme Court refused to endorse in <u>Hill</u>. <u>Hill</u>, 530 U.S. at 733. While "imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question . . . it is clear what the ordinance as whole permits." <u>Id.</u> Moreover, Plaintiff could have resolved any confusion regarding the meaning of the phrase by consulting a park official. The official presumably would have given Plaintiff the definition set forth in the Management Policies. <u>See</u> <u>Premysler v. Lehman</u>, 1994 WL 776982 at *4 (D.D.C. Dec. 12, 1994) ("A vague regulation may be able to survive scrutiny when an affected entity can clarify the meaning of the regulation

30

through inquiry or administrative proceeding").   Therefore, Section 2.51 is not

unconstitutionally vague.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment should be

denied, and Defendants' cross-motion for partial summary judgment should be granted.

Dated: June 11, 2008                      Respectfully submitted,

                                                    /s/
                        _____
                        JEFFREY A. TAYLOR, D.C. Bar # 498610
                        United States Attorney


                                   /s/
                        _____
                        RUDOLPH CONTRERAS, D.C. Bar # 434122
                        Assistant United States Attorney

                              /s/ Robin M. Meriweather
                        _____
                        ROBIN M. MERIWEATHER, D.C. Bar # 490114
                        Assistant United States Attorney
                        Civil Division
                        555 4th Street, N.W.
                        Washington, D.C. 20530
                        (202) 514-7198
                        (202) 514-8780 (fax)
                        Robin.Meriweather2@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL BOARDLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No. 07-01986 (JR)** |
| **v.** | ) |
| | ) |
| **UNITED STATES DEPARTMENT OF THE INTERIOR <u>et al</u>.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

Upon consideration of the parties' cross-motions for partial summary judgment, it is this _____ day of _____, 2008,

ORDERED that Defendants' Motion for Partial Summary Judgment be and hereby is GRANTED;

It is further ORDERED that Plaintiff's Motion for Partial Summary Judgment be and hereby is DENIED.

SO ORDERED.

_____
United States District Judge

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Michael Boardley | ) | |
| Plaintiff, | ) | Civil Action No. 01986 (JR) |
| v. | ) | |
| United States Department of Interior et al., | ) | |
| Defendants. | ) | |

## THIRD DECLARATION OF MIKE PFLAUM

1. I am the Chief Park Ranger for Mount Rushmore National Memorial, a unit of the National Park Service, which is an agency of the Department of Interior.   I make this third declaration in the above captioned case, now in support of defendant's motion for summary judgment or dismissal.

2.   Mount Rushmore National Memorial is a unit of the National Park System located in the Black Hills in western South Dakota.  Its most prominent feature is the sculpture carved high on a granite mountainside depicting four United States Presidents and symbolizing democracy and freedom.  The Mount Rushmore sculpture is not only nationally but a world-recognized symbol of our nation.

3.  As Mount Rushmore's sculptor, Gutzon Borglum, explained "A monument's dimensions should be determined by the importance to civilization of the events commemorated.  We are not trying to carve an epic, portray a moonlight scene, or write a sonnet; neither are we dealing with mystery or tragedy, but rather the constructive and dramatic moments or crises in our amazing history. ... Hence, let us place there, carved

1

high, as close to heaven as we can, the words of our leaders, their faces, to show posterity what manner of men they were. Then breathe a prayer that these records will endure until the wind and rain alone shall wear them away."

4. Mount Rushmore National Memorial attracts visitors from all over the United States and from other countries. The average annual total visitation for the most recent three year period (2005 – 2007) is 2,651,133. The busiest months of the year are from May through October. July is the busiest month of the year with an average of 716,935 total visitors during the years 2005 – 2007. January is the least busy month of the year, with an average of 26,028 total visitors from 2005 – 2007.

5. These total visitor numbers include people who do not come into the visitor parking lot area and get out of their vehicles, but rather travel on the approximately 3.5 miles of highway through the Memorial, possibly stopping at pullouts to view the Memorial and scenery, take photographs, walk, climb, or in other ways use the Memorial.

6. Mount Rushmore is the location of numerous special events, dignitary visits, permitted events, and rallies and demonstrations, many of which involve media coverage. The largest annual events are the Independence Day celebration on July 3 and 4 and the Sturgis Motorcycle Rally during the first full week in August.

7. Since the terrorist attacks on the United States of September 11, 2001, Mount Rushmore National Memorial has been designated as an "Icon Park" by the Secretary of the Interior and the Director of the National Park Service. As such, Mount Rushmore operates under heightened levels of security and law enforcement operations. In the case of an elevation of the threat level to "orange" or "red" under the Homeland Security National Threat Advisory System, we implement further enhanced security, restrictions, and potential closures.

2

8. There is a total of 1,278 acres of land within the boundary of Mount Rushmore National Memorial, and it contains much more than the mountain sculpture and visitor services and administrative area development.

9. In addition to the treasured cultural and historic resources of the mountain sculpture, the park also has the Hall of Records, where a titanium vault has been placed for posterity containing porcelain enamel panels depicting the history of Mount Rushmore and of the United States, and the Sculptor's Studio, which is one of the two remaining historic buildings built during the sculpting era and now contains Gutzon Borglum's working model of the mountain and a small bookstore.

10. Other areas of Mount Rushmore National Memorial include utility systems for water treatment and storage and wastewater treatment, a 3-story building 65-room concessioner dormitory, a Park Service residential area of five 3-bedroom houses and one 10-unit apartment building. It also contains approximately 3.5 miles of Highway 244, service roads, an outdoor firearms range, backcountry hiking and horse use trails, as well as lightly used backcountry areas with no trails and that are managed as de facto wilderness. We also have national caliber recreational rock climbing routes on the granite walls and spires, where we have over 5,000 "climber use days" per year estimated from voluntary registration system.

11. Mount Rushmore National Memorial also protects significant natural resources. These include some of the most extensive stands of old growth ponderosa pine remaining in the Black Hills, representation of the central Black Hills granite geology landscape, and representation of the plants and wildlife found in the central Black Hills. Wildlife that has been identified at the Memorial includes mule deer, whitetail deer, rarely-seen bighorn sheep, non-native mountain goats, bobcats, coyotes, mountain lions, yellow bellied marmots, squirrels, chipmunks, mice, raptors, and

3

woodland birds, among others. The natural forested setting has been determined to be important for the sculpture and visitors' experiences at the Memorial.

12. It is also common knowledge that the entire geographic province known as the Black Hills, including the land within Mount Rushmore National Memorial, is viewed as "sacred land" with a strong spiritual significance by a number of American Indian tribes, including the Lakota people of South Dakota and surrounding area. The National Park Service at Mount Rushmore National Memorial is currently in the midst of attempting to improve relations and communications with associated tribes through consultation on management of the Memorial, inviting culture demonstrations, and increasing opportunities to "tell the story" of the Indian history of the Black Hills area, including the land now within the boundary of Mount Rushmore National Memorial.

13. Mount Rushmore National Memorial has a history of threats to security, and attempted security breaches, going back to at least 1970 and continuing to the present time. In 1970 and again in 1971, the area of the Mount Rushmore sculpture was "taken over" or "occupied" by members of the American Indian Movement, primarily to draw attention to the Indian treaty claims to the Black Hills under the Fort Laramie Treaty of 1868.

14. In June, 1975, a small explosive device was detonated in the early morning hours in front of the old Visitor Center, blowing out windows and doing other damage, a crime which has never been solved. In 1987, five members of the environmental activist group "Greenpeace" illegally intruded onto the sculpture and attempted to unfurl a banner which said "We the People Say No to Acid Rain" and were arrested during the attempt and subsequently convicted of illegal acts.

15. In 1991, confidential informants provided information about a proposed significant attempt to violently disrupt Mount Rushmore's 50th Anniversary celebration

4

and the visit by President George Bush. Just prior to the beginning of the new millennium, in December, 1999, there was a vague and unconfirmed threat to explode a bomb at Mount Rushmore.

16. In July, 2005, there was a vague and anonymous unconfirmed telephone threat to hijack a helicopter and crash it at Mount Rushmore. In September, 2007, a man illegally intruded into the area behind the mountain sculpture and when confronted by a ranger, fled the area on foot, leading multiple rangers and a county deputy into a chase and subsequent search and investigation that lead to the man's arrest several hours later at a location just outside the park boundary where he was hiding in an abandoned building. There have been numerous other illegal intrusions into closed areas and other vague and general unconfirmed threats for bomb explosions or other potential damage or harm to resources or people at other times at Mount Rushmore National Memorial.

17. As a world recognized symbol of our nation, an "Icon Park", a location of heavy visitation, major special events, rallies and demonstrations, dignitary visits, frequent media attention, and a history of perceived threats or attempted security breach actions, Mount Rushmore has increased and improved security and law enforcement since September, 2001.

18. We currently have a staff of less than 20 permanent full time rangers with federal law enforcement commissions and authority. This staff is supplemented by a few temporary or "seasonal" rangers with law enforcement commissions during the busy months or when permanent staffing shortfalls may occur. Other uniformed staff at Mount Rushmore includes telecommunication operators (dispatchers), park rangers in interpretation, maintenance staff, and administrative staff, but they do not have law enforcement authority.

5

19. We are frequently not at "full staff" level in law enforcement, however, due to a variety of reasons including required training, attendance at the Federal Law Enforcement Training Center or the Field Training Program, annual or sick leave, and staff turnover in which positions remain vacant until they can be advertised and filled.

20. Park Rangers at Mount Rushmore are responsible for law enforcement, investigations, security, emergency medical services, search and rescue, firefighting, and resource education, among other duties. They are also subject to call to other park areas and other agencies for firefighting, law enforcement, security, or other duties.

21. We have a communications center that is the hub for a system of surveillance cameras, an alarm system, a radio system, and a phone system. This center is staffed 24 hours per day / 365 days per year and is a critical support system for security, law enforcement, and emergency operations at the Memorial, as well as routine communications for all park functions.

22. We maintain a 24 hour per day/365 days per year ranger patrol coverage for proactive visible patrol and deterrence and reactive response to incidents. We strive to never have less than 2 rangers on duty at any given time for safety reasons and for more effective patrol and response, but are not always able to meet that standard. During daytime hours, we average approximately 3 rangers on duty at any given time, including supervisory staff.

23. For major events or incidents, we plan in advance for scheduling to include adjustments of time off, scheduling of overtime, and possibly bringing in supplemental staff from other parks, other agencies, or a Regional Special Events and Tactical Team (SETT). For the more significant events or incidents, we may have 20 or more rangers on duty at a given time.

6

24. The Midwest Region Special Events and Tactical Team (SETT), or other Park Service SETT's have been deployed to Mount Rushmore for a number of events over a period of years. Most often, those events have been Independence Day celebrations, the Sturgis Motorcycle Rally, Presidential visits, anniversary celebrations, and other major events. The SETT's purpose is to provide temporary assistance to Park Service areas and other bureaus for events that require a tactical or team response. These include, but are not limited to: large scale demonstrations; presidential, other VIP, or dignitary visits; major disasters; special ceremonies requiring crowd control; special law enforcement investigations and emergency law enforcement operations.

25. SETT's are typically deployed as a unit, and receive their authorization from the area Superintendent or his/her designee. In the Midwest Region, SETT is under the command of the Regional Law Enforcement Specialist representing the Regional Director. The mission of SETT is to provide a high level of visitor/resource protection, dignitary protection, or other law enforcement services to National Park Service areas when the resources needed to appropriately manage the activity are beyond the capabilities of an individual park's available resources.

26. The objective is to provide a short term response to an incident through decisive, coordinated, disciplined actions, execute the assignment with a higher degree of expertise, efficiency, and safety than could be achieved using single resources taken from a variety of sources. The Regional Director or his/her designee must approve all requests for activation of the SETT. In the Midwest Region, the SETT consists of 12 well trained, dynamic rangers, including a team leader.

27. Our ability and opportunity to activate the SETT for events can efficiently occur, consistent with the Park Service demonstration and printed matter regulations, only when we have early knowledge and have the time to plan for the activity.

7

28. In addition to SETTs, the National Park Service has established and maintains one "Type 1" national "All Risk" Incident Management Team and four "Type 2" regional or interregional "All Risk" Incident Management Teams. These teams may be deployed to parks throughout the nation or may be involved at an interagency level to manage major special events such as Presidential visits or park dedications, major disasters such as hurricanes, major law enforcement incidents, major search and rescue operations, or other significant events or incidents.

29. An Incident Management Team is obviously better able to plan and prepare for an event with advance knowledge of the event. I serve on the "Type 2" Central Incident Management Team (Midwest and Intermountain Regions) for the National Park Service.

30. The objectives of our law enforcement program at Mount Rushmore National Memorial are the prevention of criminal activities through resource education, public safety efforts, and the deterrence, detection, and investigation of criminal activity and the apprehension and successful prosecution of criminal violators, and homeland security. We protect the safety and security of park visitors, employees, and concessioners; protect public and private property; and protect the natural and cultural resources at the Memorial.

31. This is a large and complex law enforcement task, given the heavy visitation, variety and frequency of events, media attention, and the special security concerns associated with protecting one of the nation's most recognized and revered icons. During the busy season from May through to mid October, the National Park Service at Mount Rushmore conducts numerous programs at the Memorial, including guided Presidential Trail walks, Sculptors Studio talks, Junior Ranger program, "Sculpture In Residence" rock sculpting demonstrations, American Indian tipi demonstrations and other cultural

8

demonstrations, the extremely popular evening sculpture lighting program, and more. Many thousands of people participate in these programs during the season.

32. In addition, a variety of school programs occur onsite, primarily during the months of March through May. Two different short films play continuously each day in two separate theaters in the Lincoln Borglum Visitor Center and Museum, one on Mount Rushmore history and the other on Mount Rushmore's natural resources. Xanterra Parks and Resorts, one of the Memorial's concessioners, also periodically brings in cultural demonstrations, other special events, and catered banquet events with the approval of the Superintendent, drawing dozens to hundreds of people, depending upon the nature of the event.

33. The Avenue of Flags is one of the special areas of the Memorial where demonstrations or the distribution of printed matter is not allowed. This walkway is lined by the flags of all 50 States, the District of Columbia, as well as the 3 territories and 2 commonwealths. The Avenue's flags are powerful symbols which remind people of their common heritage, history, and ideals and was originally established as part of the celebration of America's Bicentennial in 1976. The current Avenue of Flags was opened in 1997, and provides an opportunity for visitors to have a contemplative experience, study the flags, and to locate the flag of their state or territory. Visitors very often take photographs of the flags or of people next to the column with the inscription of a specific state or territory flag.

34. The Avenue of Flags is also a busy pedestrian area that can become very congested as people walk to and from the Visitor Center/Museum, amphitheater, and primary Memorial sculpture viewing areas. Its walkway "narrows down" from approximately 36 feet wide or greater on either end of the Avenue of Flags to approximately 18 feet wide between the insides of the granite and concrete columns that

line the avenue on each side, each column displaying 4 flags (7 columns on each side of the avenue, 14 columns total) over a linear distance of approximately 150 feet. 20,000 or more people per day will walk this avenue during the summer season, with 2,000 or more people an hour during peak periods of the day or during major special events. Each flag is lighted after dark until the Memorial's closing time, presenting a stunning visual display of the colorful flags against the night sky in the foreground of the Mount Rushmore sculpture.

35. Accordingly, and pursuant to 36 C.F.R. 2.51(e) and 2.52(e), the Avenue of Flags is an area that is "not available" for demonstrations or the distribution of printed material, insofar as such use would unreasonably impair the atmosphere of peace and tranquility of this important commemorative zone, impede pedestrian access, and impair visitors' use and potentially represent a danger to public health and safety in the event of a serious emergency, including an emergency evacuation.

36. As I detailed in my second declaration dated December 6, 2007, however, Mount Rushmore National Park has designated three First Amendment areas for demonstrations and the distribution of printed matter, and which found on a map provided as **Attachment A** and which is located on our web site.

37. As I earlier included in my second declaration, **Attachment B** is assorted photographs of the three designated First Amendment areas which is also located on our web site. One photograph is of Area # 1 the "Greenway," two photographs are of Area #2 the "Walkway," and one is photograph of Area #3 the "Amphitheater."

38. Each of these designated areas provides the permittee with a maximum exposure to visitors as well as a view of the sculptured heads of Presidents Washington, Jefferson, Lincoln and Roosevelt in the background. They have also worked very well in for past permittees' conducting their activities.

10

39. As earlier detailed , on December 19, 2007, the Park Service issued to the plaintiff a permit for his demonstration/printed matter distribution activities on August 7-8, 2008 for Area #2 Walkway, which is found as **Attachment C**. And as earlier recounted, the walkway area—which is located adjacent to the pergola, a columned pedestrian entrance structure, and between the Audio Tour Building/Information Center And Bookstore and the Concessions Building—is where the vast majority of pedestrian visitors to Mount Rushmore National Memorial walk on their way to and from the visitor parking lot to the Visitor Center, the Concessions Buildings, and to the Memorial's prime viewing areas.

40. Mount Rushmore National Memorial plans to brief its rangers of the permitted activities of plaintiff at Area #2 Walkway on August 7-8, 2008, to increase the ranger's visible presence there and to help ensure that plaintiff's activities occur without disruption.

41. Indeed, we are aware of at least two individuals who object to plaintiff's activities at Mt. Rushmore National memorial. **Attachment D** is a copy of (1) an e-mail message dated November 14, 2007 that asks that the National Park Service not to allow solicitation of any sort because they believe "[h]anding out anything inside a park is not appropriate" and (2) a published letter to the Rapid City Journal Editor dated December 2, 2007 that complains to "the Bible thumper from Minnesota" that Mt. Rushmore is a "national shrine" and "[i]f you don't like it because you couldn't pass out your Bible stuff: Too bad. You can stay out of our state if you don't like it. We would be better off without the likes of you...."

42. The National Park Service at Mount Rushmore National Memorial has primary responsibility for a wide range of park management activities, including security, law enforcement, natural resources protection and management, cultural resources

protection and management, visitor education and interpretation, emergency medical services, search and rescue, wildland fire protection, structural fire protection, facility maintenance and management, water treatment and storage and delivery systems, wastewater treatment system, visitor services, lost and found property management, trail maintenance, snow removal, boundary maintenance, procurement, property management, contracting, human resources management, concessions management and contract compliance, special park uses management, media management, partnership programs, interagency communications and cooperation, and more.

43. Mount Rushmore is a very busy unit of the National Park System with many challenges, and it must be managed in such a manner and by such means as to ensure the protection of park resources and values, the protection of human life and property, and the experiences of all park visitors.

44. **Attachment E**, which is also available on our web site, is the revised application form for special use permits that we now use at Mount Rushmore National Memorial, which provides that First Amendment applications will be processed within two business days, and revises an earlier flawed application.

45. We have also gone through our records for 2008-2007, and have located sixteen permits for various activities in areas designated for First Amendment activities, a redacted copy of which is found as **Attachment F**.  The redactions are of applicants' personal information such as their social security or tax identification numbers.

46. The permitted activities depicted in Attachment F range, in part, from The Center West for speeches and musical presentations in honor of the gay, lesbian, bisexual and transgendered community; Rita D. Fischer for a Judeo-Christian National Day of Prayer; the Sisters of the Presentation of the Blessed Virgin Mary for a vesper service;

12

Hills Parish's Easter Sunrise Service; Bethlehem United Methodist Church's musical program; to St. Mary's Catholic Church for a mass.

47. We have no record that Mount Rushmore National Memorial had ever denied a First Amendment activity request. I have also talked with a number of employees from different divisions at the Mount Rushmore National Memorial, and none of them are aware of any denial of an application for First Amendment activity.

48. In response to the plaintiff's allegation regarding Mark Oehrlein, found on pages 5 and 6, lines 44 through 56 of plaintiff's complaint, I researched the issue and found in my notes a record of a voice mail phone message from July 14, 2006, when I was at a dentist appointment for part of the day.

49. The message was somewhat broken and difficult to hear clearly. I listened carefully to the message several times in an effort to clearly hear the name and phone number, but was only able to make out the first name and not the last name and could not make out the entire phone message. I could understand the first name of the caller to be "Mark" stating that he wished to "pass out gospel tracts". It was very difficult for me to hear the phone number, I thought it might have been 320-420-7697 or 320-420-7693.

50. Late sometime on July 14, I called both of those phone numbers and a series of phone number which I thought either could be the number on the difficult to hear message or might be close. Indeed, I called ten different combinations of phone numbers, leaving messages on three of those phones which were answered with recorded messages giving names other than "Mark." Those names were "Gail" or similar, "Dan" or similar, and "Maggie" or similar. In those messages, I stated that if this was the phone number for someone named Mark who attempted to contact me regarding passing out gospel tracts at Mount Rushmore National Memorial, to contact me at my phone number. I never heard back from any of those messages.

13

51.  The other seven numbers that I called were apparently invalid or not in service at that time.  I realized that the possible combination of numbers that I would have to attempt to possibly hit the correct number would be approximately 100 if just two digits were in question, and obviously run into the hundreds and thousands if more digits were involved.  Because I could not reasonably decipher the phone number, I hoped that "Mark", last name unknown, would call back for more information.  I never received any further phone calls related to this issue.

52.  On March 9, 2008, while researching permit records related to the complaint by Mr. Boardley, Education Technician Amy Bracewell located a partially completed Special Use Permit dated July 14, 2006 with the name of permittee listed as "Mark".  Bracewell located that permit in a file from our park Communications Center.  Amy Bracewell brought it to my attention in the afternoon of March 9, 2008 and it spurred my memory on that issue.  Late in the day on July 14, 2006, after making futile attempts to contact "Mark" by calling a series of phone numbers, I prepared as much of a permit as I could, given the limited information I had obtained from the difficult to hear voice mail message.  I signed the permit authorizing "Distributing Literature" and left it at the Memorial's 24 hour per day Communications Center in the case that "Mark" either called back or came back requesting a permit, then either I could finalize it if available or the senior ranger on duty could finalize it.  It probably remained at the Communications Center for several days, and then upon no further contact, was filed.

53.  In any event, our personnel at Mount Rushmore National Memorial have worked diligently over many years to review and approve First Amendment use.  Although I am closely involved with the program, I am not the only employee at the Memorial who has approved such events over the years.  We have not denied any such request in the most recent eight plus years, and anecdotally not for many years previous.

14

54. The National Park Service regulations work for Mount Rushmore National Memorial, park visitors, and demonstrators alike. They provide objective standards for us to help regulate the location and time where First Amendment activities may occur, while preventing interference to Park Service programs and operations, protecting important park resources and values as well as public health and safety, while minimizing impairment of the atmosphere of peace and tranquility.

55. The National Park Service regulations also allow us to plan and prepare for events in advance, as well as manage competing activities, so that we have appropriate levels of staffing and resources on hand. Indeed, once plaintiff provided us with the necessary information, we were able to quickly finalize his permit so that he can conduct his activities on August 7-8, 2008.

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing are true and correct to the best of my current knowledge.

Executed in Mount Rushmore National Memorial, Keystone, South Dakota on this ninth day of May 2008.


Mike Pflaum
Chief Ranger
Mount Rushmore National Memorial
National Park Service

## Attachments to Mike Pfaulm Declaration

**Attachment A** Map of Mount Rushmore National Park three designated First

Amendment areas

**Attachment B** Photographs of Mount Rushmore National Park's three designated First

Amendment areas

**Attachment C** Mount Rushmore National Park permit to Mr. Boardley for his activities

on August 7-8, 2008

**Attachment D** copy of two individuals objecting to plaintiff's permitted activities

**Attachment E** Mount Rushmore National Memorial's new application form for special

use permits

**Attachment F** Copes of sixteen permits issued by Mount Rushmore National Park for

activities for 2007-2008

**<u>Attachment A</u>**



Presidential Trail

stairs

Lincoln Borglum
Museum (lower level)
- Museum
- Bookstore
- Restrooms
- Theaters

Area # 3
"Amphitheater"

Amphitheater

Compressor
House

Presidential
Trailhead

Grand View
Terrace

Borglum
View
Terrace

stairs

Sculptor's
Studio &
Bookstore

Tipi
Area

NPS Office

Avenue
of Flags

Nature
Trail

244

Borglum
Court

Carvers Cafe
Memorial Team
Ice Cream Shop

Gift
Shop

Area # 2
"Walkway"

Audio Tour
Building

Information
Center & Bookstore

244

to Rapid
City

Denotes
Pet Exercise
Area

Main
Parking

Main
Parking

**Mount Rushmore National Memorial**
**Keystone, South Dakota**

Area # 1
"Greenway"

**Designated First Amendment Areas**
**marked in red**

**<u>Attachment B</u>**



Mount Rushmore National Memorial
Designated First Amendment Area #1
"Greenway" area



Mount Rushmore National Memorial
Designated First Amendment Area #2
"Walkway" area



Mount Rushmore National Memorial
Designated First Amendment Area #2
"Walkway" area



**Mount Rushmore National Memorial Designated First Amendment Area #3 "Amphitheater" area**

**<u>Attachment C</u>**



# United States Department of the Interior

### NATIONAL PARK SERVICE
MOUNT RUSHMORE NATIONAL MEMORIAL
KEYSTONE, SOUTH DAKOTA 57751-0268



IN REPLY
REFER TO:

December 19, 2007

Michael Boardley

Coon Rapids, MN  55433

Dear Mr. Boardley,

Attached is the approved and signed permit for you to distribute literature and conduct open air preaching at Mount Rushmore National Memorial on August 7 and 8, 2008 as you had requested. If you have questions or comments about the permit, please contact us at phone number 605-574-2523 or by mail at the following address: Mount Rushmore National Memorial, 13000 Highway 244, Building 31, Suite 1, Keystone, SD  57751. Thank you.

Sincerely,

Gerard Baker
Superintendent

Form 10-114
Rev. DEC. 00
Page 1 of 2

Page 1 of 1

UNITED STATES DEPARTMENT OF THE INTERIOR
National Park Service

Special Use Permit

Name of Use ___Distribute Printed Material / Public Assembly___                    Date
Permit Reviewed

Reviewed

Reviewed

Expires  August 8, 2008
Long Term ___
1500-2520-08002

Region    Park    Type    No. #                                          Permit #  MWR-
          Short Term  X

Mount Rushmore National Memorial
Name of Area

_Michael Boardley_          ~~Redacted~~, Coon Rapids, MN 55433   ~~Redacted~~

Address                         Name of Permittee                    Phone

is hereby authorized during the period from (Time _5:00 a.m._ day _07_ Month _08,
2008), through (Time 11:30 p.m. day _08_ Month _08, 2008_, (exclusive of the hours
from 11:30 p.m. on 08/07 to  5:00 a.m. on 08/08 when the Memorial is closed to visitors),
to use the following described land or facilities in the above named area:
Along the main walkway from the "pergola" (columned pedestrian entrance structure) to
the area adjacent to the rear wall of the concessions building.  This is the main
pedestrian access from the parking lot at Mount Rushmore National Memorial to the visitor
center and prime viewing areas. This area is marked on the attached map as "Area #2
Walkway".  A photograph of the area is also attached.

For the purpose(s) of:  Distribution of literature ("gospel tracts") and open air
preaching.

Authorizing legislation or other authority (RE - DO-53): 36 CFR 2.52, 36 CFR 2.51

NEPA Compliance:  CATEGORICALLY EXCLUDED _____  EA/FONSI _____  EIS _____  OTHER
APPROVED PLANS  X

PERFORMANCE BOND:  Required _____  Not Required __X__  Amount

LIABILITY INSURANCE:  Required _____  Not Required __X__  Amount

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended
pages and when appropriate to the payment to the U.S. Dept. of the Interior, National Park
Service for its direct and indirect costs associated with managing the event.

The undersigned hereby accepts this permit subject to the terms, covenants, obligations,
and reservations, expressed or implied herein.

PERMITTEE _____          12-14-07
Date                        Signature

Authorizing Official _Michael D. Pflaum_  12/19/07  _____
Date                                                     Signature

Additional Authorizing Official _____
(if Required)                       Signature

Title                          Date
_Superintendent_      12/19/07

## STANDARD CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the permittee is authorized to make of the land described in this permit.

3. Benefit - No Member of Congress shall be admitted to any share or part of this permit or to any benefit that may arise therefrom: but this provision shall not be construed to extend to this grant if made with a corporation for its general benefit.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information; to do so will be considered a breach of conditions and be grounds for revocation [Re: 36 CFR 2.32(a)(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

8. Pursuant to 36 CFR 2.52 (h), It is prohibited for persons engaged in the sale or distribution of printed matter under this section to obstruct or impede pedestrians or vehicles, harass park visitors with physical contact or persistent demands, misrepresent the purposes or affiliations of those engaged in the sale or distribution, or misrepresent whether the printed matter is available without cost or donation.

**<u>Attachment D</u>**

**Ed Menard**
11/14/2007 09:12 AM
MST

To: Gerard_Baker@nps.gov
cc: Nancy_Dunston@nps.gov, Mike_Pflaum@nps.gov
Subject: From NPS.gov: freedom of speech permit

-----Forwarded by Ed Menard/MORU/NPS on 11/14/2007 09:10AM -----

To: Ed_Menard@nps.gov
From: kim479@ptd.net
Date: 11/14/2007 08:33AM
Subject: From NPS.gov: freedom of speech permit

Email submitted from: /moru/contacts.htm

"A Minnesota man was denied the right to hand out Gospel tracks in the shadow of the 'Shrine of Democracy,' Mount Rushmore. He's taking the Parks Service to court, claiming a violation of his first Amendment rights." -Focus on the Family.
As a Christian (I sometimes hate to use that word) and as a US Citizen and as a lover of the National Parks, PLEASE DO NOT ALLOW solicitation of any sort to enter your parks. Handing out anything inside a park is not appropriate. Stand outside the entrance if necessary but do not allow anyone to mar the serenity of what God has created for all of us to enjoy and plainly see the wonders of HIS creation. With rights, there are responsibilities and rules. Unfortunately, when it is "for something supposedly good" people tend to NOT see the big picture and unreasonable and in my opinion, unrational ideas seem good. We must ALL be responsible for all rights and allow freedom for all without imposing. Don't know that I can make it different but I didn't want to not say anything in case it can. There is a place and a time for everything. He or they can rent a facility and have a place and a time for their cause; just like anyone else would have to. Too bad he can't see the forest beyond his shortsighted vision.
Kim Reese

December 2, 2007
Rapid City Journal
Letter to the Editor

## Rushmore: Love it and leave religion out of it

To the Bible thumper from Minnesota: Mt. Rushmore is a national shrine. It is a tribute to our way of life. If you don't like it because you couldn't pass out your Bible stuff: Too bad. You can stay out of our state if you don't like it. We would be better off without the likes of you.

Mt. Rushmore is something everyone should be proud of. Even with a permit you should have more brains than to try and pass out stuff to people visiting our state. It's fools like you who mess up the good times. Go to some other state to pass out your stuff. I'm not against religion!

D.D. DOC STYMIEST.
Lead

**Attachment E**

(NPS Form 10-930)
(OMB No. 1024-0026)
(NEW 10/00)
(Expires 3/31/2010)

**National Park Service**
**Mount Rushmore National Memorial**
13000 Hwy. 244, Bldg. 31 Suite 1
Keystone, SD  57751
(605) 574-3113, 3125, 3115
Fax (605) 574-2307



### Application for Special Use Permit – First Amendment Request

Please supply the information requested below. **Attach additional sheets, if necessary, to provide required information**. Allow 4 business days for processing (2 business days for First Amendment requests).  A non-refundable processing fee must accompany this application unless the requested use is an exercise of a First Amendment right.  You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you **may** be required to provide proof of liability insurance.)

| | |
|---|---|
| Applicant Name: | Organization Name: |
| Social Security #: | Tax ID #: |
| Street/Address: | Street/Address: |
| City/State/Zip Code: | City/State/Zip Code: |
| Telephone #: | Telephone #: |
| Cell phone #: | Cell phone #: |
| Fax #: | Fax#: |
| E-mail: | E-mail: |

Description of Proposed Activity (attach diagram; attach additional pages if necessary):




Requested Location: _____

Date(s): _____

| Event set up will begin:<br>(date and time) | Event will begin:<br>(date and time) | Event will end:<br>(date and time) | Removal will be done:<br>(date and time) |
|---|---|---|---|
| | | | |

Maximum Number of Participants _____ (please provide best estimate)

Maximum Number of Vehicles _____(attach parking plan)

Support Equipment (list all equipment; attach additional pages if necessary)

List support personnel (contractors, etc. including addresses and telephones; attach additional pages if necessary)

Individual in charge of event on site (include address, telephone and cell phone numbers):

| | | |
|---|---|---|
| Is this an exercise of First Amendment Rights? | ☐Y | ☐N |
| Are you familiar with/have you visited the requested area? | ☐Y | ☐N |
| Have your obtained a permit from the National Park Service in the past? | ☐Y | ☐N |
| (If yes, provide a list of permit dates and locations on a separate page.) | | |
| Do you plan to advertise or issue a press release before the event? | ☐Y | ☐N |
| Will you distribute printed material? | ☐Y | ☐N |
| Is there any reason to believe there will be attempts to disrupt, | | |
| protest or prevent your event?(If yes, please explain on a separate sheet.) | ☐Y | ☐N |
| Do you intend to solicit donations or offer items for sale? | | |
| (These activities may require an additional permit.) | ☐Y | ☐N |

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature _____     Date _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Information provided will be used to determine whether a permit will be issued. A completed application must be accompanied by an application fee in the form of a cashiers check or money order in the amount of $ _0_ made payable to **National Park Service**. Application and administrative charges are non-refundable. *This completed application should be mailed to Permit Coordinator at the Park address found on the first page of this application.*

Note that this is an application only, and does not serve as permission to conduct any use of the park. If your request is approved, a permit containing applicable conditions and regulations will be sent to the person designated on the application. The permit must be signed by the responsible person and returned to the park prior to the event for final approval by the Park Superintendent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Paperwork Reduction Act Statement:** This information is being collected to allow the park manager to make a value judgment on whether or not to allow the requested use. All the applicable parts of the form must be completed. A Federal agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**Estimated Burden Statement:** Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, gather and maintain data, review instructions and complete the form. Direct comments regarding this burden estimate or any aspects of this form to the National Park Service, Special Park Uses Program Manager, 1849 C Street NW (2460), Washington, D.C. 20240.

**Attachment F**

02/27/2007 WED 14:05  FAX 1605974230?  Mount Rushmore                    TO:15055742567                    ⊠002/008



Form 10-114
Rev. Dec. 04

### UNITED STATES DEPARTMENT OF THE INTERIOR
### National Park Service
### Special Use Permit

Name of Use ___ Special Events ___ Date Permit     Reviewed _____
                                             Reviewed _____
                                             Reviewed _____

Long Term _____                                  Expires _____
Short Term ___ X ___         Permit # MWR-1500-2501-009
                                         Region Park Type  No.#
                          Name of Area: Mount Rushmore National Memorial

__ Charles Collins __       13201 S. Memorial Dr, Bixby, OK 74008     918-369-2055
Name of Permittee                          Address                        Phone

is hereby authorized during the period from (Time _6:30 pm_ day _2_ Month _06_ 2008 ), through
(Time _8:30 pm_ day _2_ Month _06_ 2008 ), to use the following described land or facilities in the above
named area: Mount Rushmore National Memorial Amphitheater.

For the purpose(s) of: "Youth Choir Concert 'Life Song'"

Authorizing legislation or other authority : __ 36 CFR 2.51 & 2.52 __
NEPA Compliance: CATEGORICALLY EXCLUDED __ EA/FONSI __ EIS OTHER APPROVED PLANS__
PERFORMANCE BOND: Required ___ Not Required _X_                     
$ _____ Amount
LIABILITY INSURANCE: Required ___ Not Required _X_    Amount $ _____

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when
appropriate to the payment to the U.S. Dept. Of the Interior, National Park Service of the sum of
$ _0.00_.
The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations,
expressed or implied hereby.
PERMITTEE: _(signature)_                _Feb 28, 2008_
                Signature                            Date
Authorizing Official _(signature)_       _Mar 1, 2008_
                Signature                            Date
Authorizing Official _____
(additional if required)    Signature         Title               Date


.7-2008 11:25A FROM:RIVERVIEW BAPTIST    918-369-3858        TO:16855742307        P.2

(NPS Form 10-930)
(OMB No. 1024-0026)
(NEW 10/00)
(Expires 3/31/2010)

**National Park Service**
Mount Rushmore National Memorial
13000 Highway 244
Building 31, Suite 1
Keystone, SD 57751
Phone 605-574-2523 / Fax 605-574-2307



### Application for Special Use Permit

Please supply the information requested below. Attach additional sheets, if necessary, to provide required information. Allow **AT LEAST 4** business days for processing (2 business days for First Amendment requests). A non-refundable processing fee should accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. Your permit may require the payment of cost recovery charges and proof of liability insurance naming the United States as also insured.

| Applicant Name: | Organization Name: Riverview Baptist Church |
| Social Security #: | Tax ID # ▓▓▓▓▓ |
| Street/Address: | Street/Address: 13701 S. Memorial Dr |
| City/State/Zip Code: | City/State/Zip Code: Bixby, OK. 74008 |
| Telephone #: | Telephone #: 918-369-2055 |
| Cell phone #: | Cell phone #: |
| Fax #: | Fax #: 918-369-3858 |
| E-mail: | E-mail: charles.collins@riverview-church.org |

Description of Proposed Activity (attach diagram, attach additional pages if necessary): david.hopkins@riverview-church.org

"Life Song" Youth Choir Concert

Requested Location: Amphitheatre
Date(s): Monday, June 2, 2008

| Event set up will begin: (date and time) | Event will begin: (date and time) | Event will end: (date and time) | Removal will be done: (date and time) |
|---|---|---|---|
| 6/2/08   6:30 P.M. | 6/2/08   7:00 P.M. | 6/2/08   8:00 P.M. | 6/2/08   8:30 P.M. |

Maximum Number of Participants Youth Choir~60  Sponsors~10  (Please provide best estimate)

Maximum Number of Vehicles 2 (1 Charter Bus, 1 15 Pass. Van  (attach parking plan)

Support Equipment (list all equipment; attach additional pages if necessary)

Choir Risers, Sound Equip. (Speakers w/ stands, amplifiers, Sound board electric cables, "snake" box, Microphones w/ stands)
Various Instruments (Keyboard w/ stool, drums, guitar, etc.)
Music Stands

List support personnel (contractors, etc. including addresses and telephones attach additional pages if necessary) _N/A_

_____

_____

Individual in charge of event on site (include address, telephone and cell phone numbers): _Charles Collins 13201 S. Memorial Dr Bixby OK 74008  918-369-2055 cell: 918-640-2957_

| | Y | N |
|---|---|---|
| Is this an exercise of First Amendment Rights? | ☐Y | ☑N |
| Are you familiar with/ have you visited the requested area? | ☐Y | ☑N |
| Have you obtained a permit from the National Park Service in the past? | ☐Y | ☑N |
| (If yes, provide a list of permit dates and locations on a separate page.) | | |
| Do you plan to advertise or issue a press release before the event? | ☐Y | ☑N |
| Will you distribute printed material? | ☐Y | ☑N |
| Is there any reason to believe there will be attempts to disrupt, protest or prevent your event?(If yes, please explain on a separate page.) | ☐Y | ☑N |
| Do you intend to solicit donations or offer items for sale? | ☐Y | ☑N |
| (These activities may require an additional permit.) | | |

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature _David Hopkins_                                    Date _2/27/08_

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

Information provided will be used to determine whether a permit will be issued.  Completed application must be accompanied by an application fee in the form of a cashiers check or money order in the amount of $____.00 made payable to **National Park Service**.  Credit card payments may be accepted at some parks. Application and administrative charges are non-refundable.  _This completed application should be mailed to _____ at the Park address found on the first page of this application._

Note that this is an application only, and does not serve as permission to conduct any use of the park. If your request is approved, a permit containing applicable terms and conditions will be sent to the person designated on the application. The permit must be signed by the responsible person and returned to the park prior to the event for final approval by the Park Superintendent.

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

_The above application form is provided with the understanding that parks will insert appropriate park names and addresses and the amount of the application fee as desired._

**Paperwork Reduction Act Statement:** This information is being collected to allow the park manager to make a value judgment on whether or not to allow the requested use.  All the applicable parts of the form must be completed. A Federal agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**Estimated Burden Statement:** Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, gather and maintain data, review instructions and complete the form.  Direct comments regarding this burden estimate or any aspects of this form to the National Park Service, Special Park Uses Program Manager, 1849 C Street NW (2460), Washington, D.C. 20240

Form 10-114
Rev. Dec. 04

UNITED STATES DEPARTMENT OF THE INTERIOR
National Park Service

Special Use Permit

Name of Use _Public Assembly_

Date Permit   Reviewed 20__
         Reviewed 20__
         Reviewed 20__
         Expires   20 08

Long Term _____
Short Term __X__

Permit # MWR- 1500 – 2510 - R0801
Region   Park   Type   No.#

_The Center West_      3601 Canyon Lake Drive Suite 4
Rapid City, SD 57702      605- 348-3244
Name of Permittee _Cedar Michael Cods_   Name of Area   Address   Phone

is hereby authorized during the period from (Time _11:00_ day _12_ Month _07_ 20 __) through

(Time _4:00_ day _13_ Month _11_ 20 __) to use the following described land or facilities in the above named area:
Mount Rushmore Amphitheater Stage and Seating Area

For the purpose(s) of: _Public Assembly related to "PrideFest 2008". See attached application for proposed presentations. May distribute printed material (36 CFR 2.52)_

Authorizing legislation or other authority : _36 CFR 2.51 Public Assembly_

NEPA Compliance: CATEGORICALLY EXCLUDED __ EA/FONSI __ EIS __ OTHER APPROVED PLANS _X_

PERFORMANCE BOND: Required ____ Not Required _X_ Amount $ _____

LIABILITY INSURANCE: Required ____ Not Required _X_ Amount $ _____

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when appropriate to the payment to the U.S. Dept. Of the Interior, National Park Service of the sum of $
_N/A_

The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations, expressed or implied herein.

PERMITTEE _____     _11/07/07_
     Signature                        Date

Authorizing Official _____     _11/04/07_
     Signature            Superintendent       Date

Authorizing Official _Michael D. Pflaum_    Chief Park Ranger   _11/9/07_
(additional if required) Signature             Title          Date

PS Form 10-930)
NEW 10/00)

(OMB No. 1024-0026)

### National Park Service
### Mount Rushmore National Memorial
### Application for Special Use Permit

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name:   Michael M. Coats                    Social Security #: ▮▮▮▮▮▮

Organization Name (if applicable):     The Center West        Tax ID # ▮▮▮▮

Street/Address:   3601 Canyon Lake Dr. Suite 4

City/State/Zip Code:   Rapid City, South Dakota, 57702

Telephone number:   605-348-3244

Description of Proposed Activities:

 Program will begin with a presentation of colors (American and Rainbow flags).

There will be several speeches, some musical numbers and retiring of the colors.

The event is designed to honor those who have lost their lives in the pursuit of equality and freedom and will

include a tribute to members of the Gay, Lesbian , Bisexual and Transgender community who have served

honorably in the Armed Services.

Our featured speaker will be Judy Shepard, Mother of Mathew Shepard, and head of the Mathew Shepard

Foundation.

The program should last about an hour and one half at the most.

Requested Location:   Mt Rushmore Amphitheater

Date (s):  July 12th 2008 _____ Set-up will begin at:  12 noon

Event will begin at:  1 pm _____       Removal will be completed by:  3pm

Maximum Number of Participants  300 _____                (Please provide best estimate)

Maximum Number of Vehicles 25-50 _____                (attach parking plan)

Support Equipment (generators, amplification, etc.)

 Sound equipment

Support Personnel (contractors, etc.)       sound man

Individual (if other than applicant) in charge of event on site:



**United States Department of the Interior**

NATIONAL PARK SERVICE
MOUNT RUSHMORE NATIONAL MEMORIAL
KEYSTONE, SOUTH DAKOTA 57751-0268



IN REPLY
REFER TO:

December 19, 2007

Michael Boardley
11532 Quay St. NW
Coon Rapids, MN 55433

Dear Mr. Boardley,

Attached is the approved and signed permit for you to distribute literature and conduct
open air preaching at Mount Rushmore National Memorial on August 7 and 8, 2008 as
you had requested. If you have questions or comments about the permit, please contact
us at phone number 605-574-2523 or by mail at the following address: Mount Rushmore
National Memorial, 13000 Highway 244, Building 31, Suite 1, Keystone, SD 57751.
Thank you.

Sincerely,

Gerard Baker
Superintendent

Form 10-114
Rev. DEC. 06
Page 1 of 2

Page 1 of 1

UNITED STATES DEPARTMENT OF THE INTERIOR
National Park Service

Special Use Permit

Name of Use __Distribute Printed Material / Public Assembly__
Permit Reviewed                                                    Date

Reviewed

Reviewed

Expires August 8, 2008
    Long Term _____
1500-2520-08002                                                    Permit # RWR-

Region  Park    Type    No. #
        Short Term _X_

__Mount Rushmore National Memorial__
Name of Area

__Michael Boardley__          __11522 Quay St. NW , Coon Rapids, MN 55433__   __(612)-587-____
____
Address          Name of Permittee          Phone

is hereby authorized during the period from (Time _5:00 a.m._ day _07_ Month _08_
_2008), through (Time 11:30 p.m. day 08    Month _08_ 2008 , (exclusive of the hours
from 11:30 p.m. on 08/07 to 5:00 a.m. on 08/08 when the Memorial is closed to visitors),
to use the following described land or facilities in the above named area:
Along the main walkway from the "pergola" (columned pedestrian entrance structure) to
the area adjacent to the rear wall of the concessions building. This is the main
pedestrian access from the parking lot at Mount Rushmore National Memorial to the visitor
center and prime viewing area. This area is marked on the attached map as "Area #2
Walkway". A photograph of the area is also attached.

For the purpose(s) of:  Distribution of literature ("gospel tracts") and open air
preaching.

Authorizing legislation or other authority (RE - DO-53): 36 CFR 2.52; 36 CFR 2.51

NEPA Compliance: CATEGORICALLY EXCLUDED _____ EA/FONSI _____ EIS _____ OTHER
APPROVED PLANS _

PERFORMANCE BOND: Required _____ Not Required _____X_____ Amount

LIABILITY INSURANCE: Required _____ Not Required _____X_____ Amount

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended
pages and when appropriate to the payment to the U.S. Dept. of the Interior, National Park
Service for its direct and indirect costs associated with managing the event.

The undersigned hereby accepts this permit subject to the terms, covenants, obligations,
and reservations, expressed or implied herein.

PERMITTEE _____            __12-14-07__
Date          Signature

Authorizing Official __Michael D. Pfum__    _12/19/07_
Date          Signature

Additional Authorizing Official _____
                    (if Required)
Title __Superintendent__    Date __12/19/07__          Signature

## STANDARD CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the permittee is authorized to make of the land described in this permit.

3. Benefit - No Member of Congress shall be admitted to any share or part of this permit or to any benefit that may arise therefrom: but this provision shall not be construed to extend to this grant if made with a corporation for its general benefit.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information; to do so will be considered a breach of conditions and be grounds for revocation [Re: 36 CFR 2.32(a)(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

8. Pursuant to 36CFR 2.52 (h), It is prohibited for persons engaged in the sale or distribution of printed matter under this section to obstruct or impede pedestrians or vehicles, harass park visitors with physical contact or persistent demands, misrepresent the purposes or affiliations of those engaged in the sale or distribution, or misrepresent whether the printed matter is available without cost or donation.

Form 10-114
Rev. Dec. 04

# UNITED STATES DEPARTMENT OF THE INTERIOR
## National Park Service
### Special Use Permit

Name of Use ___Public Assembly___          Date Permit Reviewed _____
     (World Day of Prayer)                          Reviewed _____
     *National*                                    Reviewed _____
                                 Expires __May 1, 2008__

Long Term _____                         Permit # MWR-1500-2510- __004__
Short Term ____X____                          Region Park Type  No.#
                 Name of Area: Mount Rushmore National Memorial

__Rita Fischer__                             __4275 Sturgis Rd Rapid City, SD 57702__  __(605)348-6691__
Name of Permittee                            Address                                   Phone

is hereby authorized during the period from (Time __07: 00__ day __1__ Month __05__ 2008 ),through

(Time __09:00__ day __01__ Month __05__ 20 _08_ ), to use the following described land or facilities in the above

named area: Amphitheater, Mount Rushmore National Memorial.

For the purpose(s) of: A public assembly for prayer on the National Day of Prayer May 1, 2008

Authorizing legislation or other authority : __36 CFR 2.51 & 2.52__
NEPA Compliance: CATEGORICALLY EXCLUDED _X_ EA/FONSI __ EIS OTHER APPROVED PLANS__
PERFORMANCE BOND: Required ___ Not Required _X_   Amount $_____
LIABILITY INSURANCE: Required ___ Not Required _X_   Amount $_____

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when
appropriate to the payment to the U.S. Dept. Of the Interior, National Park Service of the sum of
$ _____ .

The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations,
expressed or implied herein.

PERMITTEE ___*Rita D Fischer*___                    ___*1-30-08*___
            Signature                                    Date

Authorizing Official ___*Michael A. Plan*___        ___*1/29/08*___
            Signature                                    Date

Authorizing Official _____

(additional if required) _____     _____     _____
            Signature              Title              Date

CONDITIONS OF THIS PERMIT    207

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the
use which the permittee is authorized to make of the land described in this permit.

3. Benefit - Neither Members of, nor Delegates to Congress, or Resident Commissioners shall be admitted to any share or part of this permit or derive, either directly or indirectly, any pecuniary benefit to arise therefrom: Provided, however, that nothing herein contained shall be construed to extend to any incorporated company, if the permit be for the benefit of such corporation.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information, to do so will be considered a breach of conditions and be grounds for revocation: [RE:36 CFR 2.32(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

## APPENDIX

(NPS Form 10-930)
(NEW 10/00)

### National Park Service
### Mount Rushmore National Memorial
### Application for Special Use Permit

(OMB No. 1024-0026)



Please supply the information requested below. Use additional sheets if necessary. Allow at least two (2) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name:   Rita D. Fischer                              Social Security #

Organization Name (if applicable):   National Day of Prayer  Tax ID #   N/A

Street/Address:

City/State/Zip Code:   Rapid City, SD  57702

Telephone number:   605-348-6691

Description of Proposed Activities:   public gathering for prayer on the National Day of Prayer, May 1, 2008. This will be the Judeo-Christian expression of the National Day of Prayer as in 2006 and 2007. Plans are for those interested in attending simply to unite in corporate prayer (no program or speakers) and then if participants wish to do so, stay for breakfast and fellowship in the dining room (on their own, not a planned event).

Requested Location:   amphitheater

Date (s):   Thursday, May 1, 2008                         Set-up will begin at:  6 or 6:30 am as necessary

Event will begin at:        7 a.m.                         Removal will be completed by:   9 a.m.

Maximum Number of Participants  50-100                                        (Please provide best estimate)

Maximum Number of Vehicles  20                                              (attach parking plan)

.upport Equipment (generators, amplification, etc.) ___None

Support Personnel (contractors, etc.) ___None

Individual (if other than applicant) in charge of event on site:

Is this an exercise of First Amendment Rights?                                    Yes
Are you familiar with/ have you visited the requested area?                       Yes
Do you plan to advertise or issue a press release?                               Yes
Will you distribute printed material?    *Possible NDP prayer guides as in past years, with NPS approval*
Is there any reason to believe there will be attempts to disrupt,
    protest or prevent your event?(if yes explain on separate sheet)      Y      No

The applicant by his or her signature certifies that all the information given is complete and correct, and that no
false or misleading information or false statements have been given.

Signature __Rita D. Fischer__ _[signature]_ ___ Date __January 16, 2008__
                          _S.D. State Coordinator, NDP._

Note that this is an application only, and does not serve as permission to conduct a special event or any other use of a National Park. If your request is approved, a permit containing applicable conditions and regulations will be sent to the person designated on the application. The permit must be signed and returned to the park prior to the event.

Return this application to:        Permit Coordinator
                                   National Park Service
                                   Mount Rushmore National Memorial
                                   13000 Highway 244
                                   Building 31, Suite 1
                                   Keystone, SD 57751
            Phone (605) 574-2523        Fax (605) 574-2307

Paperwork Reduction Act Statement: This information is being collected to allow the park manager to make a valued judgement on whether or not to allow the requested use. All the applicable parts of the form must be completed.

Estimated Burden Statement: Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, review instructions and complete the form. Direct comments regarding this burden estimate or any aspects of this form to the National Park Service Program Manager, Special Park Uses, Ranger Activities Division, 1849 C Street, NW., Washington, D.C. 20240 and to the Information Collection Clearance Officer, Washington Administrative Program Center, 1849 C Street, NW., Washington, D.C. 20240. An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

Form 10-114
Rev. Dec. 04

### UNITED STATES DEPARTMENT OF THE INTERIOR
### National Park Service
### Special Use Permit

Name of Use ___Public Assembly_____    Date Permit  Reviewed _____
                                                            Reviewed _____
                                                            Reviewed _____
                                                            Expires
Long Term _____                           Permit # MWR-1500- ~~2515~~ 2510 – 005
Short Term ___X_____                          Region Park  Type  No.#
                                              Name of Area: Mount Rushmore National Memorial

___Jessica Bauers_____    ████████████████Sioux Falls. SD 57104_____
Name of Permittee                  Address                    Phone

is hereby authorized during the period from (Time _9 : 40pm_ day __15__ Month _7 20 08_ ),through

(Time _10 :00pm_ day _15_ Month _07__  20_08__ ), to use the following described land or facilities in

the above named area: Mount Rushmore National Memorial Amphitheater (Seating area).

For the purpose(s) of: Holding a 20-min Vesper after the scheduled Evening Program.

Authorizing legislation or other authority : __36 CFR 2.51 & 2.52_____
NEPA Compliance: CATEGORICALLY EXCLUDED __ EA/FONSI __EIS OTHER APPROVED PLANS_
PERFORMANCE BOND: Required ___ Not Required _X_    Amount $_____
LIABILITY INSURANCE: Required ___ Not Required _X_  Amount $_____

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when
appropriate to the payment to the U.S. Dept. Of the Interior, National Park Service of the sum of
$ _N/A_____.
The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations,
expressed or implied herein.
PERMITTEE __Jessica Bauers_____    _2-1-08_____
                    Signature                                Date

Authorizing Official __Michael D. Pflaum_____    _1/28/08_____
                    Signature           Superintendent        Date

Authorizing Official _____
(additional if required)    Signature        Title        Date

## CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the permittee is authorized to make of the land described in this permit.

3. Benefit - Neither Members of, nor Delegates to Congress, or Resident Commissioners shall be admitted to any share or part of this permit or derive, either directly or indirectly, any pecuniary benefit to arise therefrom: Provided, however, that nothing herein contained shall be construed to extend to any incorporated company, if the permit be for the benefit of such corporation.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information, to do so will be considered a breach of conditions and be grounds for revocation: [RE:36 CFR 2.32(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

## APPENDIX



Sisters of the Presentation
of the Blessed Virgin Mary

*In Joyful Service*



RECEIVED
JAN 1 8 2008
By

January 12, 2008

Superintendent of Mount Rushmore
Box 268
Keystone, SD 57751

Dear Superintendent:

On behalf of the Presentation Sisters of Aberdeen, South Dakota, I am writing to request a First Amendment Permit to hold a 20-minute vesper service at Mount Rushmore following the usual lighting ceremony on Tuesday, July 15, 2008

The Presentation Sisters are sponsoring their 13th Annual Leadership Camp at Storm Mountain from July 14-18, 2008. Girls who will be entering 7th, 8th, or 9th grade in the fall of 2008 are eligible to attend this camp. We anticipate approximately 120 campers and 30 adult leaders will attend.

The campers and leaders plan to attend the lighting ceremony. After the ceremony campers will be instructed to remain in their seats until most people have left. We would then conduct our service in the general area where we were seated.

Please do not hesitate to contact me at (605) 271-0468 or outreach@presentationsisters.org if you have any questions.

Thank you for your consideration and assistance with this request.

Sincerely,

Jessica Bauers
Presentation Sisters
Outreach Coordinator
218 W. 13th Street, Ste.112
Sioux Falls, SD 57104

1500 NORTH 2ND STREET · ABERDEEN, SOUTH DAKOTA 57401-1238
PHONE: (605) 229-8337  FAX: (605) 229-8527
www.presentationsisters.org    psdev@presentationsisters.org

Form 10-114
Rev. Dec. 04

### UNITED STATES DEPARTMENT OF THE INTERIOR
National Park Service
Special Use Permit

Name of Use ____Public Assembly____    Date Permit Reviewed _01/30/08_
Reviewed _01/30/08_
Reviewed _01/30/08_
Expires _03/23/08_

Long Term _____    Permit # MWR-1500-2510- 006
Short Term __X__    Region Park Type No.#
Name of Area: Mount Rushmore National Memorial
57201

Diane Jansen Hemmen
Name of Permittee                    Address                    Phone

is hereby authorized during the period from (Time _6 :00_ day _23_ Month _03 / 2008_ ), through

(Time _9:00_ day _23_ Month _03/ 2008__ ), to use the following described land or facilities in the above

named area: Mount Rushmore Amphitheater and Stage Area

For the purpose(s) of: A public assembly for Religious Services. (Easter Sunrise Service).
and distribution of program donations.

Authorizing legislation or other authority : ____36 CFR 2.51 & 2.52____
NEPA Compliance: CATEGORICALLY EXCLUDED __ EA/FONSI __ EIS OTHER APPROVED PLANS__
PERFORMANCE BOND: Required ___ Not Required _X_    Amount S _____
LIABILITY INSURANCE: Required ___ Not Required _X_    Amount S _____

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when
appropriate to the payment to the U.S. Dept. Of the Interior, National Park Service of the sum of
S _____
The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations,
expressed or implied herein.
PERMITTEE ____Diane Jansen Hemmen____    Jan 30, 2008
Signature                    Date

Authorizing Official ____Edward Menard____    Jan 30, 2008
Signature                    Date

Authorizing Official _____
(additional if required)    Signature        Title        Date

## CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the permittee is authorized to make of the land described in this permit.

3. Benefit - Neither Members of, nor Delegates to Congress, or Resident Commissioners shall be admitted to any share or part of this permit or derive, either directly or indirectly, any pecuniary benefit to arise therefrom: Provided, however, that nothing herein contained shall be construed to extend to any incorporated company, if the permit be for the benefit of such corporation.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information, to do so will be considered a breach of conditions and be grounds for revocation: [RE:36 CFR 2.32(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

## APPENDIX

(NPS Form 10-930)
(OMB No. 1024-0026)
(NEW 10/00)

(Expires 3/31/2010)

**National Park Service**
**Mount Rushmore National Memorial**
13000 Hwy 244 Bldg. 31 Suite 1
Keystone, SD 57751
(605)574-3137



**Application for Special Use Permit**

Please supply the information requested below. Attach additional sheets, if necessary, to provide required information. Allow AT LEAST 10 business days from receipt of application for processing, (2 business days for First Amendment requests). A non-refundable processing fee of $50 should accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. Your permit may require the payment of cost recovery charges and proof of liability insurance naming the United States as also insured.

| Applicant Name: Diane Jenssen Hermann | Organization Name: Hermann / Keystone UCC |
| Social Security #: | Tax ID # |
| Street/Address: | Street/Address: |
| City/State/Zip Code: Rapid City SD 57701 | City/State/Zip Code: |
| Telephone #: | Telephone #: |
| Cell phone #: | Cell phone #: |
| Fax #: home phone – call ahead | Fax #: |
| E-mail: | E-mail: |

Description of Proposed Activity (attach diagram, attach additional pages if necessary):

Religious Observances (Easter Sunrise Services). + 100 Drummer, choir,

Collect donations

Requested Location:    Mount Rushmore National Memorial Amphitheater

Date(s): —

| Event set up will begin: (date and time) | Event will begin: (date and time) | Event will end: (date and time) | Removal will be done: (date and time) |
|---|---|---|---|
| March 23, 2008 6:00am | March 23, 2008 7:00 am | March 23, 2008 9:00 am | March 23, 2008 10:00 am |

Maximum Number of Participants ___3560 ?___ (Please provide best estimate)

Maximum Number of Vehicles ___1200 ?___ (attach parking plan)

Support Equipment (list all equipment; attach additional pages if necessary)

open VC theater 6am for rehearsal; stage sound equipment
banner displayed (dropped-off early March); podium; chairs for stage
(cont'd)

_group will bring 2-3 golf carts_

List support personnel (contractors, etc. including addresses and telephones attach additional pages if necessary) _____

_____

_____

Individual in charge of event on site (include address, telephone and cell phone numbers): _____
_Diane Janssen Hemmen_

| | | |
|---|---|---|
| Is this an exercise of First Amendment Rights? | ☒Y | ☐N |
| Are you familiar with/have you visited the requested area? | ☒Y | ☐N |
| Have your obtained a permit from the National Park Service in the past? | ☒Y | ☐N |
| (If yes, provide a list of permit dates and locations on a separate page.) | | |
| Do you plan to advertise or issue a press release before the event? | ☒Y | ☐N |
| Will you distribute printed material? | ☒Y | ☐N |
| Is there any reason to believe there will be attempts to disrupt, | | |
| protest or prevent your event?(If yes, please explain on a separate page.) | ☐Y | ☒N |
| Do you intend to solicit donations or offer items for sale? | | |
| (These activities may require an additional permit.) | ☒Y | ☐N |

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature _Diane Janssen Hemmen_    Date _30 January 2008_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Information provided will be used to determine whether a permit will be issued. Completed application must be accompanied by an application fee in the form of a cashiers check or money order in the amount of $50.00 made payable to National Park Service. Credit card payments may be accepted at some parks. Application and administrative charges are non-refundable. _This completed application should be mailed to ___Permit Coordinator___ at the Park address found on the first page of this application._

Note that this is an application only, and does not serve as permission to conduct any use of the park. If your request is approved, a permit containing applicable terms and conditions will be sent to the person designated on the application. The permit must be signed by the responsible person and returned to the park prior to the event for final approval by the Park Superintendent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_The above application form is provided with the understanding that parks will insert appropriate park names and addresses and the amount of the application fee as desired._

Paperwork Reduction Act Statement: This information is being collected to allow the park manager to make a value judgment on whether or not to allow the requested use. All the applicable parts of the form must be completed. A Federal agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

Estimated Burden Statement: Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, gather and maintain data, review instructions and complete the form. Direct comments regarding this burden estimate or any aspects of this form to the National Park Service, Special Park Uses Program Manager, 1849 C Street NW (2460), Washington, D.C. 20240

**Mount Rushmore National Memorial**
13000 Hwy 244, Building 31, Suite 1
Keystone, SD 57751-0268
Phone: (605) 574-3137
Fax (605) 574-2307

Permit # 053

## Mount Rushmore
## National Memorial

# Special Events Permit

RECEIVED
MAR 1 5 2007
By

Name of Group Performing ___ Hills Parish ___

Date of Event/Activity: ___ April 8, 2007 ___ 6am - 9am

Type of Program ___ Easter Sunrise Service ___

Person in Charge: ___ Pastor Mitch Behringer ___

Address: ___ P.O. Box 751 Hill City, SD 57745 ___

Telephone: Day: ___ (605)574-4968 ___ Night: ___

Permit is granted subject to the following conditions:

1.      The National Park Service waives the permit fee for the year 2007.

2.      Only the equipment specified on the permit will be provided. No extra equipment will be available upon arrival. (Please mark equipment needed on reverse side.)

3.      The ranger will set up only the AV equipment. Risers and chairs will be set up by the group that is performing.

4.      Check in time is one hour before the program is to start. The ranger will not be available before that time.

5.      Brochures, handouts or programs to be distributed must be approved in advance. All litter and brochures generated by the event must be removed after the special event by the group holding the event.

6.      No food or drink is allowed to be served in the amphitheater.

7.      Vehicle access to the amphitheater is allowed only to drop off and pick up equipment. No vehicles are allowed behind the amphitheater during the performance.

8.      Each special event must be approved by the Superintendent of Mount Rushmore National Memorial.

I acknowledge acceptance of the conditions, accept responsibility for compliance, and understand if the permit is granted it may be canceled for non-compliance.

Signature _~Rev. Mitch Behringer~_          Date: _March 13 2007_

(NPS Form 10-930)
(NEW 10/00)

(OMB No. 1024-0026)
(Expires 09/30/2007)

## National Park Service
## Mount Rushmore National Memorial
### Application for Special Use Permit

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name: _Pastor "Mitch" Behringer_    Social Security # ___N/A___

Organization Name (if applicable): _Hills Parish_    _____ ID #_____

Street/Address: _____

City/State/Zip Code: _Hill City, South Dakota 57745_

Telephone number: _____

Description of Proposed Activities: _Religious Observances (Easter Sunrise Services_

Requested Location: Amphitheater

Date(s) _April 8, 2007_    Set-up will begin at _6:00 a.m._    MST (MDT)

Event will begin at _7:00 a.m._ (MDT)    Removal will be completed by _9:00 a.m._ (MDT)

Maximum Number of Participants _4000_    (Please provide best estimate) MST

Maximum Number of Vehicles _1450_    (attach parking plan)

Support Equipment (generators, amplification, etc.)

Support Personnel (contractors, etc.)

Individual (if other than applicant) in charge of event on site:

Is this an exercise of First Amendment Rights?    (Y)  N
Are you familiar with/ have you visited the requested area?    (Y)  N
Do you plan to advertise or issue a press release?    (Y)  N
Will you distribute printed material?    (Y)  N
Is there any reason to believe there will be attempts to disrupt, protest or prevent your event?(if yes explain on separate sheet)    Y  (N)

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature _Don't sign yet_    Date _____

Note that this is an application only and does not serve as permission to conduct a special event or any other
_I will type it up and mail it to_

Form 10-114
Rev. DEC. 00

Page 1 of 2

UNITED STATES DEPARTMENT OF THE INTERIOR
National Park Service

Special Use Permit

Name of Use _Public Assembly_

Date Permit Reviewed 1/22/07
Reviewed
Reviewed
Expires 5/3/07

Long Term ___
Short Term _X_

Permit # MWR-1500-3150 - RD701
Region  Park  Type  No.#

Mount Rushmore National Memorial
Name of Area

_Rita Fischer_
SD Coordinator National Day of Prayer
Name or Permittee

_Rapid City, SD 57702_
Address

Phone

is hereby authorized during the period from (Time _5:00 p.m._ day _03_ Month _05_ ), through (Time _9:00 p.m._
day _03_ Month _05_ ), to use the following described land or facilities in the above named area:

_Mount Rushmore amphitheater and stage area_

For the purpose(s) of: _A public assembly for a "National Day of Prayer" event to_
_include speakers, prayer, and music_

Authorizing legislation or other authority (RE - DO-53): _36 CFR 2.51 and 2.52_

NEPA Compliance: CATEGORICALLY EXCLUDED _X_ EA/FONSI ___ EIS ___ OTHER APPROVED PLANS

PERFORMANCE BOND: Required _____ Not Required _X_ Amount

LIABILITY INSURANCE: Required _____ Not Required _X_ Amount

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when appropriate to the payment to the U.S. Dept. of the Interior, National Park Service for its direct and indirect costs associated with managing the event.

The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations, expressed or implied herein.

PERMITTEE _Rita D. Fischer_                    1-22-07
                    Signature                    Date

Authorizing Official _Michael D. Pflum_         1/22/07
                    Signature                    Date

Additional Authorizing Official _____

(if Required)          Signature          Title          Date

## CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the permittee is authorized to make of the land described in this permit.

3. Benefit - Neither Members of, nor Delegates to Congress, or Resident Commissioners shall be admitted to any share or part of this permit or derive, either directly or indirectly, any pecuniary benefit to arise therefrom: Provided, however, that nothing herein contained shall be construed to extend to any incorporated company, if the permit be for the benefit of such corporation.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information, to do so will be considered a breach of conditions and be grounds for revocation: [RE:36 CFR 2.32(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

### APPENDIX
### SPECIAL PARK CONDITIONS
### SPECIAL USE PERMIT

1 of 2

Form 10-114
Rev. Dec. 04

## UNITED STATES DEPARTMENT OF THE INTERIOR
### National Park Service

Special Use Permit

Name of Use **Public Assembly**

Date Permit     Reviewed 20__
                Reviewed 20__
                Reviewed 20__
                Expires   20 **07** May 6
Permit # **MoR-1500-2150-R0702**
        Region  Park  Type   No.#

Long Term _____
Short Term ___X___

Name of Area **Mount Rushmore N. M.**

**J. David Len kuts**
Name of Permittee

**RC 50**
Address

**57702**

Phone

is hereby authorized during the period from (Time **9:30** day of Month **05** 20 **07**), through
(Time **0:30** day of Month **05** 20 **07**), to use the following described land or facilities in the above named area:
**Amphitheater Stage and Seating**
For the purpose(s) of: **Public assembly for a religious service.**

Authorizing legislation or other authority : **36 CFR 2.51**

NEPA Compliance: CATEGORICALLY EXCLUDED _ EA/FONSI _ EIS _ OTHER APPROVED PLANS **X**

PERFORMANCE BOND: Required _____ Not Required **X** Amount $ _____

LIABILITY INSURANCE:  Required _____ Not Required **X** Amount $ _____

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and
when appropriate to the payment to the U.S. Dept. Of the Interior, National Park Service of the sum of $
**N/A**

The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and
reservations, expressed or implied herein.

PERMITTEE _____      **5/5/07**
            Signature                       Date

Authorizing Official **Michael A. Pflaum**  Chief Park Ranger       **5/4/07**
            Signature                       Superintendent          Date

Authorizing Official _____
(additional if required) Signature        **RE 5/5/07**            Title            Date

## CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the
use which the permittee is authorized to make of the land described in this permit.

3. Benefit - Neither Members of, nor Delegates to Congress, or Resident Commissioners shall be admitted to any share or part of this permit or derive, either directly or indirectly, any pecuniary benefit to arise therefrom:  Provided, however, that nothing herein contained shall be construed to extend to any incorporated company, if the permit be for the benefit of such corporation.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information, to do so will be considered a breach of conditions and be grounds for revocation: [RE:36 CFR 2.32(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

## APPENDIX
### SPECIAL PARK CONDITIONS
### SPECIAL USE PERMIT

**Mount Rushmore
National Memorial**

Mount Rushmore National Memorial
13000 Hwy 244, Building 31, Suite 1
Keystone, SD 57751-0268
Phone: (605) 574-3137
Fax: (605) 574-2307

Permit # 058

## Special Events Permit

Name of Group Performing_____Hill City High School_____

Date of Event/Activity:___May 20, 2007_____

Type of Program ___Senior Graduation_____

Person in Charge _____Todd Satter_____

Address:_____ ████████ 659 Hill City, SD 57745_____

Telephone: Day: ████████ Night: _____

Permit is granted subject to the following conditions:

1.      The National Park Service waives the permit fee for the year 2007.

2.      Only the equipment specified on the permit will be provided. No extra equipment will be available upon arrival. (Please mark equipment needed on reverse side.)

3.      The ranger will set up only the AV equipment. Risers and chairs will be set up by the group that is performing.

4.      Check in time is <u>one</u> hour before the program is to start. The ranger will not be available before that time.

5.      Brochures, handouts or programs to be distributed must be approved in advance. All litter and brochures generated by the event must be removed after the special event by the group holding the event.

6.      No food or drink is allowed to be served in the amphitheater.

7.      Vehicle access to the amphitheater is allowed only to drop off and pick up equipment. No vehicles are allowed behind the amphitheater during the performance.

8.      Each special event must be approved by the Superintendent of Mount Rushmore National Memorial.

I acknowledge acceptance of the conditions, accept responsibility for compliance, and understand if the permit is granted it may be canceled for non-compliance.

Signature:_____[signature]_____     Date:___4-3-07_____

; Form 10-930)
:W 10/00)

(OMB No. 1024-0026)
(Expires 07/30/2007)

**National Park Service**
**Mount Rushmore National Memorial**
**Application for Special Use Permit**

DECEIVE
APR -5 2007
BY

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing.  A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name _____ Todd Satter _____ Social Security # ___ N/A _____

Organization Name (if applicable): ____ Hill City High School ____ ID # _____

Street/Address: _____ ▓▓▓▓▓▓ ▓▓▓▓▓▓ _____

City/State/Zip Code: ___ Hill City, SD 57745 _____

Telephone number: ____ ▓▓▓▓▓▓ _____

Description of Proposed Activities:

High school graduation


Requested Location: Amphitheater

Date (s)_____ May 20, 2007 _____ Set-up will begin at ____ 9:00am ____ (MDT)

Event will begin at ____ 10:00 am _____ Removal will be completed by __ 12:00 pm __ (MDT)

Maximum Number of Participants _____ 1,000 _____ (Please provide best estimate)

Maximum Number of Vehicles _____ 300 _____ (attach parking plan)

Support Equipment (generators, amplification, etc.)


Support Personnel (contractors, etc.)

Individual (if other than applicant) in charge of event on site:

Is this an exercise of First Amendment Rights?                    Ⓨ       N
Are you familiar with/ have you visited the requested area?       Ⓨ       N
Do you plan to advertise or issue a press release?                 Y       N
Will you distribute printed material?                             Ⓨ       N     Grad program
Is there any reason to believe there will be attempts to disrupt,
protest or prevent your event?(if yes explain on separate sheet)   Y      Ⓝ

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature ___ _Todd Satt_ (signature) _____ Date ___ 4·3·07 ____

Page 2

Mount Rushmore Special Events Application

The following park property can be made available for your use:

| | |
|---|---|
| ✓ | CD Player |
| | Cassette Player |
| ✓ | Choral Microphones (4 microphones) |
| ✓ | Mixer Board for additional electronic equipment |
| ✓ | Public address system (1 or 2 microphones) |
| 65 | Folding chairs (1 to 100). *Note number needed.* |
| | Three-step risers (1 to 6). *Note number needed.* |
| ✓ | Podium/Lectern |
| ✓ | Yamaha Keyboard (full keyboard = 88 keys) |

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The following information to be provided by Mount Rushmore National Memorial:

Permit time—   Starting: _____10:00 am_ (MDT)   Ending before: ___12:00pm___ (MDT)

Check in time   _9:00 am_____ (MDT)____ (Ranger will meet you at Amphitheater)

Location: __Amphitheater_____

*All times are <u>Mountain Daylight</u> Times.

## Mount Rushmore
## National Memorial

Mount Rushmore National Memorial
13000 Hwy 244, Building 31, Suite 1
Keystone, SD 57751-0268
Phone: (605) 574-3137
Fax: (605) 574-2307

Permit # 066

## Special Events Permit

RECEIVED
APR 3 0 2007
By_____

Name of Group Performing_____Bethlehem United Methodist Church

Date of Event/Activity:____June 4, 2007

Type of Program_____Musical Program

Person In Charge_____Harry Robinson

Address:_____████████████ oop Franklin, TN 37069

Telephone: Day:_____████████████_____Night_____████████████_____ (seec)

Permit is granted subject to the following conditions:

1.    The National Park Service waives the permit fee for the year 2007.

2.    Only the equipment specified on the permit will be provided. No extra equipment will be available upon arrival. (Please mark equipment needed on reverse side.)

3.    The ranger will set up only the AV equipment. Risers and chairs will be set up by the group that is performing.

4.    Check in time is one hour before the program is to start. The ranger will not be available before that time.

5.    Brochures, handouts or programs to be distributed must be approved in advance. All litter and brochures generated by the event must be removed after the special event by the group holding the event.

6.    No food or drink is allowed to be served in the amphitheater.

7.    Vehicle access to the amphitheater is allowed only to drop off and pick up equipment. No vehicles are allowed behind the amphitheater during the performance.

8.    Each special event must be approved by the Superintendent of Mount Rushmore National Memorial.

I acknowledge acceptance of the conditions, accept responsibility for compliance, and understand if the permit is granted it may be canceled for non-compliance.

Signature:_____        Date:___4.23.07___

(NPS Form 10-930)
(NEW 10/00)

(OMB No. 1024-0026)
(Expires 09/30/2007)

## National Park Service
## Mount Rushmore National Memorial
## Application for Special Use Permit

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name    Harry Robinson                              Social Security #    N/A

Organization Name (if applicable):    Bethlehem United Methodist Church    ID #

Street/Address:    ███████████

City/State/Zip Code:    Franklin. TN 37069

Telephone number:    ███████████████

Description of Proposed Activities:

Musical concert

Requested Location: Amphitheater

ate (s)    June 4, 2007                              Set-up will begin at    6:30    pm    (MDT)

Event will begin at    7:30    pm              Removal will be completed by    8:30 pm    (MDT)

Maximum Number of Participants    36                        (Please provide best estimate)

Maximum Number of Vehicles    1                        (attach parking plan)

Support Equipment (generators, amplification, etc.)

Support Personnel (contractors, etc.)

Individual (if other than applicant) in charge of event on site:

Is this an exercise of First Amendment Rights?                              Ⓨ    N
Are you familiar with/ have you visited the requested area?              Ⓨ    N
Do you plan to advertise or issue a press release?                        Y    Ⓝ
Will you distribute printed material?                                    Y    Ⓝ
Is there any reason to believe there will be attempts to disrupt,
protest or prevent your event?(if yes explain on separate sheet)        Y    Ⓝ

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature    _/Harry Robinson/_                              Date    4·23·07

## Mount Rushmore
## National Memorial

Mount Rushmore National Memorial
13000 Hwy 244, Building 31, Suite 1
Keystone, SD 57751-0268
Phone: (605) 574-0157
Fax: (605) 574-2307

Permit # 074

# Special Events Permit

Name of Group Performing _____ Ministry in the Park _____

Date of Event/Activity: ___ Sundays (Throughout Summer June 3 – Aug 26, 2007)

Type of Program ____ Religious Service _____

Person in Charge ____ Russ Jobman _____

Address: ____ Xanterra Concessions _____

Telephone: Day: ___ (605)574-2515 _____ Night _____

Permit is granted subject to the following conditions:

1. The National Park Service waives the permit fee for the year 2007.

2. Only the equipment specified on the permit will be provided. No extra equipment will be available upon arrival. (Please mark equipment needed on reverse side.)

3. The ranger will set up only the AV equipment. Risers and chairs will be set up by the group that is performing.

4. Check in time is one hour before the program is to start. The ranger will not be available before that time.

5. Brochures, handouts or programs to be distributed must be approved in advance. All litter and brochures generated by the event must be removed after the special event by the group holding the event.

6. No food or drink is allowed to be served in the amphitheater.

7. Vehicle access to the amphitheater is allowed only to drop off and pick up equipment. No vehicles are allowed behind the amphitheater during the performance.

8. Each special event must be approved by the Superintendent of Mount Rushmore National Memorial.

I acknowledge acceptance of the conditions, accept responsibility for compliance, and understand if the permit is granted it may be canceled for non-compliance.

Signature: _____ Date: 5/30/07

orm 10-930)
/ 10/00)

(OMB No. 1024-0026)
(Expires 09/30/2007)

## National Park Service
## Mount Rushmore National Memorial
## Application for Special Use Permit

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name ___Russ Jobman___      Social Security # ___N/A___

Organization Name (if applicable): ___Ministry in the Parks___

Street/Address: ___Xanterra Concession___

City/State/Zip Code: ___Mount Rushmore National Memorial___

Telephone number: ___(605)574-2515___

Description of Proposed Activities:

Religious Service

Requested Location: Amphitheater

ate (s) ___June 3 - Aug 26, 2007___      Set-up will begin at ___7:30___ am (MDT)

Event will begin at ___8:00___ am      Removal will be completed by ___9:30 am___ (MDT)

Maximum Number of Participants _____ (Please provide best estimate)

Maximum Number of Vehicles _____ (attach parking plan)

Support Equipment (generators, amplification, etc.)

Support Personnel (contractors, etc.)

Individual (if other than applicant) in charge of event on-site:

Is this an exercise of First Amendment Rights?      Y      N
Are you familiar with/ have you visited the requested area?      Y      N
Do you plan to advertise or issue a press release?      Y      N
Will you distribute printed material?      Y      N
Is there any reason to believe there will be attempts to disrupt,
protest or prevent your event?(if yes explain on separate sheet)      Y      N

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature _____      Date ___5/30/07___

that this is an application only, and does not serve as permission to conduct a special event or any other a National Park. If your request is approved, a permit containing applicable conditions and regulations be sent to the person designated on the application. The permit must be signed and returned to the park or to the event.

Return this application to:    Ed Menard
Permit Coordinator
Mount Rushmore National Memorial
13000 Hwy 244
Building 31, Suite 1
Keystone, SD 57751-0268

Phone (605) 574-3137    Fax (605) 574-2307

Paperwork Reduction Act Statement: This information is being collected to allow the park manager to make a valued judgement on whether or not to allow the requested use. All the applicable parts of the form must be completed.

Estimated Burden Statement: Public reporting burden for this form is estimated to average 30 minutes per response including the time it takes to read, review instructions and complete the form. Direct comments regarding this burden estimate or any aspects of this form to the National Park Service Program Manager, Special Park Uses, Ranger Activities Division, 1849 C Street, NW., Washington, D.C. 20240 and to the Information Collection Clearance Officer, Washington Administrative Program Center, 1849 C Street, NW., Washington, D.C. 20240. An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

**Permit # 075**

# Mount Rushmore
# National Memorial

Mount Rushmore National Memorial
13000 Hwy 244, Building 31, Suite 1
Keystone, SD 57751-0268
Phone: (605) 574-3137
Fax: (605) 574-2307

## Special Events Permit

RECEIVED
JUN 11 2007

Name of Group Performing _____ Presentation Sisters of Aberdeen, SD _____

Date of Event/Activity: _____ July 24, 2007 (After Evening Program) _____

Type of Program _____ 20 Vesper Service _____

Person in Charge _____ Jessica Bauers _____

Address: ▆▆▆▆▆▆▆▆▆▆ Sioux Falls, SD 57104 _____

Telephone: Day: ▆▆▆▆▆▆▆▆ Night: ▆▆▆▆▆▆▆▆▆

Permit is granted subject to the following conditions:

1.  The National Park Service waives the permit fee for the year 2007.

2.  Only the equipment specified on the permit will be provided. No extra equipment will be available upon arrival. (Please mark equipment needed on reverse side.)

3.  The ranger will set up only the AV equipment. Risers and chairs will be set up by the group that is performing.

4.  Check in time is one hour before the program is to start. The ranger will not be available before that time.

5.  Brochures, handouts or programs to be distributed must be approved in advance. All litter and brochures generated by the event must be removed after the special event by the group holding the event.

6.  No food or drink is allowed to be served in the amphitheater.

7.  Vehicle access to the amphitheater is allowed only to drop off and pick up equipment. No vehicles are allowed behind the amphitheater during the performance.

8.  Each special event must be approved by the Superintendent of Mount Rushmore National Memorial.

I acknowledge acceptance of the conditions, accept responsibility for compliance, and understand if the permit is granted it may be canceled for non-compliance.

Signature: _Jessica Bauers_          Date: _6-7-07_

(PS Form 10-930)
(NEW 10/00)

(OMB No: 1024-0026)
(Expires 09/30/2007)

**National Park Service**
**Mount Rushmore National Memorial**
**Application for Special Use Permit**

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name   Jessica Bauers                    Social Security #    N/A

Organization Name (if applicable):   Presenation Sisters of Aberdeen

Street/Address: ████████████████

City/State/Zip Code:   Sioux Falls. SD

Telephone number: ████████████

Description of Proposed Activities:

20-min Vesper service after EP.

Requested Location: Amphitheater

Date (s)_____July 24. 2007_____          Set-up will begin at    N/A    (MDT)

Event will begin at     9:40 pm_____          Removal will be completed by    10:15 pm    (MDT)

Maximum Number of Participants     150_____ (Please provide best estimate)

Maximum Number of Vehicles  3 busses, 2 vans_____ (attach parking plan)

Support Equipment (generators, amplification, etc):
    n/a

Support Personnel (contractors, etc.)

Individual (if other than applicant) in charge of event on site:  Jan Johnson

Is this an exercise of First Amendment Rights?              (Y)    N
Are you familiar with/ have you visited the requested area?  (Y)    N
Do you plan to advertise or issue a press release?            Y    (N)
Will you distribute printed material?                         Y    (N)
Is there any reason to believe there will be attempts to disrupt,
protest or prevent your event?(if yes explain on separate sheet)  Y    (N)

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature    Jessica Bauers_____          Date    6-7-07

**Mount Rushmore
National Memorial**

Mount Rushmore National Memorial
13000 Hwy 244, Building 31, Suite 1
Keystone, SD 57751-0268
Phone: (605) 574-3157
Fax: (605) 574-2307

Permit # 077

## Special Events Permit

RECEIVED
JUN 1 3 2007

Name of Group Performing_____ Faith Temple Choir_____

Date of Event/Activity:___ June 30, 2007_____

Type of Program :_____ Musical Concert_____

Person in Charge _____ Troy  Carr_____

Address: 715  Kansas City St_____

Telephone: Day ▓▓▓▓▓▓▓_____Night:_____

Permit is granted subject to the following conditions:

1.    The National Park Service waives the permit fee for the year 2007.

2.    Only the equipment specified on the permit will be provided.  No extra equipment will be available upon arrival.  (Please mark equipment needed on reverse side.)

3.    The ranger will set up only the AV equipment. Risers and chairs will be set up by the group that is performing.

4.    Check in time is <u>one</u> hour before the program is to start.  The ranger will not be available before that time.

5.    Brochures, handouts or programs to be distributed must be approved in advance.  All litter and brochures generated by the event must be removed after the special event by the group holding the event.

6.    No food or drink is allowed to be served in the amphitheater.

7.    Vehicle access to the amphitheater is allowed only to drop off and pick up equipment. No vehicles are allowed behind the amphitheater during the performance.

8.    Each special event must be approved by the Superintendent of Mount Rushmore National Memorial.

I acknowledge acceptance of the conditions, accept responsibility for compliance, and understand if the permit is granted it may be canceled for non-compliance.

Signature:_____    Date:___6-11-07_____

(NPS Form 10-930)
(NEW 10/00)

(OMB No. 1024-0026)
(Expires 09/30/2007)

### National Park Service
### Mount Rushmore National Memorial
### Application for Special Use Permit

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name    Troy Carr                    Social Security #    N/A

Organization Name (if applicable):    Faith Temple Choir

Street/Address:    ▮▮▮▮▮▮▮

City/State/Zip Code:    Rapid City, SD 57701

Telephone number:    ▮▮▮▮▮▮

Description of Proposed Activities:

Musical Concert

Requested Location: Amphitheater

ate (s)    June 30, 2007                    Set-up will begin at    1:30 pm    (MDT)

Event will begin at    2:00 pm            Removal will be completed by    3:00 pm    (MDT)

Maximum Number of Participants    80    (Please provide best estimate)

Maximum Number of Vehicles    10    (attach parking plan)

Support Equipment (generators, amplification, etc.):    use parking garage
musical instruments, guitars, drums, amplifier

Support Personnel (contractors, etc.)
Church members

Individual (if other than applicant) in charge of event on site: Elder Troy Carr or
Minister Walter Jones

Is this an exercise of First Amendment Rights?    (Y)    N
Are you familiar with/ have you visited the requested area?    (Y)    N
Do you plan to advertise or issue a press release?    (Y)    N
Will you distribute printed material?    (Y)    N
Is there any reason to believe there will be attempts to disrupt,
protest or prevent your event?(if yes explain on separate sheet)    Y    (N)

The applicant by his or her signature certifies that all the information given is complete and correct, and that no false or misleading information or false statements have been given.

Signature    _Troy M Carr_                    Date    6-11-07

Page 2

Mount Rushmore Special Events Application

The following park property can be made available for your use:

| | |
|---|---|
| ____X____ | CD Player |
| ____X____ | Cassette Player |
| ____X____ | Choral Microphones (4 microphones) |
| ____X____ | Mixer Board for additional electronic equipment |
| ____X____ | Public address system (1 or 2 microphones) |
| _10 chairs_ | Folding chairs (1 to 100). *Note number needed.* |
| _X need 1_ | Three-step risers (1 to 5). *Note number needed.* |
| ____X____ | Podium/Lectern |
| ____X____ | Yamaha Keyboard (full keyboard = 88 keys) |

····················································································

The following information to be provided by Mount Rushmore National Memorial:

Permit time–    Starting: ___2:00 pm___ (MDT)    Ending before: ___3:00 pm___ (MDT)

Check in time ___1:30 pm___    (MDT)    (Ranger will meet you at Amphitheater)

Location: ___Amphitheater___

*All times are <u>Mountain Daylight</u> Times.

2

Form 10-114
Rev. DEC. 00

Page 1 of  2

### UNITED STATES DEPARTMENT OF THE INTERIOR
National Park Service

Special Use Permit

Name of Use  _Religious Service_

Date Permit Reviewed
Reviewed
Reviewed
Expires  Jul. 19, 2007

Long Term ___
Short Term  X

Permit # MWR-1500- 2510- R0703
Region  Park  Type  No. #

Mount Rushmore National Memorial
Name of Area

_St. Mary of Mt. Carmel Church_    _409 Central Avenue_    _320-732-6590_
_Long Prairie, MN 56347_

Name or Permittee    Address    Phone

is hereby authorized during the period from (Time _2:30 pm_ day _19_ Month _07_), through (Time _3:30 p.m_.

day _19_ Month _07_ ), to use the following described land or facilities in the above named area:

_Amphitheater stage and seating area. Special request for a podium and small table_

For the purpose(s) of: _Celebrating Mass.  Sound level to be controlled to the minimum level necessary to reach intended audience._
_Approximately 104 people on 2 charter buses are involved_

Authorizing legislation or other authority (RE - DO-53): _36 CFR 251_

NEPA Compliance: CATEGORICALLY EXCLUDED ___ EA/FONSI __ EIS __ OTHER APPROVED PLANS X

PERFORMANCE BOND: Required ____ Not Required  X  Amount

LIABILITY INSURANCE: Required ____ Not Required  X  Amount

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when appropriate to the payment to the U.S. Dept. of the Interior, National Park Service for its direct and indirect costs associated with managing the event.

The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations, expressed or implied herein.

PERMITTEE _____

Signature

Authorizing Official _Michael D. Pflaum_    Date  7/12/07

Signature    Date

Additional Authorizing Official _____

(if Required)    Signature    Title    Date

## STANDARD CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages - The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the permittee is authorized to make of the land described in this permit.

3. Benefit - No Member of Congress shall be admitted to any share or part of this permit or to any benefit that may arise therefrom: but this provision shall not be construed to extend to this grant if made with a corporation for its general benefit.

4. Assignment - This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation - This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information; to do so will be considered a breach of conditions and be grounds for revocation [Re: 36 CFR 2.32(a)(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

Jrm 10-930)                                                    (OMB No. 1024-0026)
W 10/00)

**National Park Service**
**Mount Rushmore National Memorial**
**Application for Special Use Permit**

Please supply the information requested below. Use additional sheets if necessary. Allow at least four (4) business days for processing. A non-refundable processing fee may be required to accompany this application unless the requested use is an exercise of a First Amendment right. You will be notified of the disposition of the application and the necessary steps to secure your final permit. (Note: there may be additional fees charged, and you may be required to provide proof of liability insurance.)

Applicant Name: _Tani Westerberg_ Social Security # _N/A_

Organization Name (if applicable): _St. Mary of Mt. Carmel Church_ Tax ID # ▉▉▉▉

Street/Address: _409 Central Ave_

City/State/Zip Code: _Long Prairie, MN 56347_

Telephone number: _320-732-6590_

Description of Proposed Activities:

_We will be celebrating Mass_

Requested Location:

Date (s): _July 19_ Set-up will begin at: _2:30 pm_

Event will begin at: _2:45 pm_ Removal will be completed by: _3:30 pm_

Maximum Number of Participants _104_ (Please provide best estimate)

Maximum Number of Vehicles _2 charter buses_ (attach parking plan)

Support Equipment (generators, amplification, etc.)

_Podium/Table_

Support Personnel (contractors, etc.)

_____ al (if other than applicant) in charge of event on site:

Is this an exercise of First Amendment Rights?

Are you familiar with/ have you visited the requested area?

Do you plan to advertise or issue a press release?

Will you distribute printed material?

Is there any reason to believe there will be attempts to disrupt,
  protest or prevent your event?(if yes explain on separate sheet)

Ⓨ    N
Ⓨ    N
Y    Ⓝ
Y    Ⓝ

Y    Ⓝ

The applicant by his or her signature certifies that all the information given is complete and correct, and that no
false or misleading information or false statements have been given.

Signature _Traci W esterberg_____    Date 7/9/07

Form 10-114
Rev. DEC. 00

Page 1 of _2_

## UNITED STATES DEPARTMENT OF THE INTERIOR
### National Park Service

### Special Use Permit

Name of Use ___Public Assembly___

Date Permit  Reviewed
Reviewed
Reviewed
Expires  November 3, 2007

Long Term ___

Permit #  MWR-1500-R08.
Region   Park   Type   No. #

Short Term _X_

___Mount Rushmore National Memorial___
Name of Area

___Ferale Hubbard, South Dakota Project Hot Seat, Greenpeace,___ ███████, Sioux Falls, SD
57104, Phone ████████ or ████████ E-Mail: █████
hubbard@wdc.greenpeace.org___

| Name of Permittee | Address | Phone |

is hereby authorized during the period from (Time _3:00 p.m._ day __03__ Month __11_ ), through (Time _5:00 p.m.
day __03__ Month __11__ ), to use the following described land or facilities in the above named area:

Mount Rushmore National Memorial amphitheater stage and lower deck seating area

For the purpose(s) of:  A public assembly, "Step It Up", to discuss information related to the subject of global
warming.  The event will include people speaking on the topic.  The media has been invited.  Filming or
photography of the event is allowed for personal use or "breaking news", other filming / photography may be
allowed under terms of a separate film / photo permit.  No sound amplification equipment will be used.

Authorizing legislation or other authority (RE - DO-53): Title 36 Code of Federal Regulations, 2.51

NEPA Compliance: CATEGORICALLY EXCLUDED _X_  EA/FONSI ___ EIS ___ OTHER APPROVED PLANS

PERFORMANCE BOND: Required _____ Not Required _X_ Amount

LIABILITY INSURANCE: Required ____ Not Required _X_ Amount

ISSUANCE of this permit is subject to the conditions on the reverse hereof and appended pages and when
appropriate to the payment to the U.S. Dept. of the Interior, National Park Service for its direct and indirect
costs associated with managing the event.

The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations,
expressed or implied herein.

PERMITTEE ___*[signature]*___   _11/2/07_
       Signature         Date

Authorizing Official ___*[signature]*___   _11/2/07_
       Signature         Date

Additional Authorizing Official _____

(if Required)        Signature         Title         Date

## STANDARD CONDITIONS OF THIS PERMIT

1. The permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all applicable laws and regulations of the area.

2. Damages – The permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the permittee is authorized to make of the land described in this permit.

3. Benefit – No Member of Congress shall be admitted to any share or part of this permit or to any benefit that may arise therefrom: but this provision shall not be construed to extend to this grant if made with a corporation for its general benefit.

4. Assignment – This permit may not be transferred or assigned without the consent of the Superintendent, in writing.

5. Revocation – This permit may be terminated upon breach of any of the conditions herein or at the discretion of the Superintendent.

6. The permittee is prohibited from giving false information; to do so will be considered a breach of conditions and be grounds for revocation [Re: 36 CFR 2.32(a)(4)].

7. Permittee will comply with applicable public health and sanitation standards and codes.

Additional Conditions:

1. The event and participants can not damage park resources or facilities, impair the area's atmosphere of peace and tranquility, interfere with program activities., or impair public use of facilities.

2. The event and participants can not present a clear and present danger to the public health and safety.

3. All applicable federal and state laws and regulations are in effect.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Michael Boardley | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 01986 (JR) |
| | ) | |
| v. | ) | |
| | ) | |
| United States Department of | ) | |
| Interior et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DAN WENK

1. I am the Deputy Director for Operations for the National Park Service ("NPS" or "Park Service"), which is an agency of the Department of the Interior.  I make this declaration in support of defendants' motion for summary judgment or dismissal in the above captioned case.

2. As Deputy Director, I oversee the management of the National Park Service. Before I became Deputy Director in 2007, I served as Director of the NPS Denver Service Center from December 2001, where I oversaw the agency's centralized  planning, design, and construction services, and provided parks and regional offices services including contracting and project management.  Before that I was Superintendent of Mount Rushmore National Memorial from 1985 to 2001, where I oversaw development of natural and cultural resource management programs to ensure the long-term

1

preservation of the sculpture and the natural area of the surrounding forest. I began my National Park Service career in 1975 as a landscape architect at the Denver Service Center and was a management assistant at Yellowstone National Park from 1979 to 1984.

3. The National Park Service has an annual budget of $2.25 billion, and employs 20,000 diverse professionals who work in permanent, temporary, and seasonal positions, as well as more than 145,000 Volunteers in Parks.

4. The National Park System currently consists of 391 park units. It covers more than 84 million acres and is located in every state (except Delaware), the District of Columbia, American Samoa, Guam, Puerto Rico, and the Virgin Islands. This area equals131,753 square miles, which is larger than the total areas of the states of Pennsylvania [46,055 square miles], Tennessee [42,143 square miles] and Virginia [42,774 square miles] combined.

5. **Attachment A** is National Park Service's The National Parks: Index 2005-2007, which summarizes each of the many and varied park units, their location and acreage, and their legal origins.

6. These park units are located in a wide range of environments as diverse as the United States itself. They include urban areas, from the Town of Harpers Ferry to New York City; oceans, lakes, swamps and rivers; mountainous areas that go up in height to the 20,320-foot Mount McKinley; caves, canyons, cliffs, and karst; deserts, forests, and grasslands; and areas throughout the Nation's reach, from Buck Island National Monument in the Caribbean, to War in the Pacific National Historical Park in Guam, to Gates of the Arctic National Park and Preserve above the Arctic Circle.

2

7. The size of these park units vary tremendously. The largest National Park is Wrangell-St. Elias National Park and National Preserve, Alaska at 13.2 million acres. Yellowstone National Park is 2,219,790 acres. The smallest unit of the National Park System is Thaddeus Kosciuszko National Memorial, Pennsylvania at 0.02 acres.

8. Very large numbers of people annually visit the National Park System. According to the National Park Service's 2006 Statistical Abstract, **Attachment B**, there were 273,623,980 visits to the National Park System in 2006. Examples of the number of visits per park include 9,289,215 to Great Smoky Mountains National Park, Tennessee; 2,083,588 to Acadia National Park, Maine; 1,989,771 to Mount Rushmore National Memorial; 676,605 to Vicksburg National Military Park, Mississippi; and 14,470 to William Howard Taft National Historic Site, Ohio.

9. As detailed in the NPS Overview (January 5, 2007), found as **Attachment C**, the National Park System is also habitat for 369 threatened or endangered species, has more than 100 million items in museum collections, has 1.5 million archaeological sites, and has 27,000 historic structures.

10. The National Park System also has a physical infrastructure that includes 21,000 buildings, 17,000 miles of trails, 10,000 miles of paved and unpaved roads, 5,000 housing units, 22,000 campgrounds and picnic areas, 1,600 waste water treatment systems, and 1,400 water treatment systems.

11. The Park Service's efforts to preserve the air, water, biology, geology, and natural soundscape in the National Park System are complex and multidimensional. The National Park Service's Natural Resources Year in Review-2006, **Attachment D**,

3

provides a portrait in natural resources stewardship and science in the National Park

System. The Park Service's ongoing research and monitoring efforts to assist in the

management of National Parks is detailed in chapters entitled "Protecting the Integrity of

National Park Resources and Values," "Understanding Park Service Interactions on an

Ecological Basis," "Alliances for Science: Partnerships and Innovation in Resource

Conservation," and "For the Enjoyment of Future Generations."

12. After the establishment of Yellowstone National Park in 1872, Congress

subsequently created the National Park Service to conserve unimpaired many of the

world's most magnificent landscapes. They are also places that enshrine our nation's

enduring principles, and that remind us of the tremendous sacrifices Americans have

made on behalf of those principles. They are the most remarkable collection of places in

America for recreation and learning. Visitors can immerse themselves in places where

events actually happened and enjoy some of the most significant natural and historic

places in America.

13. The National Park Service Organic Act, 16 U.S.C. § 1, created the National

Park Service to "promote and regulate the use of Federal areas known as national parks,"

and charged it with the following "fundamental purpose": "to conserve the scenery and

the natural and historic objects and the wild life therein and to provide for the enjoyment

of the same in such manner and by such means as will leave them unimpaired for future

generations."

4

14. Units of the National Park System are generally created through acts of Congress, although some national monuments were created by Presidential proclamations under authority delegated by Congress to the President in the Antiquities Act.

15. About one-third of the units of the National Park System--such as Great Smoky Mountains National Park, Tennessee; Grand Canyon National Park, Arizona; Everglades National Park, Florida; and Hawaii Volcanoes National Parks, Hawaii-- preserve nature's many and varied gifts to the Nation.

16. The other two-thirds of the units of the National Park System recognize benchmarks of human history in America. These units protect elements of great native cultures, far older than European exploration and settlement; present battle sites from the Revolutionary and Civil Wars – including the key surrender fields of both great conflicts; embrace Thomas Edison's New Jersey laboratories where he and his staff led a technological revolution more dramatic even than the coming of the computer age; and more. These historic park units reflect the development of both art and industry in America, along with landmarks of social and political change.

17. The forts that are part of the National Park System are often more than the crucibles of the American Revolution, the Civil War, or other military engagements. They also include the great fur-trading posts of Fort Union National Monument, where North Dakota and Montana meet, and Fort Vancouver National Historical Site, Washington, which gave its name to one city and lies just across the Columbia River from another -- Portland, Oregon.

5

18. There are Fort Necessity National Battlefield, Pennsylvania, and Fort Stanwix National Monument, New York, from the French and Indian Wars, and Fort McHenry National Monument and Historic Shrine, Maryland, which inspired a national anthem from the War of 1812.

19. There are Fort Sumter National Monument, South Carolina where the Civil War's first engagement took place; Antietam National Battlefield, Maryland where the Civil War's bloodiest single-day battle took place and where 5,032 soldiers are interred; Gettysburg National Military Park, Pennsylvania where the second Confederate invasion of the North was stopped and where President Abraham Lincoln spoke at the dedication of its cemetery; and Appomattox Court House National Historical Park, Virginia, where General Robert E. Lee surrendered his field army to Lt. General Ulysses S. Grant.

20. They include military sites that never witnessed battles, such as the Minuteman Missile National Historic Site, South Dakota, a lasting silent sentinel of the Cold War era of the late 20th century. In addition to these forts and military sites, units of the National Park System were also created to memorialize great people and events, and protect properties of famous citizens.

21. Great landscapes, representing many of the Nation's most compelling natural and scenic vistas, were also set aside and protected as units of the National Park System. Other areas, deemed to have outstanding recreational potential in settings as varied as coastal beaches, man-made lakes behind massive dams, and urban open-space lands, were added to the Park System.

6

22. Eventually, a broader reading of history took hold. The National Park System grew to include the historic homes of civil rights, political, and corporate leaders, and the lands of the poor, struggling to build lives for themselves on a Nebraska homestead claim or in an urban community.

23. Accordingly, National Park System embraces the birthplace, church and grave of Dr. Martin Luther King at Martin Luther King, Jr. National Historical Site, Georgia; the birth of jazz at New Orleans Jazz National Historical Park, Louisiana; the flowering of a literary giant at the Eugene O'Neill National Historical Site, California; and the artistic grace of a great sculptor's studios at Saint-Gaudens National Historical Site, New Hampshire.

24. Because of the lessons they help us remember, the National Park System also includes the Japanese American World War II internment camp in the desert at Manzanar National Historical Site, California, as well as Andersonville National Historical Site, Georgia, one of the very bleakest of the Civil War prison sites.

25. Equally important, the National Park System offers visitors not only visual, educational and recreational experiences but also inspirational, contemplative and spiritual experiences. For example, visitors find the expansive canyons of Grand Canyon National Park, Arizona to be humbling, as its sunrises, sunsets, and storms take on a dimension that matches the vast geological landscape.

26. For neighboring Native Americans, Rainbow Bridge National Monument, Utah, is considered a sacred religious site, such that the Park Service asks visitors to respect these long-standing beliefs by volunteering not to approach or walk under the bridge. The 600-

7

foot butte of Devils Tower National Monument, Wyoming, is considered a sacred site to Native Americans of the northern plains who travel there to perform private traditional cultural and religious activities, such that the Park Service asks visitors to respect these long-standing beliefs by volunteering not to climb the tower in the month of June. El Morrro National Monument, New Mexico, contains pre-Columbian petroglyphs as well as areas traditionally used by Native Americans, such that Congress declared, at 16 U.S.C. § 460uu-47(a), that they should have nonexclusive assess for traditional cultural and religious purposes.

27. As stated in the 2006 NPS Management Policies ¶ 1.4.1, "[t]he most important statutory directive for the National Park Service is provided by interrelated provisions of the NPS Organic Act of 1916 and the NPS General Authorities Act of 1970, including amendments to the latter act enacted in 1978."

28. The key management-related provision of the National Park Service Organic Act, codified at 16 U.S.C. § 1, is that the National Park Service "shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

8

29. So that the NPS might fulfill that mandate, Congress empowered the Secretary of

the Interior, at 16 U.S.C. § 3, to "make and publish such rules and regulations as he may

deem necessary or proper for the use and management of the parks."

30. Congress later supplemented the management directive for the Park System

through enactment of the NPS General Authorities Act in 1970, and an amendment to that

Act in 1978. The key provision of the NPS General Authorities Act, as amended, 16 U.S.C.

§ 1a-1, is the following:

> Congress declares that the national park system, which began with
> establishment of Yellowstone National Park in 1872, has since grown to
> include superlative natural, historic, and recreation areas in every major region
> of the United States, its territories and island possessions; that these areas,
> though distinct in character, are united through their inter-related purposes and
> resources into one national park system as cumulative expressions of a single
> national heritage; that, individually and collectively, these areas derive
> increased national dignity and recognition of their superlative environmental
> quality through their inclusion jointly with each other in one national park
> system preserved and managed for the benefit and inspiration of all the people
> of the United States; and that it is the purpose of this Act to include all such
> areas in the System and to clarify the authorities applicable to the system.
> Congress further reaffirms, declares, and directs that the promotion and
> regulation of the various areas of the National Park System, as defined in
> section 1c of this title, shall be consistent with and founded in the purpose
> established by section 1 of this title to the common benefit of all the people of
> the United States. The authorization of activities shall be construed and the
> protection, management, and administration of these areas shall be conducted
> in light of the high public value and integrity of the National Park System and
> shall not be exercised in derogation of the values and purposes for which these
> various areas have been established, except as may have been or shall be
> directly and specifically provided by Congress.

31. The NPS General Authorities Act also clarified that all units of the

National Park System are subject to the general authorities relating to the administration and protection of park areas, such as the NPS Organic Act, the Land and Water Conservation Act, the statutes governing NPS concessions, and more, to the extent these general authorities do not conflict with the specific authority for a particular park unit.

32. As explained in the 2006 NPS Management Policies ¶ 1.2, excerpts of which are found as **Attachment E,**[1] "The number and diversity of parks within the national park system grew as a result of a government reorganization in 1933, another following World War II, and yet another during the 1960s. ... These units are variously designated as national parks, monuments, preserves, lakeshores, seashores, wild and scenic rivers, trails, historic sites, military parks, battlefields, historical parks, recreation areas, memorials, and parkways. Regardless of the many names and official designations of the park units that make up the national park system, all represent some nationally significant aspect of our natural or cultural heritage. They are the physical remnants of our past—great scenic and natural places that continue to evolve, repositories of outstanding recreational opportunities, classrooms of our heritage, and the legacy we leave to future generations—and they warrant the highest standard of protection."

33. Through museums, publications, and personal contact with visitors, the Park Service promotes public understanding of the events, people, and natural communities that relate to the properties in its care. There is a strong focus on teaching the lessons of civics,

---

[1] The entire 2006 NPS Management Policies is available to be viewed or downloaded by the public at our website at nps.gov/policy/mp/policies.html.

society, and nature the parks represent, as well as stimulating a sedentary generation, restoring children to outdoor living, and connecting with an ever-widening cultural pool of neighbors who share in the complex legacy of America.

34. As detailed in 2006 NPS Management Policies, the Park Service also awards concession contracts and issues commercial use authorizations to provide commercial visitor services that are necessary and appropriate for public use and enjoyment of units of the National Park System. Concession operations, however, must be consistent to the highest practicable degree with the preservation and conservation of resources and values of the park unit, and they must demonstrate sound environmental management and stewardship.

35. As detailed in NPS Director's Order 9 (2006) in support of the Park Service's mission, our law enforcement officers serve the public interest to protect resources and people, prevent crime, conduct investigations, apprehend criminals, and serve the needs of the visitors. To help in accomplishing this mission, the Park Service employs two different law enforcement branches: (1) United States Park Rangers and Special Agents, and (2) Officers of the United States Park Police. While the United States Park Police are predominantly stationed in the urban parks areas in and around Washington, D.C., with Field Offices in and around New York City and San Francisco, our Park Rangers and Special Agents are predominantly stationed in all the other areas of the National Park System.

36. The objectives of the Park Service's law enforcement program are the prevention of criminal activities through resource education, public safety efforts, and deterrence; the detection and investigation of criminal activity and the apprehension and successful

11

prosecution of criminal violators; and homeland security. In carrying out the law enforcement program, the Service makes every reasonable effort to provide for the protection, safety, and security of park visitors, employees, concessioners, and public and private property, and to protect the natural and cultural resources entrusted to our care.

37. This is a large and complex law enforcement task. For the entire National Park System which covers more than 84 million acres, there are slightly over 1,500 Park Rangers and Special Agents, while the Park Police has slightly under 600 officers.

38. While for security and safety reasons we do not want to reveal in a public document the exact number of Park Rangers and Special Agents in each of our park units, the current distribution of Park Rangers in each of the National Park Service's seven Regions is as follows: 43 in the Alaska Region, 408 in the Intermountain Region, 174 in the Midwest Region, 53 in the National Capital Region, 230 in the Northeast Region, 267 in the Pacific West Region and 254 in the Southeast Region.

39. We also maintain a number of Special Event and Tactical Teams (SETT) of NPS law enforcement officers in the seven NPS Regions. They are designed to provide law enforcement support to planned major events or critical incidents throughout the country, through highly trained teams with specialized tactical skills and event experience.

40. Each SETT team comprises a team leader with ten law enforcement officers, who possess exceptional professionalism, leadership and dedication, and extensive Park Service experience in many disciplines, with particular expertise in the outdoor environment. SETT teams regularly assist with events at National Park Service icon parks such as Mt. Rushmore

National Memorial, the Statue of Liberty, Jefferson National Expansion Memorial Park, and the National Mall And Memorial Parks.   They have also frequently participated in Presidential protection details in remote park areas.

41. Another important Park Service management tool is the Incident Command System (ICS), which is implemented by the Incident Management Teams.  Developed in the 1970's as a standardized system for managing multi-jurisdictional events, activities and incidents, the ICS needs time to identify the event, activity or incident so it can assess manpower needs and assemble additional staff.   It provides a flexible system with sufficient standardization so that personnel from multiple agencies and disciplines can be integrated into one system on an "as needed" basis.

42. Since the 1980's the Park Service has used ICS and Incident Management Teams to manage, in part, a wide variety of events and incidents, such as the 1988 Yellowstone National Park wildland fires, the 1991 50th Anniversary of the attack on Pearl Harbor, the 2004 Centennial of Flight Celebration at Wright Brothers National Memorial, and the annual Bridge Day Events at New River Gorge National River.   The Park Service ICS System, and its Incident Management Teams which currently include one National Type 1 Incident Management Team and four Regional Type 2 Incident Management Teams, provide Superintendents with a management team with the capacity to request additional personnel and equipment and to integrate them into the system.  The ICS System is also valuable in situations where a park does not have sufficient staff with the necessary expertise to manage a proposed activity or where multiple jurisdictions and agencies are involved.

43. And while units of the National Park System are generally safe, our law enforcement personnel are very busy carrying out their many and varied tasks and addressing the law enforcement incidents that do occur.  Indeed, the 2006 Annual Report states that 44 NPS officers were assaulted in the line of duty.

44. The 2006 Annual Report also states that our law enforcement officers investigated 71,223 non-DWI traffic incidents, 12,767 non-Archaeological Resource Protection Act ("ARPA") natural resource violations, and 16 hate/bias incidents.  In addition, 4,485 Part I Offenses and 103,831 Part II Offenses on Federal parkland.

45. Park Service law enforcement officers also perform other important functions. They operate 16 park detention facilities, while 27 other detention facilities operate under contract.  Our law enforcement officers also conduct search and rescue as well as drug eradication operations.

46. The 2006 Annual Report also states that NPS law enforcement officers participated in 2,564 search and rescues in park environments, which include urban settings, oceans, lakes, swamps, rivers, mountains, caves, canyons, cliffs, deserts, forests, grasslands and other challenging terrain.  Park Service law enforcement officers also responded to or investigated 7,125 boating incidents and 163 aircraft incidents.  And of the 6,062 drug cases reported, Park Service law enforcement officers discovered 2 booby traps, 3 clandestine labs, and 2 indoor marijuana operations.  The Park Service also seized 70,327 marijuana plants, 34,837 grams of cocaine, 83 firearms, and 64 vehicles.

47.  In addition, certain units of the National Park System, like Mt. Rushmore National Memorial, are also national icons.  Because such icons are internationally recognized symbols of American power, culture, and democratic tradition, they may be subject to terrorist attack and require special protection.  "The need to protect our national monuments and icons from terrorist attack requires the development and coordination of comprehensive policies, practices, and protective measures." The National Strategy For The Physical Protection of Critical Infrastructures and Key Assets 72 (February 2003), excerpts of which is found as **Attachment F**.[2]

48.  Pursuant to the NPS Organic Act and other statutory authorities, the Park Service has issued a series of regulations that govern public conduct in units of the National Park System.  The regulations at 36 C.F.R. § 1.2 describe the applicability and scope of the NPS regulations.  Section 1.2(c) notes that the regulations in Parts 7 and 13 are special park regulations prescribed for specific parks and may be different from the general regulations contained in Parts 1 through 5 and Part 12.  In that regard, consistent with 36 C.F.R. § 1.2(c), the special regulations for the National Capital Region found at 36 C.F.R. § 7.96 contain regulations on demonstrations, special events and sales that are different from the NPS general regulations.

49.  The NPS general regulations at 36 C.F.R. Part 2 address resource protection, public use and recreation, violations of which are punishable under 36 C.F.R. § 1.3.  In

---

[2] The entire report on The National Strategy For The Physical Protection of Critical Infrastructures and Key Assets (February 2003) is available to be viewed or downloaded by the public at the web site at www.whitehouse.gov/pcipb/physical.html.

promulgating these regulations in 1983, and responding to comments from 1,966 individuals,

organizations, Federal, State and local agencies as well as representatives of the legal

community, the Park Service explained that these regulations were necessary to "protect the

natural and cultural resources of the parks and to protect visitors and property within the

parks." 48 Fed. Reg. 30252 (June 30, 1983)(Final Rule).

50.  Found as **Attachment G,** these Park Service general regulations cover a wide

range of activities, such as the preservation of natural, cultural and archeological resources at

36 C.F.R. § 2.1, wildlife protection at 36 C.F.R. § 2.2,  sanitation and refuse at 36 C.F.R. §

2.14, trespassing, tampering and vandalism at 36 C.F.R. § 2.31, explosives at 36 C.F.R. §

2.38, public assemblies and meetings at 36 C.F.R.  § 2.51, the sale or distribution of printed

matter at 36 C.F.R. § 2.52, and memorialization at 36 C.F.R. § 2.62.

51.  In a memorandum from the NPS Director dated October 24, 2007, we issued a

written reminder to all Regional Directors and Park Superintendents of the legal and policy

guidance governing political activities in the National Park System.  Attached as

**Attachment H,** this memorandum states in pertinent part that:

> NPS Management Policies ¶ 8.6.3 (2006) provides that the National Park
> Service will authorize the use of park land for public assemblies, meetings,
> demonstrations, religious activities, and other public expressions of views
> protected under the First Amendment of the U. S. Constitution, in accordance
> with 36 C.F.R. § 2.51 or 36 C.F.R. § 7.96.  The terms "public expressions of
> views" under 36 C.F.R. § 2.51 and "demonstrations" under 36 C.F.R. §
> 7.9[6](g) have traditionally been used interchangeably to include
> "demonstrations, picketing, speechmaking, marching, holding vigils or
> religious services and all other like forms of conduct which involve the
> communication or expression of views or grievances, engaged in by one or
> more persons, the conduct of which has the effect, intent or propensity to draw
> a crowd or onlookers.  This term does not include casual park use by visitors

or tourists which does not have an intent or propensity to attract a crowd or onlookers." 36 C.F.R. § 7.9[6](g)(1). Since such demonstrations involve personal expressive activity, and parks are not mere billboard venues, unattended signage is not allowed.

52. The NPS general demonstration and printed matter regulations at 36 C.F.R. § 2.51 and § 2.52 are substantially similar. Subsection (a) of both regulations provides that such activities are generally permitted provided a permit has been issued by the superintendent. Subsection (b) of both regulations requires that a permit application contain important information regarding the proposed date, time, duration, nature and place of the proposed event, and an estimate of the number of persons expected to attend, as well as other relevant information.

53. Subsection (e) of both regulations provides that the superintendent shall designate on a map the locations available for such activities; and that locations may be designated as not available only if such activities would negatively impact the park based on five listed objective criteria. Subsection (c) of both regulations provides that the superintendent shall, "without unreasonable delay," issue a permit on proper application unless such activities would negatively impact the park based on five listed objective criteria.

54. Subsection (d) of both regulations provides that if a permit is denied, the applicant shall be so informed in writing with the reason(s) for the denial. Subsection (f) of both regulations provides that the permit may contain conditions reasonably consistent with protection and use of the park area for the purposes for which it is established. It may contain reasonable limitations on the equipment used and the time and area. Subsection (g)

provides that no permit shall be issued for a period in excess of 7 days for demonstrations, or 14 consecutive days for printed matter distribution, provided that permits may be extended for like period, upon a new application, unless another applicant has requested use of the same location and multiple occupancy of that location is not reasonably possible.

55.   Subsection (h) of both regulations prohibits persons engaged in permitted activities to obstruct or impede pedestrians or vehicles, or harass park visitors, while the printed matter regulation also requires that there be no misrepresentation with regard to the purposes or affiliations of those engaged in the activity or whether the printed matter is available without cost or donation.  Subsection (i) of both regulations provides that a permit may be revoked under any of the conditions listed in paragraph (c) that constitute grounds for denial of a permit, or for violation of the terms and conditions of the permit.  Such a revocation shall be made in writing, with the reason(s) for revocation clearly set forth, except under emergency circumstances, when an immediate verbal revocation or suspension may be made, to be followed by written confirmation within 72 hours.  Finally, subsection (j) of both regulations makes clear that violation of the terms and conditions of a permit may result in the suspension or revocation of the permit.

56.   Following the decision by the Eleventh Circuit Court of Appeals in *United States v. Frandsen* (2000), the Park Service reviewed the "without unreasonable delay" provision of subsection (c), and then issued guidance and direction to its employees on its implementation.   Specifically, a two-business day requirement was imposed on Superintendents to either issue or deny a 36 C.F.R. § 2.51 or 36 C.F.R. §2.52 permit.  This

18

management direction is embodied in a memorandum from the Acting NPS Director dated

August 2, 2000 and found as **Attachment I,** as well as in the 2006 NPS <u>Management</u>

<u>Policies</u> ¶ 8.6.3.   **Attachment J** is a revised generic application form for special use permits

that has recently been distributed to units of the National Park System to correct an earlier

flawed form.  The application form states that First Amendment applications will be

processed within two business days.

57.  The NPS general demonstration and printed matter regulations at 36 C.F.R. §

2.51 and § 2.52 remain critical for the management and administration of the units of the

National Park System, to protect natural and cultural resources, and to protect visitors and

property.   Indeed, these regulations are content neutral and have neither the intent nor effect

of hindering First Amendment activities.  Rather, these regulations provide a means where

such activities may occur on parkland while safeguarding the good order upon which civil

liberties ultimately depend.

58.  Indeed, as the Park Service explained in its 1983 rulemaking, "[t]he intended

effect of this regulation is to impose on those activities that involve First Amendment

considerations only those narrow restrictions that are necessary to protect park resources and

to ensure the management of park areas for public enjoyment." 48 Fed. Reg. at 30272 (June

30, 1983)(Final Rule).

59.  These National Park Service regulations contain narrow, objective, and definite

standards to guide how Park Service decision-makers can respond to people requesting to

demonstrate and distribute printed matter on Federal parkland.

19

60. In that regard, 36 C.F.R. § 2.51(e)(1)-(5) and § 2.52(e)(1)-(5) the following objective standards for placing a park location off-limits: "Locations may be designated as not available only if such activities would: (1) Cause injury or damage to park resources; or (2) Unreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or commemorative zones; or (3) Unreasonably interfere with interpretive, visitor Service, or other program activities, or with the administrative activities of the National Park Service; or (4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors; or (5) Present a clear and present danger to the public health and safety."

61. Similarly, the provisions of 36 C.F.R. § 2.51(c)(1)-(3) set the following objective standards for when a Superintendent may not issue a demonstration permit: "(1) A prior application for a permit for the same time and place has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of that particular area; or (2) It reasonably appears that the event will present a clear and present danger to the public health or safety; or (3) The event is of such nature or duration that it cannot reasonably be accommodated in the particular location applied for, considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities."

62. And other objective standards, found at 36 C.F.R. § 2.52(c)(1)-(5) provide that a Superintendent may not issue a printed matter distribution permit when: "(1) A prior

application for a permit for the same time and location has been made that has been or will be

granted and the activities authorized by that permit do not reasonably allow multiple

occupancy of the particular area; or (2) It reasonably appears that the sale or distribution will

present a clear and present danger to the public health and safety; or (3) The number of

persons engaged in the sale or distribution exceeds the number that can reasonably be

accommodated in the particular location applied for, considering such things as damage to

park resources or facilities, impairment of a protected area's atmosphere of peace and

tranquility, interference with program activities, or impairment of public use facilities; or (4)

The location applied for has not been designated as available for the sale or distribution of

printed matter; or (5) The activity would constitute a violation of an applicable law or

regulation."

63. These regulations provide a fair and content neutral means to regulate activities

while protecting park resources and visitors. They allow First Amendment activities, and

mitigate potential negative impacts. While allowing for First Amendment activities, they

also deal with multiple requests for the same area and time; help protect sensitive areas,

endangered species, fragile cultural resources, and other park resources and, values; and

allow for a park visitor experience free from unwarranted intrusions.. The regulations also

establish a mechanism to resolve potential conflicts between activities and provide the park

the ability to schedule extra personnel and to coordinate necessary services that include law

enforcement, emergency medical, traffic control and trash disposal. The permit system

required by the regulations also creates a process for considering applications, issuing

21

permits or, when necessary denying a permit in writing. The system thus helps applicants, park visitors, and park staff abide by the rules, avoid conflicts, protect park resources, and facilitate First Amendment expression.

64. If 36 C.F.R. § 2.51 and § 2.52 are voided, then demonstrations and the distribution of printed matter could occur in areas that the National Park Service has determined under its regulations to be "not available." This would result in unregulated activities occurring even if they (1) cause injury or damage to park resources; or (2) unreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or commemorative zones; or (3) unreasonably interfere with interpretive, visitor Service, or other program activities, or with the administrative activities of the National Park Service; or (4) substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors; or (5) present a clear and present danger to the public health and safety.

65. If 36 C.F.R. § 2.51 is voided, then demonstrations could occur where the National Park Service would have earlier determined under the regulations that no permit should be issued. This would result in unregulated activities occurring even if (1) a prior application for a permit for the same time and place has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of that particular area; or (2) it reasonably appears that the event will present a clear and present danger to the public health or safety; or (3) the event is of such nature or duration that it cannot reasonably be accommodated in the particular location applied for, considering such

22

things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities.

66. If 36 C.F.R. § 2.52 is voided, then the distribution of printed matter could occur where the National Park Service would have earlier determined under the regulations that no permit should be issued. This would result in unregulated activities occurring even if (1) a prior application for a permit for the same time and location has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of the particular area; or (2) it reasonably appears that the sale or distribution will present a clear and present danger to the public health and safety; or (3) the number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated in the particular location applied for, considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquility, interference with program activities, or impairment of public use facilities; or (4) the location applied for has not been designated as available for the sale or distribution of printed matter; or (5) the activity would constitute a violation of an applicable law or regulation.

67. Moreover, given the limited number of Park Service law enforcement officers, their varied tasks, and the geographic expanse and diversity of the National Park System where they are stationed, it is critical that the Park Service retain the permit system found at 36 C.F.R. § 2.51 and § 2.52. If people are otherwise allowed to engage in demonstrations

or printed matter distributions in the park units covered by these regulations–essentially wherever and whenever they want on Federal parkland and requiring no permit--these units of the National Park System would be negatively impacted.   We would be unaware of their activities until they began and thus unable to address conflicts, much less have a park's law enforcement personnel or a SETT team ready on-site to monitor their activities and protect their exercise of their First Amendment rights.   Furthermore, we would be unable to prevent the impairment or derogation of park resources and values as required by the National Park Service Organic Act.

68.  Indeed, given the limited number of law enforcement officers located in units of the National Park System, if an upcoming permitted event is determined to require additional law enforcement personnel, the permit system typically provides NPS the opportunity to find NPS law enforcement personnel located in other park units or non-NPS personnel from other police jurisdictions that could be transported to the affected park unit. But because such law enforcement personnel have regular duty assignments, we also need the opportunity to plan and arrange for them to come to the affected park unit, as well as backfill replacements for the personnel who are sent away from performing their normal duties.

69.  The Park Service regulations establish a process that allows park management to maximize the use of park lands, while continuing to ensure that visitors have access and park resources are protected.   Indeed, the regulatory process provides objective standards to deal with situations of multiple requests for a particular date and park areas.  And even First

24

Amendment activities that do not appear to pose an elevated security threat may present

challenges to a park in terms of logistics and public health and safety.

70. The number of individuals expected to attend an event may require that a park

plan for additional vehicle parking, traffic control or accommodating extra buses in parking

areas. Parking is limited or not present in some parks, and arrangements may need to be

made for additional off-site parking with transportation to the site. The addition of event

participants to a park's normal visitation may exceed the capacity of available sanitary

facilities requiring the installation of portable toilets, or extra park staff might need to be

scheduled to keep available facilities stocked and cleaned. Depending on the number of

people anticipated and the weather expected, additional water fountains might need to be

installed or potable water supplied to ensure public health. In addition, temporary first aid

stations may need to be erected and agreements reached with neighboring first responders

and hospitals should additional assistance become necessary.

71. Equally important, sometimes just a few people demonstrating or distributing

printed matter can pose a law enforcement safety and security problem as much as a large

number of people. This is because some people do not believe that Federal parklands are an

appropriate venue for demonstrations or handing out leaflets, or because some causes can be

so emotional or controversial that even a few people can pose problems requiring a law

enforcement presence. Examples of these causes include an anti-abortion demonstration,

with individuals carrying large graphic photographs of aborted fetuses; a pro-choice

demonstration, whose rhetoric or signage may inflame others; or a Ku Klux Klan, Neo-Nazi,

or white supremacist assembly, whose expression may provoke others.

72. It could be a small group like the Westboro Baptist Church, whose numerous

demonstrations at military funerals and other venues have employed a provocative anti-

homosexual, anti-America rhetoric. Their flyers and signs assert messages like "God Hates

America" and "Thank God For Improvised Explosive Devices," and their self-proclaimed

web sites are entitled www.godhatesamerica.com and www.godhatesfags.com. See e.g.

Lizette Alvarez, *Outrage at Funeral Protests Pushes Lawmakers to Act*, N.Y. Times, April

17, 2006, A14 (Detailing evolving and emotional nature of the Westboro Baptist Church's

small demonstrations, the response of counter-demonstrations, and reporting of the presence

of nearby police cars at one demonstration "keeping watch, but mostly making sure no one

attacked the protestors.").

73. Individual's messages and causes, even while First Amendment protected, may

still generate park visitor responses that may pose a public safety issue and require

appropriate Park Service management and protection under its regulatory system. Indeed,

consistent with the First Amendment and NPS regulations, there are designated areas of the

park units where people under permit may freely express their views and distribute their

printed matter. These Park Service regulations allow us to fairly balance demonstrations and

leafleting activities with park visitor and resource protection.

74. The following are just two examples where, consistent with the First Amendment

and Park Service regulations, the National Park Service was able to safely and effectively

work with demonstration organizers and issue permits for their activities. But this occurred only because our regulations had a permit requirement, and provided objective and content-neutral standards, by which we could safely facilitate the demonstrations under a permit for a designated park area, while protecting park visitors and resources.

75. As one example, the neo-Nazi white supremacist group National Socialist Movement demonstrated under permit at a designated location in Colonial National Historical Park, Virginia on June 5, 2005, while two organizations called Congregation Zion's Sake and Center for Education Rights counter-demonstrated under permit nearby against them.

76. Because past rallies by the Neo-Nazi white supremacist group had attracted counter-demonstrators as well as violence-prone provocateurs, the Colonial National Historical Park conducted early and extensive public safety preparations as well as discussions with the demonstration organizers. Quickly realizing that Colonial National Historical Park had insufficient numbers of commissioned park rangers to address such demonstrations, the park developed a public safety plan by working with other units of the National Park System, the United States Park Police, and seventeen local police agencies.

77. The demonstrations also required an extensive police presence, public safety fencing to keep the groups apart, security checkpoints using magnetometers, and permit conditions that prohibited items that could be used as weapons. Indeed, consistent with 36 C.F.R. § 1.5, Colonial National Historical Park issued a Record of Determination that closed certain park areas around the demonstration sites as a security buffer, as well as restricted

27

what could be brought into the area. A copy of Colonial National Historical Park's permits for the three demonstrations; its Record of Determination; and a news article entitled "Neo-Nazi Group Rallies at Yorktown" is found as **Attachment K**.

78. As another example, after extensive safety and security planning and a significant on-site law enforcement presence, the World Knights of the Ku Klux Klan demonstrated under permit at a designated location in Antietam National Battlefield, Maryland on June 10, 2006, while counter-demonstrators protested nearby against them. Consistent with 36 C.F.R. § 1.5, Antietam National Battlefield issued a Record of Determination that closed certain park areas around the demonstration sites as a security buffer, as well as restricted what could be brought into the area. A copy of Antietam National Battlefield's permit for the Klan demonstration; the Park's Record of Determination; various news articles entitled "KKK converges on Antietam battlefield," "KKK Stages Rally at Civil War Battlefield" and "Klan members, protesters exchange barbs"; and the Regional Director's response to a complaint about the Park Service plan to allow the demonstration, are found as **Attachment L**.

79. In conclusion, the National Park Service general demonstration and printed matter regulations contain appropriate, narrow, objective, and definite standards to guide Park Service decision makers, and to protect important park resources and values, as well as the safety of park visitors while accommodating First Amendment activities.

28

This declaration is made pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury

that the foregoing is true and correct to the best of my current knowledge

Executed in Washington D.C. on this _29_ day of May 2008.

Dan Wenk

Deputy Director

National Park Service

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael Boardley )<br><br>  Plaintiff, )<br><br>  v. )<br><br> United States Department of )<br> Interior et al., )<br><br>  Defendants. ) | Civil Action No. 01986 (JR) |

## ATTACHMENTS TO DECLARATION OF DAN WENK

Attachments A-L to the Declaration of Dan Wenk will be filed in paper form as a bulky exhibit in accordance with Local Civil Rule 5.4(e)(1).