# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL BOARDLEY,              :
                              :
        Plaintiff,            :
                              :
    v.                        :  Civil Action No. 07-1986 (JR)
                              :
U.S. DEPARTMENT OF THE INTERIOR, :
*et al.*,                      :
                              :
        Defendants.           :

## MEMORANDUM

Michael Boardley is a professing Christian who believes it is his Christian duty and privilege to inform others about the Gospel of Jesus Christ. Compl. ¶ 7. In the summer of 2007, he and a few others traveled to Mount Rushmore National Memorial to distribute free gospel tracts. Id. ¶ 17. On August 9, Boardley handed out tracts near the entrance to the Memorial without incident. Id. ¶¶ 18-19. When he returned to the same location the next day, he was approached by a park ranger, Les Hanson, who told him that he could not distribute printed material without a permit. Id. ¶ 26. Hanson informed him that he could obtain a permit within two days if he requested one from park officials. Id. ¶¶ 29-30.

Boardley returned to his Minnesota home without distributing any more leaflets or requesting a permit. Soon after, though, he called the Mount Rushmore ranger's office to ask for a permit in anticipation of a return trip to the park the next summer. Id. ¶ 31. He encountered some difficulties. He

first spoke with a park official who promised to mail him a permit.  Id. ¶ 34.  When he did not receive one within a few weeks, he called another park official and left a message requesting a permit for a different date.  Id. ¶ 36.  The official called back and referred him to the park's chief ranger, Mike Pflaum.  Id. ¶ 37.  He called Pflaum and requested a permit once more, but in the following weeks, he did not receive a permit, a permit denial, or a permit application.  Id. ¶¶ 39-40.

     Boardley then filed this suit against the United States Department of the Interior, the National Park Service, and five federal officials.  He challenges the validity of 36 C.F.R. § 2.51 and § 2.52 -- two similar regulations that apply to conduct at all national parks.  Both regulations authorize park superintendents to designate the locations within each park that are available for certain activities: "[p]ublic assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views" under section 2.51(a), and "[t]he sale or distribution of printed matter" under section 2.52(a).  To get a permit for these activities, one must fill out a short application that includes one's name, the date, time, duration, nature, and location of the planned activity, and an estimate of the number of participants.  See id. § 2.51(b); id. § 2.52(b).  The park superintendent must issue the applicant a permit "without unreasonable delay" unless: a prior application for a

permit for the same time and location has been made; it reasonably appears that the activity would present a clear and present danger to public health or safety; or the number of persons engaged in the activity, or the length of the activity, could not reasonably be accommodated.  See id. § 2.51(c); id. § 2.52(c).[1]  If the superintendent rejects the permit application, she must inform the applicant in writing, "with the reason(s) for the denial set forth."  Id. § 2.51(d); id. § 2.52(d).

Boardley contends that both regulations are facially invalid under the First Amendment because they are unjustified prior restraints on expression and because they are substantially overbroad, and under the First and Fifth Amendments because they are impermissibly vague.  He also claims that section 2.52 is invalid as-applied under the First Amendment, the Fifth Amendment's Equal Protection Clause, and the Religious Freedom Restoration Act (RFRA).  He moves for partial summary judgment on his facial challenges.

The defendants cross-move for partial summary judgment on Boardley's facial challenges, and move to dismiss the as-

---

[1] Section 2.52(c) also authorizes the superintendent to deny the application if the location applied for was not designated as available, or the activity would constitute a violation of applicable laws or regulations.

applied challenges.  The individual defendants move to dismiss all claims against them on qualified immunity grounds.

## Analysis

### A. As-applied challenges

#### 1. Constitutional claims

Boardley claims that section 2.52 was applied to him twice: in the summer of 2007, when Ranger Hanson told him that he could not distribute printed material without a permit, and again that fall, when park officials did not give him a permit or a permit application despite his repeated requests.  He contends that these actions violated the First Amendment because they "constitute[d] impermissible content- and viewpoint-based restrictions on constitutionally protected expression in public fora," compl. ¶ 73, and that they violated the Fifth Amendment because they "treat[ed] [him] differently than other similarly situated individuals and groups on the basis of the content and viewpoint of his speech," id. ¶ 99.  Each of these claims must be dismissed.

Boardley does not plead sufficient facts about the first application of section 2.52 to support either of his claims.  "While a complaint attacked by a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

- 4 -

labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do.  Factual allegations
must be enough to raise a right to relief above the speculative
level."  <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-65
(2007) (internal citations omitted).  The only alleged fact that
raises the possibility of content-based discrimination is that,
when Boardley's friend, Mark Oehrlein, asked for a permit to
distribute religious material, an unnamed Mount Rushmore official
told him that he "didn't like that."  Compl. ¶¶ 51-52.  That
allegation is taken as true, but it is not enough to sustain
Boardley's claim that Ranger Hansen asked him (and not others) to
get a permit because of the religious content of his leaflets.
Though <u>Twombly</u> "has produced some uncertainty as to exactly what
is required of a plaintiff at the pleading stage," it surely
requires a plaintiff to plead enough facts to "suggest a
'plausible' scenario" for his entitlement to relief.  <u>Tooley v.
Napolitano</u>, 2009 WL 414593, *3 (D.C. Cir. Feb. 20, 2009)
(internal citation omitted).

        The claims arising from the second application of
section 2.52 -- the failure of park officials to respond promptly
to Boardley's permit requests -- are moot because Boardley
received his requested permit months in advance of his scheduled
trip to Mount Rushmore.  In the fall of 2007, Boardley asked
Mount Rushmore officials for a permit that covered certain days

in the summer of 2008.  Shortly after he filed this suit in
November 2007, Boardley got his permit, see Supp. Decl. of Mike
Pflaum, ¶ 4, and, in the summer of 2008, he "handed out printed
material, held religious signs, and conducted open air religious
preaching at Mount Rushmore" without hindrance.  Dkt. 55, at 1.
Boardley lacks standing to bring as-applied claims against
conduct that caused him no injury.  See Lujan v. Defenders of
Wildlife, 504 U.S. 555, 560 (1992).

### 2. RFRA

Boardley's RFRA claim will also be dismissed.  Under
RFRA, the government may not "substantially burden a person's
exercise of religion" unless it demonstrates that the application
of the burden "(1) is in furtherance of a compelling government
interest; and (2) is the least restrictive means of furthering
that compelling government interest."  42 U.S.C. § 2000bb-1.  A
regulation is a substantial burden if it forces a person to
engage in conduct that his religion forbids or prevents him from
engaging in conduct his religion requires.  See Henderson v.
Kennedy, 253 F.3d 12, 16 (D.C. Cir. 2001).  Boardley "hands out
gospel tracts in public areas because of his sincerely held
religious beliefs concerning Christianity," compl. ¶ 8, but he
does not allege that he must distribute his gospel tracts *at the
United States national parks*.  Because the challenged regulations
are, "at most[,] a restriction of one of a multitude of means"

Boardley can use to spread the Gospel, they do not substantially burden his exercise of religion.  <u>Henderson</u>, 252 F.3d at 17; <u>see also</u> <u>Mahoney v. U.S. Marshals Serv.</u>, 454 F. Supp. 2d 21, 38 (D.D.C. 2006) (dismissing RFRA claim because plaintiffs "do not allege that their religion compels them to engage in [religious] speech at the time and place and in the manner at issue here").[2]

## B. Facial challenges

Boardley claims that the regulations are facially invalid because they are overbroad, unjustified prior restraints on expression, and impermissibly vague.  Because Boardley emphasizes his prior restraint claim, and it provides the basis for many of his arguments on the other two claims, I will begin there.

### 1. Prior restraint

The permit requirements found in the challenged regulations are prior restraints because they require individuals to receive authorization from government officials before engaging in certain expression.  <u>See</u> <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 130 (1992).  Although there is a "heavy presumption" against the validity of prior restraints, <u>Bantam Books, Inc. v. Sullivan</u>, 372 U.S. 58, 70

---

[2] The dismissal of Boardley's as-applied claims renders moot the individual defendants' motion for qualified immunity. Because Boardley did not suffer any constitutional or statutory violations, he is not entitled to damages from any of the defendants.

(1963), the government may impose time, place, and manner restrictions on protected speech in a public forum if the restrictions (1) are not based on the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative channels for communication.  See <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 293-94 (1984).  For good measure, when the restrictions take the form of a permitting scheme, they must also be "narrowly drawn, reasonable, and definite," so that the officials enforcing them do not have "limitless discretion." <u>Niemotko v. Maryland</u>, 340 U.S. 268, 271-72 (1951).

Boardley concedes that the regulations are content-neutral.  <u>See</u> dkt. 35, at 13.  He focuses on the narrow tailoring and limited discretion requirements.  Most of his arguments apply equally to both regulations, which cover different forms of expression but are otherwise identical.  But a few of his arguments only relate to section 2.51.  I will address those first.

### a. Section 2.51

Section 2.51(a) requires park visitors to obtain a permit for "[p]ublic assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views." The phrase "other public expressions of views" was probably intended to cover events like those in the list that precede it.

But, on its face, it does not satisfy the narrow tailoring and limited discretion requirements.[3]

A regulation is narrowly tailored "if a substantial portion of the burden it imposes furthers the Government's interest." American Library Ass'n v. Reno, 33 F.3d 78, 88 (D.C. Cir. 1994).  The government claims that sections 2.51 and 2.52 help preserve the scenic beauty and historical value of the national parks, maintain the cleanliness and tranquility of the park grounds, and ensure the safety and security of park visitors.  See dkt. 45, at 14.  Those are worthy aims, but section 2.51(a) restricts far more expression than necessary to achieve them.

Many, if not most, of the visitors to the national parks engage in "public expressions of views" while there.  The visitor who sports the cap of her local baseball team, wears a T-shirt supporting a political candidate, or displays a tattoo of her favorite band, is publicly expressing a view.  As is any visitor who gives his opinion on any issue to a group of any size.  Each of these visitors is required to obtain a permit

_____

[3] When faced with ambiguous statutory or regulatory language, courts may apply the rule of *ejusdem generis*, which "limits general terms which follow specific ones to matters similar to those specified." Gooch v. United States, 297 U.S. 124, 128 (1936).  I will not apply that rule here, however, because I must determine whether the regulation adequately limits officials' discretion, and I cannot conclude that it is sufficiently limiting by assuming that officials will apply the rule of *ejusdem generis* to restrict its scope.

- 9 -

under the plain language of section 2.51(a) even though their conduct does little, if anything, to undermine the government's stated interests.  That is unconstitutional.  <u>See, e.g.</u>, <u>Cmty. for Creative Non-Violence v. Turner</u>, 893 F.2d 1387, 1392 (D.C. Cir. 1990) (holding that a Washington Metropolitan Area Transit Authority regulation requiring a permit for "the organized exercise of rights and privileges which deal with political, religious, or social matters and are non-commercial" on Metro property was unconstitutional because it "significantly restrict[ed] a substantial quantity of speech that d[id] not impede WMATA's permissible goals.").

The breadth of the phrase "public expressions of views" also invites park officials to exercise nearly unfettered discretion.  Because officials obviously cannot reasonably demand a permit from all visitors whose conduct falls under section 2.51(a) (baseball caps, T-shirts, tattoos, etc.) their enforcement of section 2.51 is by definition selective, raising the specter of enforcement based on the content or viewpoint of a visitor's expression.  There is no evidence in the record that such selective enforcement has occurred at Mount Rushmore or elsewhere.  "[T]he success of a facial challenge on the grounds that [a regulation] delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner," however, but

on "whether there is anything in the [regulation] preventing him

from doing so."  Forsyth County, 505 U.S. at 133 n.10.

The National Park Service (NPS) attempted to clarify

the scope of section 2.51(a) after this suit was filed.  In a

memorandum to all regional directors and park superintendents,

the NPS director explained that:

> The terms "public expressions of views" under
> 36 C.F.R. § 2.51 and "demonstrations" under
> 36 C.F.R. § 7.9[6](g) have traditionally been
> used interchangeably to include
> 'demonstrations, picketing, speechmaking,
> marching, holding vigils or religious
> services and all other like forms of conduct
> which involve the communication or expression
> of views or grievances, engaged in by one or
> more persons, the conduct of which has the
> effect, intent or propensity to draw a crowd
> or onlookers.  This term does not include
> casual park use by visitors or tourists which
> does not have an intent or propensity to
> attract a crowd or onlookers.'

Decl. of Dan Wenk, Ex. H.

This interpretation can only be considered during a

facial challenge to section 2.51 if it has been "made explicit by

textual incorporation, binding judicial or administrative

construction, or well-established practice."  City of Lakewood v.

Plain Dealer Pub. Co., 486 U.S. 750, 770 (1988).  Whether this

interpretation meets that standard is an open question.  Even if

it does, the interpretation only creates a new set of problems

for the government.  If anything, its definition of "public

expressions of views" gives officials more discretion than the

regulation itself, because it allows officials to restrict speech based on their determination that a person *intends* to draw a crowd with her conduct.  That determination can easily rest on impermissible grounds, like an official's perception that certain expression is controversial or inappropriate.  The First Amendment does not tolerate that outcome.  <u>See, e.g.</u>, <u>id.</u> at 763-64.

### b. Remaining Challenges

Boardley's remaining challenges to the regulations fall short.  He claims that the regulations give officials unbridled discretion because they permit the denial of a permit application if "[i]t reasonably appears that the event will present a clear and present danger to the public health or safety."  36 C.F.R. §2.51(c)(2); <u>id.</u> § 2.52(c)(2).  Other district courts have found that exact language unconstitutional.  <u>See</u> <u>Naturist Soc'y, Inc. v. Fillyaw</u>, 858 F. Supp. 1559, 1570 (S.D. Fla. 1994); <u>United States v. Rainbow Family</u>, 695 F. Supp. 294, 311 (E.D. Tex. 1988).  The Fifth Circuit, <u>Fernandes v. Limmer</u>, 663 F.2d 619, 631 (5th Cir. 1981), and the Supreme Court, <u>Shuttlesworth v. City of Birmingham</u>, 394 U.S. 147, 149 (1969), have invalidated somewhat broader language.  But the Supreme Court has more recently found that a local ordinance permitting an official to deny a permit application if the proposed activity "would present an unreasonable danger to the health or safety of park users" did

- 12 -

not "leave the decision 'to the whim of the administrator.'"
Thomas v. Chicago Park Dist., 534 U.S. 316, 324 (2002) (quoting
Forsyth County, 505 U.S. at 133).

Boardley argues that the "clear and present danger"
standard invites park officials to restrict speech they think
will be controversial, as the NPS director's "intent" standard
does.  But divining an individual's intent is far more subjective
than predicting whether a proposed activity will be dangerous.
The two determinations also occur at different stages of the
process: the "clear and present danger" standard is used to
assess whether a permit application should be granted, while the
"intent" standard is used to evaluate whether a permit is needed
at all.  The former determination is likely to be more studied --
the superintendent can digest the applicant's description of the
event and analyze its implications -- whereas the latter
determination is likely to be more *ad hoc* -- an official
encountering an ongoing event must make an immediate assessment
of the participants' intent based primarily on her view of the
proceedings.  And while there is no record of why an official
decided that a permit was required in this case, the
superintendent who rejects an application because of the "clear
and present danger" standard must do so in writing, "with the
reason(s) for the denial set forth."  36 C.F.R. § 2.51(d); id.

- 13 -

§ 2.52(d).  Taken together, these factors limit the ability of
the superintendent to restrict speech she disfavors.

Boardley next asserts that the regulations are invalid
because they require park superintendents to respond to permit
applications "without unreasonable delay," rather than within
some limited, specified time period.  Boardley fears that
officials could "pocket veto" speech they do not like by ignoring
applications until the date of the proposed event has passed.

"Administrative interpretation and implementation of a
regulation are, of course, highly relevant" to the analysis of
this claim.  Ward v. Rock Against Racism, 491 U.S. 781, 795
(1989).  The defendants submit that permit applications for
expressive activities must be processed within two days at Mount
Rushmore.  See Third Decl. of Mike Pflaum, ¶ 44 & Ex. E.  That is
but one national park, but in Boardley's survey of eleven parks,
he discovered that each had a self-imposed deadline of between
three and ten days.  See dkt. 50, at 19.  Boardley emphasizes the
lack of uniformity between the parks, but as long as they all
have short and definite deadlines -- which they appear to have --
then officials will be unable to simply ignore applications for
speech they do not like.

Boardley next argues that the regulations are not
narrowly tailored because they apply to individuals and small
groups.  He cites a handful of cases for the proposition that

"[p]ermit schemes . . . that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." America-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 608 (6th Cir. 2005).  That may be the case, but the evidence here justifies the broader scope of these regulations.

These regulations do not cover city streets, see Cox v. City of Charleston, 416 F.3d 281 (4th Cir. 2005), or subway entrances, Turner, 893 F.3d at 1387, or the local public park, Grossman v. City of Portland, 33 F.3d 1200 (9th Cir. 1994); they cover places of immense historical significance (like Martin Luther King, Jr.'s church and the Gettysburg battlefield) and great natural beauty (like Yellowstone Park and the Grand Canyon).  Unlike people walking in the city center or entering the subway, visitors to a national park expect a peaceful and tranquil environment, and the government has a legitimate interest in providing that experience to them.  Even a small demonstration, or a lone pamphleteer, can disrupt that experience, particularly in some of the smaller parks.  See Decl. of Dan Wenk, ¶¶ 71-78.

Indeed, individuals and small groups may actually benefit from these regulations.  Park officials use the information on permit applications to dispatch law enforcement personnel.  See id., ¶ 68.  These personnel keep a watchful eye on the participants in the event, but they also prevent park

visitors from interrupting ongoing events.  See id. ¶ 72.
Without this law enforcement presence, participants -- especially
individuals or smaller groups -- may be drowned out by counter-
demonstrators, or even verbally or physically attacked.  "To
allow unregulated access to all comers could easily reduce rather
than enlarge the park[s'] utility as a forum for speech."
Thomas, 534 U.S. at 322 (quoting Thomas v. Chicago Park Dist.,
227 F.3d 921, 924 (7th Cir. 2000)).

The regulations could be more narrowly tailored; they
could, for example, impose different standards based on the size,
location, or popularity of different parks.  But "[t]he
regulation[s] will not be invalid simply because a court
concludes that the government's interest could be adequately
served by some less-speech-restrictive alternative."  Ward, 491
U.S. at 800.

Finally, Boardley argues that the regulations are not
narrowly tailored because they foreclose two types of expression:
spontaneous expression, because a visitor must wait to receive a
permit, and anonymous expression, because a visitor must include
her name on a permit application.

Spontaneous speech may often be "the most effective
kind of expression," Grossman, 33 F.3d at 1206, but once the
phrase "public expressions of views" is excluded from section
2.51(a), the remaining activities -- "[p]ublic assemblies,

- 16 -

meetings, gatherings, demonstrations, [and] parades" under
section 2.51(a), and "[t]he sale or distribution of printed
matter" under section 2.52(a) -- are unlikely to occur in truly
spontaneous fashion.  While a short waiting period may restrict
the occasional visitor who wishes to engage in a demonstration,
it also provides park officials with an opportunity to plan for
upcoming events.  See Third Decl. of Mike Pflaum, ¶ 55.  On
balance, "a substantial portion of the burden [the regulations]
impose furthers the government's interest."  American Library
Ass'n, 33 F.3d at 88; see also A Quaker Action Group v. Morton,
516 F.2d 717, 735 (D.C. Cir. 1975) (approving requirement that
park visitors apply for a permit 48 hours in advance of a planned
event).

        Just as with spontaneous speech, the regulations
impinge only minimally on anonymous expression.  Only one person
involved in an activity is required to include her name on the
permit application; the other participants can remain anonymous.
The applicant is only required to give her name when she applies
for the permit, not "at the moment of actual speech."  Green v.
City of Raleigh, 523 F.3d 293, 302 (4th Cir. 2008).  And unlike
in Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of
Stratton, 536 U.S. 150, 166 (2002), where the Court invalidated a
permit requirement in part because of its impact on anonymous
speech, there is no evidence in this record that permit

applications are available for public inspection.  Neither the applicant nor her fellow participants face much danger of suffering "retaliation" or "social ostracism" because of these regulations, McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 341-42 (1995), and the limited burden they impose is necessary to ensure that the permitting process works efficiently.[4]

## 2. Overbreadth

Usually, a regulation is only facially invalid if it is unconstitutional in its every application, see United States v. Salerno, 481 U.S. 739, 745 (1987), but in the First Amendment context, "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech, . . . [t]he showing that [a regulation] punishes a 'substantial' amount of protected free speech . . . suffices to invalidate [it]." Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) (internal citation omitted).  Courts have recognized that a

---

[4] On the third and final prong, Boardley argues that the regulations do not "leave open ample alternative channels of communication" because they do not "merely limit expressive activity to a specific part of the regulated area or to a limited time frame." Turner, 893 F.2d at 244.  Despite the broad geographic and temporal scope of the regulations, they are valid because they do not ban park visitors from engaging in certain forms of expression, see Ward, 491 U.S. at 803, and, unlike the regulation invalidated in Turner, they allow park visitors to engage in most common forms of expression without a permit.  See also United States v. Kistner, 68 F.3d 218, 222 (8th Cir. 1995) (finding that section 2.52 leaves open sufficient alternative means of communication); United States v. Sued, 143 F. Supp. 2d 346, 353 (S.D.N.Y. 2001) (finding that both section 2.51 and 2.52 leave open ample alternative channels for communication).

substantial overbreadth claim is similar, if not identical, to a claim that a prior restraint is not narrowly tailored.  See, e.g., Turner, 893 F.2d at 1400 (Williams, J., concurring) (calling the two claims "the same thing in different words"); Alderman v. Philadelphia Hous. Auth., 496 F.2d 164, 173 n.57 (3d Cir. 1974) (noting the "overlap" between the two analyses). Accordingly, Boardley's overbreadth claims will be resolved as his prior restraint claims were.

### 3. Vagueness

A regulation is unconstitutionally vague under the First and Fifth Amendments if "it authorizes or even encourages arbitrary and discriminatory enforcement."  Chicago v. Morales, 527 U.S. 41, 56-57 (1999).  Boardley argues that the phrase "public expressions of views" in section 2.51(a) is vague.  I have already found that the phrase affords officials nearly unfettered discretion, so, for the sake of symmetry, I now find that it is impermissibly vague as well.

### Conclusion

The phrase "public expressions of views" in 36 C.F.R. § 2.51(a) violates the First and Fifth Amendments.  It will be severed from the rest of that section because the resulting regulation is "fully operative as law" and because the Department of the Interior would likely have promulgated the regulation even if it could not have included the invalid phrase.  Buckley v.

<u>Valeo</u>, 424 U.S. 1, 108-09 (1976).  The defendants' motion for partial summary judgment on the remainder of Boardley's facial challenges will be granted, as will their motion to dismiss Boardley's as-applied claims.  The individual defendants' motion to dismiss all claims against them on qualified immunity grounds will be denied as moot.

An appropriate order accompanies this Memorandum.


JAMES ROBERTSON
United States District Judge